UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA     :

v.                           :          Crim. No.: 18-cr-313 (RMB)

JOSEPH GOOCH                 :

                             :

---

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
JOSEPH GOOCH'S MOTION FOR EARLY TERMINATION OF
PROBATION**

---

Stacy Ann Biancamano, Esq.
Biancamano Law, LLC
42A N20th Street
Kenilworth, New Jersey
(908) 858-2161

## I.    INTRODUCTION

On November 9, 2023, Your Honor sentenced Joseph Gooch, a first-time offender at the age of 66, to 4 years probation, a fine of $2,000 and a special assessment of $100 (*see* Judgment in a Criminal Case, attached as **Exhibit A**). Joe had previously pled guilty to an information charging him with a dual object conspiracy to receive and accept a gratuity, contrary to 18 U.S.C. Section 201(c) and with making false claims against the United States knowing such claims to be false, fictitious or fraudulent, contrary to 18 U.S.C. Section 287 and in violation of 18 U.S.C. Section 371 pursuant to his February 20, 2018, plea agreement with the United States Government. Since that time, Joe has been under supervision of the United States Probation Department, New Jersey, and has successfully completed 24 months of probation to date. He has fully satisfied the obligations imposed by Your Honor and has shown himself to be an exemplary probationer, on the lowest level of supervision and the least restrictive obligations. His Probation Officer, Juliana Adeola, has advised she will review the motion upon recepit.  After completing 2 years of probation, and paying his $2000 fine and $100 special assessment, Joe, now 68 years old, respectfully brings this motion pursuant to 18 U.S.C. Section 3564(c) to terminate his probation before the completion of his 4 year term.

### A. Consideration of Mr. Gooch's circumstances in light of the statutory framework compels early termination of his probation.

Since his sentencing on November 23, 2023, Joe has shown a sincere and consistent commitment to leading a law-abiding and productive life.  He has fully complied with all conditions of his probation, devoted meaningful time and care to his family, and has actively worked to maintain his health which has significantly deteriorated since his sentence. At 68 years old, Joe faces a range of health challenges as detailed more fully below. He has not only fully complied with probation, but has also made financial amends and has shown full cooperation throughout the entire process. Given his 5½ years on pretrial supervision from the date of his arrest to his date of sentencing (May 28, 2018 to November 23, 2023) with 100% compliance, plus his exemplary conduct during his 24 months on probation and his current

circumstances, there are strong reasons to conclude that Joe is no longer a man in need of supervision, and that terminating his probation early would meaningfully benefit both his family and health.

Title 18 U.S.C. Section 3564(c) allows a court to release a person from probation upon the successful conclusion of one year based upon the conduct of the defendant and in the interest of justice. Title 18 U.S.C. Section 3564(c) states that a court may terminate a term of probation and discharge the defendant at any time after the expiration of one year of probation, after considering the factors set forth in 18 U.S.C. Section 3553(a) and pursuant to the provisions of the Federal Rules of Criminal Procedure relating to the modifications of probation, if it is satisfied that such action is warranted by the conduct of the defendant released and the interest of justice. 18 U.S.C. Section 3564(c). This standard is similar to the standard for early termination of supervised release. (*Compare* 18 U.S.C. Section 3564(c) *with* 18 U.S.C. Section 3584(e)(1)); *see also, United States v. Tolley,* No. 3:21-CR-194, 2025 WL 83745, at *1 (M.D. Pa. Jan. 13, 2025)(applying guidance applied by the Third Circuit when addressing motions for early termination of supervised release pursuant to 18 U.S.C. Section 3584(e)(1) to early termination of probation pursuant to 18 U.S.C. Section 3564(c) and noting that the Third Circuit Court of Appeals has not addressed the proper application of Section 3564(c) in determining whether a request for early termination of probation should be granted)).

Courts enjoy discretion when determining whether to grant early termination. (*See, United States v. Wilson,* 707 F.3d. 412, 416 (3d Cir. 2013)(noting that the District Court's discretion whether to modify the terms of supervision is "broad")). Indeed, the opening language of Section 3564(c) – "[t]he court, after considering the factors set forth in section 3553(a) to the extent they are applicable," – specifically directs courts to review the individualized factors common to federal sentencing determinations. (*See, Tolley* at *2). District courts are not required to make specific findings of fact with respect to each of the 3553(a) factors, rather "a statement that [the district court] has considered the statutory factors is sufficient." (*See, Melvin* at 53 (citing *United States v. Gammarano,* 321 F.3d 311, 315-16 (2d Cir. 2003)).

The Third Circuit held the "expansive phrases 'conduct of the defendant' and 'interest of justice' make clear that a district court enjoys discretion to consider a wide range of circumstances." (*See, United*

2

*States v. Melvin*, 978 F.3d 49, 53 (3d. Cir. 2020) (citing *United States v. Emmett*, 749 F.3d 817, 819 (9th Cir. 2014)). Additionally, nothing in Section 3564(c), its analog Section 3853(e)(1), or Section 3553(a) requires a defendant to show changed circumstance, exceptional behavior or undue hardship. Indeed, in *Melvin*, the Third Circuit specifically held "that a district court need not find that an exceptional, extraordinary, new, or unforeseen circumstance warrants early termination of a term of supervised release" thereby clarifying a misapprehension by district courts of non-precedential decisions of the Court. (*See, Melvin* at 53 (vacating District Court's order "because of its reliance on our non-precedential decisions in *Laine* and *Davies* for the proposition that early termination 'is warranted '*only when* the sentencing judge is satisfied that something exceptional or extraordinary warrants it,' or 'upon a showing of 'new or unforeseen circumstances[.]'"").

Furthermore, the Judicial Conference Committee on Criminal Law encourages courts to exercise their early termination discretion in cases where the offender presents no safety risk and whose good conduct demonstrates that s/he no longer needs supervision. "[E]arly termination is a practice that holds a great deal of promise as a positive incentive for persons under supervision and as a measure to contain costs in the judiciary without compromising the mission of public safety." (*See*, Cohen, Thomas H., Early Termination: Shortening Federal Supervision Terms Without Endangering Public Safety (January 15, 2025) page 3. Available at SSRN: https://ssrn.com/abstract=5098803 and attached as **Exhibit B**, *citing*, "Early Termination: Shortening Federal Supervision Terms Without Endangering Public Safety," Laura M. Baber & James L. Johnson, "Early Termination: No Compromise to Community Safety", Federal Probation, Vol. 77, No. 2, at 1, September 2013, attached as **Exhibit C**)

On November 1, 2025, the United States Sentencing Commission (the "Commission") amended the United States Sentencing Guideline Manual to specifically address the importance of judges making individualized decisions about supervised release at all relevant stages, including modification and early termination. (*see* "Amendments to the Sentencing Guidelines," the United States Sentencing Commission, dated April 30, 2025 (effective date November 1, 2025) attached as **Exhibit D**, pg.31) These amendments were implemented after extensive consideration of supervised released through a November 24, 2024

3

roundtable that was attended by judges, retired federal probation officers, providers of reentry services, academics, federal probation, government and defense community representatives, and a reentry program graduates, that included extensive public comment and testimony from members of Congress, the Committee on Criminal Law of the Judicial Conference of the United States, the Department of Justice, the Federal Public and Community Defenders, the Commission's advisory groups, law professors, currently and formerly incarcerated individuals, and other criminal justice system stakeholders (*Id.*). The November 1, 2025 Guideline amendments underscore the authority of courts, in consultation with probation officers, to reassess supervised release decisions, including decisions about the length and conditions of supervision (*Id.*). Specifically, newly adopted Section 5D1.4(b), restates the court's authority to terminate remaining terms of supervised release any time after one year of supervised release if the court determines, following consultation with the government and the probation officer, that the termination is warranted by the conduct of the defendant and in the interest of justice. Application Note 1B to this Section specifies factors a court might consider in determining whether to terminate the remaining term of supervised release, including:

> (i) any history of court-reported violations over the term of supervision; (ii) the ability of the defendant to lawfully self-manage (e.g., the ability to problem-solve and avoid situations that may result in a violation of a condition of supervised release or new criminal charges); (iii) the defendant's substantial compliance with all conditions of supervision; (iv) the defendant's engagement in appropriate prosocial activities and the existence or lack of prosocial support to remain lawful beyond the period of supervision; (v) a demonstrated reduction in risk level or maintenance of the lowest category of risk over the period of supervision; and (vi) whether termination will jeopardize public safety, as evidenced by the nature of the defendant's offense, the defendant's criminal history, the defendant's record while incarcerated, the defendant's efforts to reintegrate into the community and avoid recidivism, any statements or information provided by the victims of the offense, and other factors the court finds relevant (*Id.* at 56).

We respectfully submit to Your Honor that a consideration of the 18 U.S.C. 3553(a) factors as well as the newly enumerated considerations set forth in Application Note 1B to U.S.S.G. Section 5D1.4(b) supports early termination of probation for Joe in the instant offense pursuant to 18 U.S.C. 3564(c).

1. **18 U.S.C. 3553(a) Health Related Considerations and U.S.S.G. Section 5D1.4(b) Conduct of Defendant and Interests of Justice as Applied to Joe Gooch**

18 U.S.C. 3553(a)(1) specifically provides for the Court's consideration of the nature and circumstances of the offense and the history and characteristics of the defendant when assessing whether to release a defendant from probation pursuant to 18 U.S.C. Section 3564(c).

Since his sentencing, Joe's quiet life with his family has been dominated by his significantly increasing health issues. His sister Mary Beth Gooch has moved in with him to assist with his daily medical needs. Joe is a long-term sufferer of rheumatoid arthritis, an autoimmune disease, which is only partially controlled (*see* letter from Dr. Widman dated September 9, 2025 attached as **Exhibit E**). His condition requires ever increasing oversight and care. Sadly, it also has resulted in significant compounding medical issues. Joe has undergone numerous back surgeries, the latest one having been performed in January of this year. With four sets of rods and 16 screws in his spine, Joe manages significant chronic pain as well as limited mobility. His autoimmune issues have also caused multiple lung infections. Earlier this year he was hospitalized to treat his most recent lung infection with a higher dose antibiotic which, unfortunately, caused the weakening of his tendons. As a result, he suffered two ruptured achilles tendons that required him to wear CAM boots for three months. Unfortunately, the treatment of his achilles through CAM boots led to significant muscle atrophy which has required, and continues to require, an extensive therapy regime over several months. More recently, Joe was diagnosed with a skin condition, also a result of his auto-immune disease. He has been placed on a bio drug and injects himself every two weeks. Sadly, the doctors also found a growth in Joe's mouth and he is awaiting the biopsy results. Joe has watched many of his friends with whom he served in the United States Marine Corps succumb to cancer and is worried that his numerous health issues might be harbingers of a similar fate (*see* letter from Joe' s sister, Mary Beth Gooch, dated October 29, 2025 attached as **Exhibit F**).

Joe is truly remorseful for his offense and knows that his actions have affected numerous people. He accepted responsibility for his actions, cooperated with the government, and made amends to any victims of the offense. While on probation, Joe has shown no intent other than to resume a quiet, normal, law-abiding life. He has successfully completed his period of 8 months home detention and has also dedicated over 300 hours to community service despite his significant health issues (*see* **Exhibit F**). His

lack of new arrests or convictions attests to that desire as does his status as a probationer on the lowest level of supervision with the least restrictive obligations. Joe has used the time since the offense to forge a meaningful life, and the granting of this motion would represent a clean break from his past.

Indeed, since being placed on probation 24 months ago, Joe has demonstrated through his conduct that he meets each of the considerations newly enumerated by the United States Sentencing Commission in U.S.S.G. Section 5D1.4(b) and its application notes. Specifically, Joe has had no history of court-reported violations over his term of supervision, has lawfully self-managed, has not only substantially - but faultlessly - complied with all conditions of his supervision, has engaged in appropriate prosocial activities, has the support of a prosocial support team, and has demonstrated a reduction in his risk level to the lowest risk category over his period of supervision. Finally, Joe has demonstrated efforts to reintegrate into his community and to avoid recidivism.

In addition to his personal commitment to leading a law abiding life, Joe's advanced age, his significant health concerns and his low criminal history, with the instant offense representing his sole and deeply regretted offense, have been shown to be closely correlated with lower rates of recidivism. (*See* Rhodes et al., "Recidivism of Offenders on Federal Community Supervision," prepared by Abt Associates for Bureau of Justice Statistics and Office of Probation and Pretrial Services, December 21, 2012, attached as **Exhibit G**; *see also* Kim Steven Hunt, Ph.D & Robert Dumville, "Recidivism Among Federal Offenders: A Comprehensive Overview," United States Sentencing Commission, March 2016, attached as **Exhibit H** at 5)

Since his sentencing, Joe has been committed to reassessing his life's priorities and making better decisions for himself and his family. He has taken full advantage of the second chance he has been given to spend time with his family in the final years of his life. Indeed, by accepting responsibility for his actions, cooperating with the government, and making amends to the victims of his offense, Joe has done what he can to atone for his illegal conduct, and to show that he is a changed man. Early termination of his probation would allow Joe to make a clean break with the past and to move forward with his life. All the goals and purposes that serve public needs (punishment, protection, and general deterrence) have been served. As for

the ways in which punishment by the criminal justice system is meant to impact Joe (specific deterrence and rehabilitation), those goals have been met as well. As for the need to avoid unwarranted disparities, a court's determination that early termination is warranted in light of the statutory factors inherently implies a determination that disparity, in the form of a shortened term of probation, is warranted. Indeed, this individualized approach to considering early termination of supervision has been expressly adopted by the Sentencing Commission's November 1, 2025 amendments to the Sentencing Guidelines. (*see* **Exhibit D**, pg 34, regarding the intent of the Commission to provide that "Courts are encouraged to consider modifying the terms and conditions of supervised release whenever changed individual circumstances so warrant.") Additionally, terminating Joe's probation would serve the interests of justice by allowing the U.S. Probation Officer to invest its resources in the supervision of those who really need it, instead of someone who has proven himself beyond the need for supervision. Therefore, the defendant respectfully requests that this Court grant his request for early termination of probation.

Undersigned counsel contacted both Economic Crime Unit Chief Carolyn Silane and U.S. Probation Officer Juliana Adeola regarding this motion. The Government has indicated that they have no object to this motion. Probation confirmed that Joe, who is on the lowest form of supervision with the least restrictions, will review the motion upon receipt and make her recommendation to the Court.

Joe has demonstrated his commitment to living a law abiding productive life and has been fully compliant with all of the terms of his probation. At this late stage of his life, he asks the Court to allow him to move forward without the burden of probation so that he may fully focus on his health, his loved ones and the positive path he has worked diligently to establish.

## CONCLUSION

For the foregoing reasons, Joseph Gooch respectfully requests the early termination of his probation pursuant to 18 U.S.C. Section 3564(c).

Respectfully submitted,

Stacy Ann Biancamano
Biancamano Law, LLC

cc:     Carolyn Silane, Economics Crime Unit Chief
        Juliana Adeola, US Probation Officer
        Joseph Gooch

# EXHIBIT A

AO 245B (Mod. D/NJ 12/08) Sheet 1 - Judgment in a Criminal Case

# UNITED STATES DISTRICT COURT
## District of New Jersey

UNITED STATES OF AMERICA

    v.                              **CASE NUMBER   1:18-CR-00313-RMB-1**

JOSEPH GOOCH

    Defendant.

### JUDGMENT IN A CRIMINAL CASE
**(For Offenses Committed On or After November 1, 1987)**

The defendant, JOSEPH GOOCH, was represented by STACY A. BIANCAMANO, ESQUIRE.

The defendant pleaded guilty to a One-Count of the INFORMATION on 5/29/2018. Accordingly, the court has adjudicated that the defendant is guilty of the following offense(s):

| Title & Section | Nature of Offense | Date of Offense | Count Number(s) |
|---|---|---|---|
| 18 U.S.C. § 371 [18 U.S.C. §§ 201(c) and 287] | Conspiracy to Defraud the Unites States | from January 2006 through December 2017 | 1 |

As pronounced on November 09, 2023, the defendant is sentenced as provided in pages 2 through 5 of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

It is ordered that the defendant must pay to the United States a special assessment of $100.00 for Count One, which shall be due immediately.  Said special assessment shall be made payable to the Clerk, U.S. District Court.

It is further ordered that the defendant must notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant must notify the court and United States attorney of any material change in economic circumstances.

Signed this <u>13th</u> day of November, 2023.

Renée Marie Bumb
Chief U.S. District Judge

08080-
2000

Case 1:18-cr-00313-RMB    Document 28    Filed 11/13/23    Page 2 of 5 PageID: 233

AO 245B (Mod. D/NJ 12/06) Sheet 4 - Probation

Judgment - Page 2 of 5

Defendant: JOSEPH GOOCH
Case Number: 1:18-CR-00313-RMB-1

## PROBATION

You are hereby sentenced to probation for a term of 4 years.

While on probation, you must not commit another federal, state, or local crime, must refrain from any unlawful use of a controlled substance and must comply with the standard conditions that have been adopted by this court as set forth below.

Based on information presented, you are excused from the mandatory drug testing provision, however, you may be requested to submit to drug testing during the period of supervision if the probation officer determines a risk of substance abuse.

You must cooperate in the collection of DNA as directed by the probation officer.

If this judgment imposed restitution, you must make restitution in accordance with 18 U.S.C. §§ 2248, 2259, 2264, 2327, 3663, 3663A, and 3664. You must pay the assessment imposed in accordance with 18 U.S.C. §3013. If this judgment imposed a fine, you must pay in accordance with the Schedule of Payment sheet of this judgment. You must notify the court of any material change in your economic circumstances that might affect your ability to pay restitution, fines, or special assessments.

You must comply with the following special conditions:

LOCATION MONITORING PROGRAM

You must submit to home detention for a period of 8 months and comply with the Location Monitoring Program requirements as directed by the U.S. Probation Office. You will be restricted to your residence at all times except for employment, education, religious services, medical, substance abuse and mental health treatment, court-ordered obligations, and any other such times specifically authorized by the U.S. Probation Office. The location monitoring technology is at the discretion of the U.S. Probation Office. The cost of the monitoring is waived.

COMMUNITY SERVICE (300 hours over 4 years)

You must contribute 300 hours of community service work over a period of 4 years or less, from the date supervision commences. Such service will be without compensation, with the specific work placement to be approved by the U.S. Probation Office.

FINANCIAL DISCLOSURE

Upon request, you must provide the U.S. Probation Office with full disclosure of your financial records, including co-mingled income, expenses, assets and liabilities, to include yearly income tax returns. With the exception of the financial accounts reported and noted within the presentence report, you are prohibited from maintaining and/or opening any additional individual and/or joint checking, savings, or other financial accounts, for either personal or business purposes, without the knowledge and approval of the U.S. Probation Office. You must cooperate with the U.S. Probation Officer in the investigation of your financial dealings and must provide truthful monthly statements of your income. You must cooperate in the signing of any authorization to release information forms permitting the U.S. Probation Office access to your financial records.

NEW DEBT RESTRICTIONS

You are prohibited from incurring any new credit charges, opening additional lines of credit, or incurring any new monetary loan, obligation, or debt, by whatever name known, without the approval of the U.S. Probation Office. You must not encumber or liquidate interest in any assets unless it is in direct service of the fine and/or restitution obligation or otherwise has the expressed approval of the Court.

AO 245B (Mod. D/NJ 12/06) Sheet 4 - Probation

Judgment - Page 3 of 5

Defendant: JOSEPH GOOCH
Case Number: 1:18-CR-00313-RMB-1

## STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1) You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.

2) After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.

3) You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.

4) You must answer truthfully the questions asked by your probation officer.

5) You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.

6) You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.

7) You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have fulltime employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.

8) You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.

9) If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.

10) You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e.. anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).

11) You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.

12) If the probation officer determines that you pose a risk to another person (including an organization), the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk.

AO 245B (Mod. D/NJ 12/06) Sheet 4 - Probation

Judgment - Page 4 of 5

Defendant: JOSEPH GOOCH
Case Number: 1:18-CR-00313-RMB-1

## STANDARD CONDITIONS OF SUPERVISION

13) You must follow the instructions of the probation officer related to the conditions of supervision.

┌─────────────── *For Official Use Only - - - U.S. Probation Office* ───────────────┐

   Upon a finding of a violation of probation or supervised release, I understand that the Court may (1) revoke supervision or (2) extend the term of supervision and/or modify the conditions of supervision.

   These conditions have been read to me. I fully understand the conditions, and have been provided a copy of them.

   You shall carry out all rules, in addition to the above, as prescribed by the Chief U.S. Probation Officer, or any of his associate Probation Officers.

        (Signed)_____    _____
                        Defendant                                Date


                _____    _____
                U.S. Probation Officer/Designated Witness          Date
└──────────────────────────────────────────────────────────────────────────────┘

AO 245B (Mod. D/NJ 12/06) Sheet 5 - Fine

Judgment - Page 5 of 5

Defendant: JOSEPH GOOCH
Case Number: 1:18-CR-00313-RMB-1

### FINE

The defendant shall pay a fine of $2,000.00.

This fine, plus any interest pursuant to 18 U.S.C. § 3612(f)(1), is due immediately and shall be paid in monthly installments of no less than $100.00, to commence 30 days after the date of this judgment.

If the fine is not paid, the court may sentence the defendant to any sentence which might have been originally imposed. See 18 U.S.C. § 3614.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

# EXHIBIT B

**Early Termination: Shortening Federal Supervision Terms Without Endangering Public Safety[1]**

*Thomas H. Cohen*

*Branch Chief – Data Unit*

*Probation and Pretrial Services Office*

*Administrative Office of the U.S. Courts*

---

[1] The author would like to thank Aaron Wonneman, Christopher Lowenkamp, James Johnson, Nina Chipman, Scott VanBenschoten, and Vanessa Starr for their helpful suggestions and comments. Special thanks to Ellen Fielding for her careful editorial review. Direct correspondence to Thomas H. Cohen, Administrative Office of the U.S. Courts – Probation and Pretrial Services Office, One Columbus Circle, NE, Washington, DC 20544 (e-mail: thomas_cohen@ao.uscourts.gov).

## Abstract

In the U.S. federal system, courts have the discretion to grant early termination of supervision for people on federal probation or supervised release under certain circumstances. This study sought to provide a profile of who was most likely to receive early terminations by examining 296,023 people whose supervision terms were successfully closed via early or regular termination during the 10 years encompassing fiscal years 2014 through 2023. Several research issues were explored, including the extent to which a supervisee's risk profile correlated with the use of early termination and an examination of whether early terminations endangered community safety. Overall, research showed that this closure type had moderate correlations with a supervisee's risk profile; however, other factors—including supervision time imposed and, most importantly, district of case closure—had the greatest bearing on whether a case would end by early termination. Moreover, using a process in which early and regular termed supervisees were matched on a variety of criteria associated with the risk of recidivism, the study found that early terminations did not threaten community safety.

**Early Termination: Shortening Federal Supervision Terms Without Endangering Public Safety**

**IN THE FEDERAL** supervision system, courts have the discretion to grant early termination of supervision for persons on federal probation or terms of supervised release (i.e., TSR) under certain circumstances.[2] Specifically, 18 U.S.C. §§ 3564(c) and 3583(e)(1) allow the court to terminate terms of probation in misdemeanor cases at any time and terms of supervised release or probation in felony cases after the expiration of one year of supervision if the court is satisfied that such action is warranted by the supervisee's conduct and is in the interest of justice. In 2003 and 2005, the Judicial Conference promulgated policies that sought to increase the use of early termination to reduce officer workload burden and allow evidence to guide judicial decisions (Baber & Johnson, 2013). Specifically, in 2003, the Judicial Conference approved policies that encouraged officers to seek early termination whenever statutory eligibility was reached for those supervisees who have satisfied their conditions of supervision, have successfully reintegrated into the community, and did not pose a foreseeable risk to public safety generally or to any individual third party (Baber & Johnson, 2013).

In 2005, the Judicial Conference further revisited the early termination policy by allowing supervisees with outstanding balances on fines and restitutions to be considered for early termination as long as they were otherwise suitable and in compliance with their payment schedule (Baber & Johnson, 2013). The Judicial Conference in 2005 further revised the early termination policy by recommending provisions modeled after the U.S. Parole Commission

---

[2] Supervised release refers to persons sentenced to a term of community supervision following a period of imprisonment within the Federal Bureau of Prisons (18 U.S.C. §3583). Probation refers to a period of supervision without any imposed incarceration sentence (18 U.S.C. §3561).

regulations. Of particular importance, the Judicial Conference created a presumption in favor of early termination for non-career and non-violent supervisees who 1) have been under supervision for at least 18 months, present no identified risk to the public or victims, and are free from any moderate- or high-severity violations; or 2) have been under supervision for at least 42 months and are free from any moderate- or high-severity violations (Baber & Johnson, 2013).

These policies remain in effect today; as such, early termination is a practice that holds a great deal of promise as a positive incentive for persons under supervision and as a measure to contain costs in the judiciary without compromising the mission of public safety. While early terminations afford an opportunity both to contain costs and to move persons who present a low risk of re-offending off federal supervision, relatively little is known about how early terminations are implemented in the federal system and whether their application endangers community safety. The one study done on this topic is over ten years old and employed a relatively small number of matched cases ($n = 2,872$) to examine the degree to which curtailing a person's supervision term represented threats to public safety (Baber & Johnson, 2013).

The current study seeks to provide a fuller picture of the application of early terminations in the federal system by using a larger and newer dataset and more sophisticated statistical techniques. Specifically, the extant research will focus on examining the application of early termination in the federal system by exploring who receives this form of case closure and how key criteria, including a supervisee's risk characteristics, most serious conviction offense, demographics, supervision time imposed, and district of case supervision might be associated with early termination. Then, the study will assess whether early termination endangers community safety by using matched samples of persons receiving early and full termination. Before delving into the study, a brief overview of early termination literature is provided.

**Literature on Early Termination**

The concept of early termination is based on the framework of goals-based supervision (Robina Institute of Criminal Law and Justice, 2020). Under the goals-based supervision framework, success is defined by a supervisee's completion of specific requirements or programs rather than completion of an imposed supervision term that can last several years (Pew Charitable Trusts, 2020). There are a variety of terminologies that fall under the goals-based supervision rubric, including "early termination, earned discharge, earned compliance, and earned time credit." (Petersilia, 2007; Robina Institute of Criminal Law and Justice, 2020: 1). The basic way these programs work is that the probation officer sets expectations that the supervisee will complete all program requirements and remain in compliance with all supervision conditions and that, should these expectations be met, the supervisee will be rewarded through the reduction of the probation/parole term (Jacobson et al., 2017; Pew Charitable Trusts, 2020; Robina Institute of Criminal Law and Justice, 2020; Smith et al., 2012). States that employ early termination programs do so through a variety of methods; in some states, a formula is used to shorten supervision terms, while other states allow reductions when a supervisee meets certain goals (e.g., successful program completion, payment of fines, fees, or restitution costs, etc.) (Pew Charitable Trusts, 2020; Robina Institute of Criminal Law and Justice, 2020). In most states where early termination is permitted, the discretion to grant an early discharge resides with judicial officials (Pew Charitable Trusts, 2020).

*State-Level Studies of Early Termination Programs*

Relatively few efforts to empirically evaluate early termination programs have occurred at the state level, and most have demonstrated that shortening supervision terms did not endanger community safety (Courtney et al., 2022; Jacobson et al., 2017; Pew Charitable Trusts, 2016).

One notable study examined earned compliance in Missouri using an approach that compared the recidivism rates of supervisees who received early termination with a matched sample of supervisees discharged in that state prior to the policy's implementation. Results showed no statistically significant differences in the recidivism rates between the early termed and comparison group; the policy reduced the supervision population by 18 percent (Pew Charitable Trusts, 2016). Another study conducted in New York City found that the aggressive implementation of early discharge policies generated an increase in the percentage of supervisees receiving this form of case closure from 3 percent to 17 percent; correspondingly, the early-term cohort manifested rearrest rates that were lower than a similarly situated group serving their full supervision terms (Jacobson et al., 2017: New York City Department of Probation, 2013). Another study, which examined the feasibility of reducing supervision terms in Oregon and South Carolina, found that more than 90 percent of probationers could have spent less time on supervision without compromising community safety; in addition, had these supervisees served the shortest supervision terms needed to minimize reoffending, the two states' average daily supervision populations could have been reduced by 32 percent or more (Pew Charitable Trusts, 2020). Last, some studies focused on implementation challenges have found that early termination programs can sometimes be obstructed either by local criminal justice actors or by requirements that all financial conditions be satisfied before early termination is granted (Courtney et al., 2022; Griffin et al., 2013; Minnesota Department of Corrections, 2017; Smith et al., 2012).

*Federal-Level Studies of Early Termination Programs*

At the federal level, a study on early termination was conducted by Baber and Johnson in 2013. This study encompassed an examination of 2,872 supervisees whose cases were either early or

fully termed in 2008, and these individuals were matched on a variety of criteria associated with the risk of recidivism, including risk prediction index score, criminal history category, gender, age, and district of case supervision. In general, the study found that persons serving their entire supervision term were nearly two times more likely to receive an arrest for new crimes after supervision compared to the early-termed cohort (19.2 percent vs. 10.2 percent, respectively). Moreover, the study showed that early-termed supervisees remained crime free for slightly longer periods than their full-termed counterparts (Baber & Johnson, 2013). Last, the study calculated that substantial savings could be realized through the application of early termination (Baber & Johnson, 2013).

While the Baber and Johnson (2013) study provided an important contribution to the understanding of early termination in the federal system, several key questions about this topic remain unanswered. Specifically, issues involving a profile of who receives early termination and how the application of early termination might vary by criteria associated with risk, conviction offenses, demographics, supervision time imposed, and the district of case supervision need addressing. Last, statistical techniques that allow for matching approaches encompassing a larger group of covariates than Baber and Johnson (2013) used are required to ascertain the extent to which early termination does or does not endanger community safety.

**Present Study**

The current study seeks to enhance the work begun by Baber and Johnson (2013) by exploring how early termination is being applied in the federal supervision system and examining whether the use of early termination could potentially endanger community safety. The initial part of this research is mostly descriptive and focuses on the ways that early termination is being applied for

persons on federal community supervision (hereafter federal supervisees). The following issues form the main components of this research:

1. What percentage of federal supervisees with successful case closures (i.e., closed without a revocation or violation) receive an early termination, and has the early termination rate varied over time?

2. What is the profile of federal supervisees receiving early termination? To what extent does the granting of early termination vary by a supervisee's risk characteristics as measured by the federal Post Conviction Risk Assessment (PCRA), most serious conviction offense, demographic characteristics (e.g., race/ethnicity, age, and gender), and supervision time imposed?

3. How much influence does the district of supervision have on the likelihood of early termination? Are supervisees in some districts more likely to receive an early termination than those in other districts?

4. How many months of supervision time are saved through the early termination process, and do the time savings vary by a supervisee's risk profile, most serious conviction offenses, or supervision time imposed?

The second part of this research delves into whether supervisees who receive early termination are more, less, or equally likely to recidivate compared to their counterparts whose supervision terms ended through an expiration of their term. Using a matching approach (see methods) in which early- and full-termed supervisees are matched on a variety of criteria associated with the risk of recidivism, the following questions form this analysis:

1. Are persons who receive an early termination more or less likely to recidivate for any or violent offenses after completion of their supervision terms compared to a matched group of persons receiving full termination?

2. When rearrested, are early and full-term supervisees rearrested for similar offenses?

**Method**

*Sample*

In order to address these questions, data were extracted from an administrative dataset maintained by the Administrative Office of the U.S. Courts (AO) that included 296,023 persons whose supervision terms were successfully closed in the 94 federal district courts during the ten-year period encompassing fiscal years 2014 through 2023. A successful closure means that the person either served the full term of supervision without any major violations resulting in a revocation (i.e., regular termination) or received an early termination of the supervision sentence (i.e., early termination). It should be noted that supervisees whose cases were closed unsuccessfully by revocation, violations, transfers, or other means were omitted from this study ($n$ lost = 132,511).[3] Supervisees with unsuccessful terminations, particularly revocations, were excluded from this study because these persons are by definition ineligible for early termination. Moreover, early terminations based on compassionate grounds, which comprised less than 1 percent of all successful closures, were also removed from this analysis ($n$ lost = 1,962). Last, persons placed on federal post-conviction supervision with successful case closures who were not U.S. citizens ($n$ lost = 18,230) or for whom rap sheet data were unavailable ($n$ lost = 9,051), were also removed from the study sample.

---

[3] About 85 percent of the unsuccessful closures involved a revocation from federal supervision.

Table 1 provides a descriptive overview of the supervisees in the study sample. Among the population examined, 11 percent were rearrested for any offenses and 3 percent were rearrested for violent offenses within 24 months after their case closure date. About 37 percent of the study population comprised non-Hispanic White individuals, while Blacks accounted for similar portions of supervisees (36 percent). Hispanic individuals of any race comprised 23 percent of the study sample. Males accounted for 79 percent of the study population, and the average supervisee age was about 44 years (SD = 12.1). The offense conviction types that accounted for the largest portion of supervisees involved drug (45 percent), property/white collar (22 percent), and weapons/firearms offenses (13 percent); together these three offense types comprised 80 percent of the study sample. In regard to the PCRA risk distribution, which places supervisees into one of four risk categories (low, low/moderate, moderate, or high) (see Lowenkamp et al., 2015), similar percentages of supervisees were classified as either PCRA lows (43 percent) or low/moderates (43 percent) at their final assessments, while the remainder were PCRA moderates (11 percent) or PCRA highs (2 percent). Table 1 also provides details on the percentage of supervisees testing positive for illicit substances during their supervision terms and the average number of supervision months imposed on the study population.

---

Insert table 1 here

---

*Measures*

**Early termination**

Early termination refers to instances where the court approves a request to shorten an individual's supervision term. Although the request is typically initiated by the probation officer, it can also come from the federal defender. Though the general contours for early termination are

provided by federal statute, the Judicial Conference in the early- to mid-2000s attempted to create a presumption in favor of early termination for supervisees meeting specified criteria (see Baber & Johnson, 2013). Among the 296,023 federal supervisees with successful case closures between fiscal years 2014 and 2023, 25 percent received an early termination (see Table 1).

Over time, the percentage of federal supervisees early termed has generally increased. Using administrative data that include all supervisees with successful case closures between fiscal years 2000 through 2023 (see Figure 1), the percentage of supervisees with early-term case closures increased from about 12 – 13 percent prior to the Judicial Conference changes (i.e., fiscal years 2000 through 2002) to 21 percent at the time when the Judicial Conference promulgated new policies about early termination (i.e., fiscal year 2005). During the 2005 to 2009 timespan, the percentage of supervisees placed on early termination declined from 21 percent to 18 percent; however, since then there has been a steady increase in the early termination rate, so that one year prior to the COVID-19 pandemic in 2019, 25 percent of supervisees had an early termination case closure. The early termination rate peaked at 28 percent during the COVID-19 pandemic year of 2020, declined slightly in 2021, and then increased back to 28 percent in 2023.

---

Insert Figure 1 here

---

### *PCRA and Other Independent Variables*

The recidivism risk profile for supervisees receiving early and regular termination was measured through several PCRA risk domain scores. The PCRA is an actuarial risk assessment instrument used by federal officers to gauge a supervisee's likelihood of being rearrested both during and after supervision. This instrument is a fourth-generation risk tool that can identify changeable

dynamic risk factors and ascertain whether those factors have changed over multiple assessments (see Cohen et al., 2016; Johnson et al., 2011; Lowenkamp et al., 2013, 2015; Luallen et al., 2016). Implemented in 2009, the PCRA has nearly universal usage rates and has been shown to be a valid predictor of a supervisees' risk of recidivism. Specifically, the PCRA risk tool manifests AUC-ROC scores in the .73-.74 range for any offenses and .76-.77 range for violent offenses (see Lowenkamp et al., 2015). These scores mean that the PCRA provides "good" to "excellent" predictive capacities (Desmarais & Singh, 2013) and hence, can be used as a risk classification measure for this research.

In this study, the supervisees' risk profile was accounted for by controlling for several domain scores embedded within the PCRA instrument generated at the final assessment, including the criminal history (scores range 0-9), education/employment (scores range 0-3), substance abuse (scores range 0-2), social networks (scores range 0-3), and cognitions (scores range 0-1). In addition, the supervisees' risk level at final assessment encompassing whether the supervisee was low, low-moderate, moderate, or high was incorporated as an additional risk control metric. Also included was the extent to which a supervisees' risk categorization grouping changed between the first and final assessments that are measured to include either no changes or increases/decreases of plus or minus one or two or risk levels. Last, the score produced by the offender section of the PCRA that measures a supervisees' general criminal thinking levels was included as another risk metric. The general criminal thinking score is based on the Psychological Inventory of Criminal Thinking Styles (PICTS), which has been shown to be a valid predictor of recidivism with AUC scores in the .65 range (Walters & Lowenkamp, 2016).

In addition to the PCRA, the supervisees' age in years, drug use during supervision (both number of positive drug tests and positive tests for polysubstance use), fiscal year of case

closure, most serious conviction offenses, number of conditions imposed, sex, supervision time imposed in months, and race/ethnicity were used as additional covariates for the current analysis. With the exception of age, number of positive drug tests, number of conditions imposed, and supervision time imposed, which are continuous variables, the remaining factors are captured using dummy (0/1) variable coding.

### Outcome Measures

The primary outcome of interest involves whether a supervisee was rearrested within 24 months after their supervision case was closed. Rearrests for new criminal activity, which are also referred to as recidivism, were obtained from the National Crime Information Center (NCIC) and Access to Law Enforcement System (ATLAS). ATLAS is a software program used by the AO that provides an interface for performing criminal record checks through a systematic search of official state and federal rap sheets (Baber, 2010). Recidivistic events were defined to include arrests for either any (excluding arrests for technical violations) or violent offenses within 24 months of case closure. Violent arrest activity includes the following offenses: assault (including sexual), arson, kidnapping, murder, attempted murder, rape, robbery, or threats.

### Analytical Plan

Descriptive statistics encompassing primarily crosstabs, means, and medians were used to examine the application of early termination for supervisees on federal post-conviction supervision. Statistical tests including chi-squares and ANOVAs were used to test for differences in the use of early termination across several covariates; moreover, effect sizes are reported when feasible to measure the magnitude of these relationships.

In addition to examining who receives early termination and how many months were saved through this method of closing cases, an assessment of the recidivism rates for the early

and full-termed supervisees was conducted. When comparing the percentage of early- and regular-termed supervisees rearrested for new offenses after case closure, it is important to acknowledge that these two groups of supervisees differ in many ways on key domains associated with recidivism (see Figures 2 and 3, Table 2, and Appendix). Accounting for these differences is crucial when attempting to assess whether the use of early termination endangers community safety, and this issue was addressed through the application of propensity score matching (PSM) techniques to generate matched groups of supervisees who received early and regular termination. PSM has become a commonly employed technique to estimate treatment effects when randomized assignment is unavailable and it becomes necessary to account for covariates that could influence the outcome of interest (Rosenbaum & Rubin, 1983, 1985).

In this study, the "treated" supervisees constituted those who received early termination, while the "control" supervisees encompassed those with cases concluded through regular termination. Supervisees were matched on their final PCRA criminal history, education/employment, substance abuse, social networks, and cognition domain scores as well as their final risk levels (low, low/moderate, moderate, or high), and general criminal thinking scores. Moreover, supervisees were matched according to the extent to which their PCRA risk levels changed from their first to final assessments; this was one way to control for the presence of noncompliance between these two groups. Another way to account for noncompliance involved an effort to match early- and full-termed supervisees by the number of times they tested positive for any illegal substances and whether these supervisees tested positive for multiple substances (i.e., they were polysubstance users) during supervision. In addition to accounting for these recidivism risk criteria, supervisees were matched by most serious conviction offenses, felony vs. misdemeanor conviction, supervision time in months imposed, number of supervision

conditions imposed, demographic characteristics (i.e., age, race/ethnicity, and sex), and fiscal year of case closure. It should be noted that matching by supervision district was explored, but ultimately not used because too many cases would have been lost by matching on this criterion and the results did not appreciably differ when supervision district was included in the matching algorithm. Last, a subset of the larger sample of early- and full-termed supervisees whose recidivism activity could be tracked for two years after case closure ($n = 244,941$) was applied to the recidivism section of this research.

A two-step process was employed in the matching model. First, logistic regression was employed, in which the likelihood of a supervisee receiving an early termination was used to estimate the propensity scores. Then, the estimated likelihood scores were used to match the early termination group to a comparison group of supervisees with regular terminations, applying one-to-one nearest neighbor matching with a .0001 caliper setting (Guo & Fraser, 2014). This method resulted in matches being found for 77 percent of supervisees receiving an early termination. Results from the matching procedures (shown in the appendix) display the balance obtained between the early- and regular-termed supervisees. This appendix shows that the matching procedures generated early- and regular-termed groups of supervisees, showing strong balance on the key covariates of interest. Last, a more conservative alpha level of .001 was used to denote statistical significance because of the large sample sizes analyzed in this study.

**Findings**

*Profile of Who Receives Early Termination*

A fuller profile of persons receiving early termination by their PCRA risk designation, along with statistical tests of significance and effect sizes, is provided in Figure 2. Regarding the relationship between risk and early termination outcomes, persons designated by the PCRA in

the lowest risk category at their final assessment were about three times more likely to receive early termination (26 percent early termed) than people who were classified in the PCRA highest risk category (8 percent early termed). However, the relationship between risk and early termination was less substantial for people whom the PCRA placed in the low- and low/moderate-risk categories. For example, the percentage of supervisees with early termination in these risk categories was nearly the same, ranging from 26 percent for PCRA lows to 27 percent for PCRA low/moderates.

--------

Insert Figure 2 here

--------

A profile of the application of early termination across selected covariates, including statistical tests and effect size metrics, is provided in Table 2. Across the major offense categories, persons convicted of drug offenses were about two times more likely to receive this closure method (34 percent early termed) than persons convicted of other major offenses, including weapons/firearms (20 percent early termed), public order (19 percent early termed), or property offenses (16 percent early termed). Given the statute's language favoring early terminations for persons convicted of misdemeanor offenses, it is interesting to note that supervisees with felony convictions were more likely to be early-termed (25 percent) than their misdemeanor counterparts (15 percent).

The use of early termination varies somewhat across the demographic categories of race/ethnicity, age, and gender. By race/ethnicity, there was a 4-percentage-point difference between the group most likely to receive early terminations (non-Hispanic Whites – 26 percent) and Hispanics, who were least likely to be early termed (22 percent); however, the data show little variation in the use of early terminations by non-Hispanic Whites (26 percent) and Blacks

(25 percent). Moreover, there were essentially no differences in the use of early terminations of male (25 percent) and female (24 percent) supervisees. Last, about 25 percent of supervisees 50 and older received early terminations, compared to 19-20 percent of supervisees under the age of 30.

Unlike demographics, there exists a moderate relationship between early termination and supervision months imposed. For example, over a third of supervisees (36 percent) sentenced to a supervision term of four years or more and more than half (53 percent) of supervisees sentenced to a supervision term of more than five years were early termed from federal supervision. In comparison, about a fifth (22 percent) of persons placed on supervision for $2 - 3$ years, constituting the largest federal supervision sentencing time frame, were early termed from federal supervision.

---

Insert Table 2 here

---

Information on the application of early terminations across the federal judicial system is provided in Figure 3. Overall, Figure 3, which deidentifies the federal judicial districts, shows that there is substantial disparity regarding the use of early terminations at the district level, and these differences hold even when they are adjusted to account for factors driving the use of early termination, including PCRA risk scores, most serious conviction offenses, and supervision times imposed. The districts on the far right of the chart close over 50 percent of their cases by early termination; in comparison, the districts on the left side of the chart resolved less than 10 percent of their cases through early termination. The disparity in the application of early terminations across the federal judicial system is most likely the result of cultural differences and policy preferences about how this method of case closure should be applied at the local level.

---

Insert Figure 3 here

---

*Supervision Months Saved Through Early Termination*

Early-term supervisees were sentenced to supervision terms that were on average about 12 months longer than those of supervisees who completed a full term of supervision (50 months vs. 38 months, respectively) (see Table 3). Although early-term supervisees had longer supervision sentences, on average they were on supervision 7 months fewer than persons with full terms (31 months to 38 months, respectively). Overall, half of supervisees with early terminations had their supervision sentences reduced by 16 months or more.

---

Insert Table 3 here

---

   Table 4 provides information on the average reduction in supervision sentences resulting from early termination and the relationship between these sentencing reductions and several covariates.[4] In general, the supervision time imposed and most serious conviction offense had the strongest relationship with early termination sentencing reductions. Specifically, persons convicted of sex and drug offenses who were early termed witnessed the largest reductions; their supervision sentences were reduced by 37 months and 22 months, respectively. Conversely, supervisees convicted of property or public order sentences saw their supervision terms shortened by less than 15 months. The average supervision sentences imposed at the time of sentencing also had a substantial bearing on early termination reductions. For example, supervisees sentenced to terms of 4 – 5 years witnessed drops in their supervision sentences of

---

[4] Table 4 also includes ANOVA statistical tests and effect size metrics.

about two years (23 months). Moreover, persons sentenced to five years or more of supervision received reductions of about 4 years (47 months) when early termination was applied. Interestingly, there was a relatively weak correlation between risk as measured by the PCRA and early-term sentencing reductions, with the low-risk supervisees receiving slightly higher sentencing reductions (18 months) than their higher risk counterparts (15 months).

---

Insert Table 4 here

---

*Early Termination and Community Safety*

The next part of this analysis explored whether the policy of early terminations represented a threat to community safety. Specifically, the focus here was on whether persons receiving early terminations recidivated at higher, similar, or lower rates compared to persons serving their full supervision terms. To reiterate, recidivism is defined by rearrest activity involving any or violent offenses that occurred within 24 months after the expiration of a person's supervision term. Moreover, PSM matching techniques were employed to create "like" groups of persons receiving early and regular termination to examine their post-supervision recidivism rates (see Methods section and Appendix Table 1).

Differences in the post-supervision rearrest rates for matched persons with early and regular terminations are shown in Figure 4. Even though both groups have similar risk profiles through the matching process, supervisees with early termination were 2 percentage points less likely to recidivate (10 percent rearrested) than their regular termination counterparts (12 percent rearrested). These differential arrest rates widened from a 1-percentage-point difference for PCRA lows with early termination (4 percent) and regular termination (5 percent) to a 4-

percentage-point difference for PCRA moderates with early termination (24 percent) and regular

termination (28 percent). Among high-risk supervisees, the post-supervision arrest rates for

regular and early terminations were essentially the same. While for the most part the early- and

full-termed supervisees manifested rearrest rates that statistically differed at the .001 level, it is

important to note that the effect size metrics (see Cramér's V scores) show the magnitude of

these differences being relatively negligible.

In regard to recidivism for a violent offense, people whose supervision sentences were

terminated early garnered violent arrest charges (2.9 percent) at rates similar to those receiving

full supervision terms (3.2 percent) (see Figure 5). By risk level, there were no statistically

significant differences in the violent rearrest rates for persons ending supervision with PCRA risk

designations of low, low/moderate, or high. Only the persons in the moderate risk category

manifested statistically different violent arrest rates, with the early-term group witnessing a

violent arrest rate two percentage points lower (8 percent) than the regular-termed group (10

percent); however, the magnitude of these differences as shown by the Cramér's V score

indicates a relatively marginal effect size.

———————————

Insert Figure 4 here

———————————

Insert Figure 5 here

———————————

Information on the most common rearrest offenses for early- and regular-termed

supervisees who recidivated was also examined (data not shown). The rearrest patterns for both

groups are similar, with drugs accounting for the largest re-offense category, followed by

violence, public-order, and property offenses. The majority of arrests for violent offenses involved assault-type crimes (85 percent) for both groups.

**Discussion**

The current analysis examined the application of early terminations in the federal supervision system. Specifically, it provided a profile of who was most likely to receive early terminations, explored district-level differences in the use of early terminations, assessed the time saving garnered by using early terminations, and analyzed whether early terminations endangered community safety. Overall, the research found that early terminations have been increasing, with about 1 out of 4 successful closures over the last 10 years occurring through early termination of the supervision sentences. Regarding who receives early terminations, the research showed that this closure type was moderately correlated with a supervisee's risk profile and that other factors—particularly the number of supervision months imposed and (most important) the district of case closure—had the greatest bearing on whether a case would end by early termination. While persons who received early termination were sentenced to longer supervision terms than their regular-termed counterparts, on average they were on supervision for seven fewer months than persons who served their full supervision terms. In general, the greatest reduction in supervision sentences through the application of early termination was reserved for those convicted of drugs and sex offenses or for those sentenced to supervision sentences of four years or more. It is notable that sex offenders receiving early termination manifested the greatest sentencing reductions, because these persons tend to receive longer supervision terms compared to the average supervisee (USSC, 2012).

In findings mirroring research conducted by Baber and Johnson (2013) and work focusing on early termination at the state level (Courtney et al., 2022; Jacobson et al., 2017; Pew

Charitable Trusts, 2016), this study found that early terminations did not endanger community safety. Specifically, when matched on a range of criteria associated with the risk of recidivism, supervisees with early terminations manifested post-supervision arrest rates that were two percentage points lower for any offenses than those of their regular-termed counterparts. Moreover, the post-supervision rearrest rates for violent offenses were relatively similar for the early- and regular-termed groups. While the current study produced findings showing a narrower band in the recidivism rates between the early- and regular-termed supervisees than that highlighted by Baber and Johnson (2013), these differences might be explained by the fact that the extant research uses more rigorous statistical approaches (e.g., propensity score matching) and matches on a greater range of variables than prior studies on federal early termination. Another recidivism finding was that the types of post-supervision arrest offenses between the two groups was essentially the same.

*Directions for Future Research*

Several directions for future research could be undertaken on the topic of early termination. Specifically, additional research could attempt to apply approaches that allow for more rigorous causal inferences to be drawn on the relationship between early termination and community safety. While the propensity-scoring models generated similar groups of regular- and early-termed individuals matched on several recidivism risk characteristics, it is possible that factors unaccounted for (such as drug addiction severity) could potentially explain the differences in the rearrest rates between the early- and regular-termed supervisees. If these unmeasured factors were included in the matching models, it is possible that the differences in rearrest outcomes between the early- and regular-termed individuals might change. Although methods that would allow for causal inferences, including random assignment of early termination, are probably

infeasible, it might be possible to apply techniques such as interpreted time series designs to take advantage of those districts that decided to move from using early termination sparingly to making more extensive use of this closure method. Such efforts would allow for further exploration of whether early termination might be endangering the community.

Another potential avenue for future research could be delving into the differential use of early terminations at the district level. Methods that are more qualitatively oriented, including the use of focus groups or surveying judges, U.S. attorneys, or executive probation staff, on their attitudes or policies towards early termination would be required to better understand the disparities in the use of early termination across the judicial districts. The AO is seeking to collaborate with the Federal Judicial Center on conducting a more qualitative approach to better understand the use of early termination at the district level. It is anticipated that these efforts will illuminate district-level differences in early termination and perhaps suggest methods for bringing greater levels of uniformity to this technique of case closure.

**Conclusion**

Although the early termination research agenda could be further expanded, it is essential to highlight the compelling findings presented here. These results demonstrate that supervisees granted early termination under current policies pose no greater risk to the community than those who serve a full term of supervision (Baber & Johnson, 2013). These findings reaffirm the notion that early termination policies empower officers to make responsible decisions about which persons are suitable candidates for an early termination of their supervision term.

EARLY TERMINATION                                                              24

## References

Baber, L. (2010). Results-based framework for post-conviction supervision recidivism analysis. *Federal Probation, 74*, 5.

Baber, L. M., & Johnson, J. L. (2013). Early termination of supervision: No compromise to community safety. *Federal Probation, 77(2)*, 17-22.

Cohen, T. H., Lowenkamp, C. T., & VanBenschoten, S. W. (2016). Does change in risk matter? Examining whether changes in offender risk characteristics influence recidivism outcomes. *Criminology & Public Policy, 15*(2), 263-296.

Courtney, L., Pierce, B., Oglesby-Neal, A., & Nembhard, S. (2022). *An assessment of probation sentencing reform in Louisiana and Georgia.* The Urban Institute.

Desmarais, S., & Singh, J. (2013). *Risk assessment instruments validated and implemented in correctional settings in the United States.* Council of State Governments Justice Center.

Griffin, M. L., Hepburn, J. R., & Ginsburg, K. (2013). *The effects of earned time credit on successful probation outcomes: An evaluation of Maricopa County, Arizona's experience.* Unpublished.

Guo, S., & Fraser, M. W. (2014). *Propensity score analysis: Statistical methods and applications* (Vol. 11). SAGE.

Jacobson, M. P., Schiraldi, V., Daly, R., & Hotez, E. (2017). *Less is more: How reducing probation populations can improve outcomes.* Harvard Kennedy School, Program in Criminal Justice Policy and Management.

Johnson, J. L., Lowenkamp, C. T., VanBenschoten, S. W., & Robinson, C. R. (2011). The construction and validation of the federal Post Conviction Risk Assessment (PCRA). *Federal Probation, 75(2)*, 16.

Lowenkamp, C. T., Johnson, J. L., Holsinger, A. M., VanBenschoten, S. W., & Robinson, C. R. (2013). The federal Post Conviction Risk Assessment (PCRA): A construction and validation study. *Psychological Services, 10*(1), 87.

Lowenkamp, C. T., Holsinger, A. M., & Cohen, T. H. (2015). PCRA revisited: Testing the validity of the Federal Post Conviction Risk Assessment (PCRA). *Psychological Services, 12*(2), 149.

Luallen, J., Radakrishnan, S., & Rhodes, W. (2016). The predictive validity of the Post-Conviction Risk Assessment among federal offenders. *Criminal Justice and Behavior, 43*(9), 1173-1189.

Minnesota Department of Corrections. (2017). *Study of Earned Compliance Credit: Recommendations for Minnesota.* Minnesota Department of Corrections.

New York City Department of Probation. (2013). *Do more good: A progress report from the NYC Department of Probation.* New York City Department of Probation.

Petersilia, J. (2007). Employ behavioral contracting for earned discharge parole. *Criminology & Public Policy, 6*, 807-814.

Pew Charitable Trusts. (2016). *Missouri policy shortens probation and parole terms, protects public safety.* The Pew Charitable Trusts.

Pew Charitable Trusts. (2020). *States can shorten probation and protect public safety.* The Pew Charitable Trusts.

Robina Institute of Criminal Law and Criminal Justice. (2020). *Research in brief: Goal-based supervision.* University of Minnesota.

Rosenbaum, P. R., & Rubin, D. B. (1983). The central role of the propensity score in observational studies for causal effects. *Biometrika, 70*(1), 41–55.

Rosenbaum, P. R., & Rubin, D. B. (1985). Constructing a control group using multivariate matched sampling methods that incorporate the propensity score. *The American Statistician, 39*(1), 33–38.

Smith, S. M., Omori, M. K., Turner, S. F., & Jannetta, J. (2012). Assessing the earned discharge pilot project: The importance of context, capacity, and content. *Criminology & Public Policy, 11*(2), 385-410.

U.S. Sentencing Commission (USSC) (2012). *Report to Congress: Federal child pornography offenders.* U.S. Sentencing Commission.

Walters, G. D., & Lowenkamp, C. T. (2016). Predicting recidivism with the Psychological Inventory of Criminal Thinking Styles (PICTS) in community-supervised male and female federal offenders. *Psychological Assessment, 28*(6), 652.

*Statutes*
18 U.S.C. § 3561 (1984) *Sentence of probation*

18 U.S.C. § 3564(c) (1984) *Running of a term of probation – early termination*

18 U.S.C. § 3583 (1984) *Inclusion of a term of supervised release after imprisonment*

18 U.S.C. § 3583(e)(1) (1984) *Inclusion of a term of supervised release after imprisonment – modifications of conditions*

**Table 1: Descriptive statistics of federal supervisees in study sample**

| Variables | % (n) | M (SD) |
|---|---|---|
| **Dependent variables** | | |
| Re-arrest any offense within 2 years of case closure | 11.0 (32,641) | |
| Re-arrest violent offense within 2 years of case closure | 3.1 (9,060) | |
| **Independent variables - selected** | | |
| **Early termination** | 24.7 (73,155) | |
| **Race/ethnicity** | | |
| White, not Hispanic | 36.7 (107,985) | |
| Black, not Hispanic | 35.5 (104,575) | |
| Hispanic, any race | 23.0 (67,798) | |
| Other race | 4.8 (13,967) | |
| **Male** | 78.8 (233,393) | |
| **Age at supervision end date (in years)** | (296,023) | 43.5 (12.1) |
| **Most serious conviction offense** | | |
| Drugs | 44.6 (131,917) | |
| Property/White Collar | 21.7 (64,050) | |
| Weapons/Firearms | 13.3 (39,384) | |
| Public order | 8.5 (25,137) | |
| Immigration | 4.5 (13,233) | |
| Violence | 4.2 (12,354) | |
| Sex offense | 2.8 (8,384) | |
| All other | 0.4 (1,133) | |
| **Misdemeanor or infraction conviction** | 5.9 (17,584) | |
| **Final PCRA risk categories** | | |
| Low | 43.4 (128,515) | |
| Low/Moderate | 43.3 (128,199) | |
| Moderate | 11.2 (33,155) | |
| High | 2.1 (6,154) | |
| **Drug use during supervision** | | |
| None | 73.6 (217,948) | |
| Tested positive one substance | 16.7 (49,474) | |
| Tested positive multiple substances | 9.7 (28,601) | |
| **Supervision time imposed (in months)** | (295,675) | 40.8 (20.9) |

Note. Includes 296,023 federal supervises with cases closed successfully between fiscal years 2014 through 2023 with PCRA assessments. PCRA = Post Conviction Risk Assessment. Other race includes Asians, Pacific Islanders, Native Americans, Alaska Natives, and other non-identified races.

EARLY TERMINATION                                                                                27

**Table 2: Profile of persons with successful closures who received an early termination by selected covariates**

| Selected covariates | Number of supervisees | Percent early terminations | | $\chi^2$ | | Cramer's V |
|---|---|---|---|---|---|---|
| **Most serious conviction offense** | | | | | | |
| Drugs | 131,917 | 33.5 | % | 10000.0 | * | 0.18 |
| Weapons/Firearms | 39,384 | 20.2 | | | | |
| Public order | 25,137 | 19.2 | | | | |
| Sex offense | 8,384 | 17.8 | | | | |
| Property/White Collar | 64,050 | 16.4 | | | | |
| Immigration | 13,233 | 15.9 | | | | |
| All other | 1,133 | 15.4 | | | | |
| Violence | 12,354 | 15.3 | | | | |
| **Conviction severity** | | | | | | |
| Felony | 278,405 | 25.3 | % | 910.0 | * | -0.06 |
| Misdemeanor or infraction | 17,584 | 15.2 | | | | |
| **Race/ethnicity** | | | | | | |
| White, non-Hispanic | 107,985 | 26.3 | % | 538.7 | * | 0.04 |
| Black, non-Hispanic | 104,575 | 25.2 | | | | |
| Other | 13,967 | 23.8 | | | | |
| Hispanic any race | 67,798 | 21.5 | | | | |
| **Gender** | | | | | | |
| Male | 233,393 | 24.9 | % | 26.3 | * | 0.01 |
| Female | 62,628 | 23.9 | | | | |
| **Age at supervision end date (in years)** | | | | | | |
| Under 20 | 143 | 18.9 | % | 601.3 | * | 0.05 |
| 20 - 29 | 34,694 | 20.0 | | | | |
| 30 - 39 | 88,153 | 24.2 | | | | |
| 40 - 49 | 85,866 | 26.6 | | | | |
| 50 and older | 87,167 | 25.2 | | | | |
| **Supervision time imposed** | | | | | | |
| Less than 12 months | 23,217 | 5.3 | % | 18000.0 | * | 0.25 |
| 12 months - 23 months | 44,033 | 14.6 | | | | |
| 24 months - 35 months | 124,079 | 21.7 | | | | |
| 36 months - 47 months | 25,621 | 30.2 | | | | |
| 48 months - 59 months | 65,028 | 35.7 | | | | |
| 60 months or more | 13,697 | 52.9 | | | | |

Note. Includes 296,023 federal supervises with cases closed successfully between fiscal years 2014 through 2023 with PCRA assessments. Successful closures include those supervisees with regular or early terminations. PCRA = Post Conviction Risk Assessment. Other race includes Asians, Pacific Islanders, Native Americans, Alaska Natives, and other non-identified races. * p <.001

**Table 3:  Differences between imposed and actual supervision sentences for persons with early and regular terminations**

| Supervision term | Number of closures | Imposed term (months) | | Served term (months) | | Months saved | |
|---|---|---|---|---|---|---|---|
| | | Mean | Median | Mean | Median | Mean | Median |
| Early termination | 72,845 | 49.8 | 47.9 | 30.8 | 27.8 | 19.0 | 15.6 |
| Regular termination | 222,830 | 37.8 | 35.9 | 37.8 | 35.9 | 0.0 | 0.0 |

Note. Numbers won't match those of table 1 because of missing data. Data on supervision time imposed and served available for over 99% of the total study sample.

**Table 4: Reduction in average number of supervision months for persons with early terminations by selected covariates**

| Selected covariates | Number with early terminations | Average supervision terms | | Mean term reduction |
|---|---|---|---|---|
| | | Imposed | Served | |
| **PCRA 1.0 risk categories** | | | | |
| Low | 32,921 | 47.0 | 29.5 | 17.5 |
| Low/Moderate | 34,653 | 52.8 | 32.2 | 20.6 |
| Moderate | 4,794 | 48.1 | 29.7 | 18.3 |
| High | 477 | 43.7 | 29.0 | 14.7 |
| Significance $F[3, 72841] = 210.6; p < .001; \omega^2 = .009$ | | | | |
| **Most serious conviction offense (not all offense types shown)** | | | | |
| Public order | 4,813 | 33.4 | 21.1 | 12.3 |
| Property/White Collar | 10,514 | 39.2 | 25.3 | 13.9 |
| Violence | 1,870 | 42.6 | 27.9 | 14.8 |
| Weapons/Firearms | 7,918 | 41.8 | 26.8 | 15.0 |
| Drugs | 44,098 | 55.4 | 33.7 | 21.7 |
| Sex offense | 1,271 | 90.7 | 53.8 | 37.0 |
| Significance $F[7, 72755] = 828.8; p < .001; \omega^2 = .074$ | | | | |
| **Race/ethnicity** | | | | |
| Other race | 3,306 | 43.4 | 27.5 | 15.9 |
| Hispanic, any race | 14,572 | 49.0 | 31.4 | 17.6 |
| White, not Hispanic | 28,162 | 47.0 | 29.0 | 18.0 |
| Black, not Hispanic | 26,355 | 54.1 | 32.8 | 21.4 |
| Significance $F[3, 72391] = 288.3; p < .001; \omega^2 = .012$ | | | | |
| **Gender** | | | | |
| Female | 14,975 | 44.5 | 28.2 | 16.3 |
| Male | 57,870 | 51.2 | 31.4 | 19.7 |
| Significance $F[1, 72843] = 504.7; p < .001; \omega^2 = .007$ | | | | |
| **Supervision time imposed** | | | | |
| Less than 12 months | 1,236 | 11.3 | 7.1 | 4.2 |
| 12 months - 23 months | 6,446 | 23.0 | 15.5 | 7.5 |
| 24 months - 35 months | 26,958 | 35.8 | 23.3 | 12.4 |
| 36 months - 47 months | 7,747 | 47.5 | 30.5 | 17.0 |
| 48 months - 59 months | 23,212 | 59.7 | 37.1 | 22.6 |
| 60 months or more | 7,246 | 103.3 | 56.0 | 47.3 |
| Significance $F[5, 72839] = 10556.8; p < .001; \omega^2 = .420$ | | | | |

Note. Includes 72,845 federal supervises with cases closed through early terminations and with complete information on number of supervision months saved. Some categories may not sum to totals because of missing data. With exception of PCRA risk categories, data sorted from smallest to highest involving reductions in mean supervision terms. PCRA = Post Conviction Risk Assessment.

EARLY TERMINATION

APPENDIX TABLE 1. Equivalent groups generated by propensity score matching - early terminations

| Matching covariates | Panel A: Pre-matching group differences | | | | Panel B: Post-matching group differences | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Persons with early term (n = 59,026) | Persons without early term (n = 185,915) | T-statistic | p Value | Persons with early term (n =45,251) | Persons without early term (n = 45,251) | T-statistic | p Value | % Bias reduction |
| **Race** | | | | | | | | | |
| Black | 0.37 | 0.36 | 4.55 | 0.000 | 0.35 | 0.36 | -0.98 | 0.327 | 71.3 |
| White | 0.39 | 0.36 | 12.50 | 0.000 | 0.39 | 0.39 | 0.14 | 0.892 | 98.5 |
| Other | 0.05 | 0.05 | -2.26 | 0.024 | 0.05 | 0.05 | -0.24 | 0.814 | 86.1 |
| Hispanic, any race | 0.20 | 0.23 | -18.56 | 0.000 | 0.21 | 0.21 | 1.11 | 0.266 | 92.2 |
| **Sex (male = 1)** | 0.81 | 0.81 | 0.59 | 0.552 | 0.81 | 0.81 | 0.25 | 0.799 | 42.6 |
| **Average age (in years)** | 41.5 | 40.3 | 20.77 | 0.000 | 41.1 | 41.2 | -0.73 | 0.463 | 95.3 |
| **Most serious conviction offense** | | | | | | | | | |
| Drugs | 0.63 | 0.41 | 88.22 | 0.000 | 0.57 | 0.58 | -2.44 | 0.015 | 96.3 |
| Weapons/Firearms | 0.10 | 0.14 | -21.86 | 0.000 | 0.12 | 0.12 | 1.49 | 0.137 | 91.4 |
| Immigration | 0.03 | 0.04 | -19.06 | 0.000 | 0.03 | 0.03 | 0.45 | 0.652 | 97.3 |
| Property/White Collar | 0.14 | 0.23 | -47.43 | 0.000 | 0.16 | 0.16 | 1.17 | 0.241 | 97.0 |
| Sex offense | 0.02 | 0.03 | -18.00 | 0.000 | 0.01 | 0.01 | 0.17 | 0.868 | 99.1 |
| Violence | 0.02 | 0.05 | -23.68 | 0.000 | 0.03 | 0.03 | -0.18 | 0.856 | 99.2 |
| Public order | 0.06 | 0.09 | -17.69 | 0.000 | 0.07 | 0.07 | 1.05 | 0.294 | 92.5 |
| All other | 0.00 | 0.00 | -6.67 | 0.000 | 0.00 | 0.00 | -0.77 | 0.444 | 86.9 |
| **Misdemeanor conviction** | 0.03 | 0.06 | -25.91 | 0.000 | 0.04 | 0.04 | 1.06 | 0.291 | 95.4 |
| **Average final PCRA domain scores** | | | | | | | | | |
| Total score | 5.74 | 6.22 | -31.31 | 0.000 | 5.69 | 5.70 | -0.42 | 0.672 | 98.3 |
| Criminal history | 4.09 | 4.10 | -1.43 | 0.153 | 4.00 | 4.02 | -1.03 | 0.305 | 5.2 |
| Employment/education | 0.64 | 0.82 | -41.22 | 0.000 | 0.66 | 0.66 | 0.43 | 0.667 | 98.7 |
| Drugs/Alcohol | 0.12 | 0.23 | -45.03 | 0.000 | 0.13 | 0.13 | 0.49 | 0.627 | 98.8 |
| Social networks | 0.84 | 0.95 | -31.42 | 0.000 | 0.85 | 0.85 | 0.88 | 0.380 | 96.6 |
| Cognitions | 0.04 | 0.12 | -51.78 | 0.000 | 0.05 | 0.05 | 0.30 | 0.767 | 99.5 |

EARLY TERMINATION                                                                                          31

APPENDIX TABLE 1 (continued)

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **PCRA risk levels** | | | | | | | | | |
| Low | 0.45 | 0.42 | 13.06 | 0.000 | 0.46 | 0.46 | 0.93 | 0.354 | 90.4 |
| Low/Moderate | 0.48 | 0.43 | 20.36 | 0.000 | 0.46 | 0.46 | -1.10 | 0.271 | 92.7 |
| Moderate | 0.06 | 0.13 | -40.79 | 0.000 | 0.07 | 0.07 | 0.26 | 0.793 | 99.3 |
| High | 0.01 | 0.02 | -26.62 | 0.000 | 0.01 | 0.01 | 0.25 | 0.804 | 99.3 |
| **Changes PCRA risk levels first to final assessment** | | | | | | | | | |
| Minus two or more | 0.01 | 0.01 | 2.82 | 0.005 | 0.01 | 0.01 | 0.17 | 0.863 | 91.7 |
| Minus one | 0.21 | 0.17 | 17.20 | 0.000 | 0.20 | 0.20 | -0.99 | 0.320 | 92.0 |
| No change | 0.75 | 0.74 | 4.62 | 0.000 | 0.76 | 0.75 | 1.35 | 0.178 | 61.8 |
| Plus one | 0.03 | 0.07 | -34.93 | 0.000 | 0.03 | 0.03 | -1.09 | 0.277 | 96.9 |
| Plus two or more | 0.00 | 0.00 | -10.93 | 0.000 | 0.00 | 0.00 | -0.30 | 0.765 | 97.9 |
| **General criminal thinking** | 90.0 | 91.7 | -16.96 | 0.000 | 90.0 | 90.1 | -0.99 | 0.320 | 92.5 |
| **Drug use during supervision** | | | | | | | | | |
| None | 0.82 | 0.71 | 54.93 | 0.000 | 0.81 | 0.81 | 0.15 | 0.879 | 99.7 |
| Tested positive one substance | 0.13 | 0.18 | -30.33 | 0.000 | 0.14 | 0.13 | 0.31 | 0.756 | 98.7 |
| Tested positive multiple substances | 0.05 | 0.11 | -43.32 | 0.000 | 0.05 | 0.06 | -0.73 | 0.464 | 98.3 |
| **Average number positive drug tests during supervision** | 0.74 | 1.40 | -30.46 | 0.000 | 0.81 | 0.81 | -0.04 | 0.970 | 99.9 |
| **Average supervision time imposed (in months)** | 49.6 | 37.8 | 120.22 | 0.000 | 44.5 | 44.3 | 1.48 | 0.140 | 98.6 |
| **Average number of conditions** | 6.7 | 7.5 | -35.24 | 0.000 | 6.7 | 6.7 | -0.16 | 0.876 | 99.5 |

Note: Nearest neighborhood matching with Caliper 0.0001 was used. A total of 13,775 persons with early terminations were lost through an inability to match with control group. In addition to matching on the above covariates, persons were matched on the fiscal year of case closure (not shown in table). Propensity score matching applied to a subset of supervisees (n = 244,941) whose rearrest activity could be tracked for a minimum of two years after case closure.

EARLY TERMINATION



Figure 1. Percentage of successful closures ended by early termination, fiscal years 2000 - 2023

Note: Includes persons whose cases were closed through a successful termination (early or regular). Excludes cases closed through revocation, transfer, or other means. Early terminations based on compassionate grounds not included in figure; these cases accounted for less than 1% of all terminations.

EARLY TERMINATION



Percent of supervisees granted early termination

**Figure 2. Percentage of supervisees who received early termination by the final PCRA risk groups**

PCRA risk categories
$\chi 2 = 3300.0$, $p < .000$;  Cramer's V = 0.11

Note. PCRA = Post Conviction Risk Assessment.

EARLY TERMINATION                                                                                    34



Percent closed
through early
termination

Figure 3. Percent of successful closures ended through early termination by judicial district (de-identified)

Federal judicial districts: de-identified

Note. Percentages adjusted to take into account post-conviction risk assessment scores, most serious conviction offenses, and supervision time imposed. Federal judicial districts de-identified in figure.

**Figure 4. Percent of early and regular term supervisees re-arrested for any offense within 24 months of their supervision end dates by final risk categorization**



Note. Early and regular termed supervisees matched on a variety of criteria - see appendix table.

PCRA = Post Conviction Risk Assessment

EARLY TERMINATION                                                                                       36



Percent
violent
arrests

**Figure 5. Percent of early and regular term supervisees re-arrested for violent offenses within 24 months of their supervision end dates by final risk categorization**

■ Early termination      ◌ Regular termination

Note. Early and regular termed supervisees matched on a variety of criteria - see appendix table.
PCRA = Post Conviction Risk Assessment

# EXHIBIT C

# Early Termination of Supervision: No Compromise to Community Safety

*Laura M. Baber*
*James L. Johnson*
*Office of Probation and Pretrial Services*
*Administrative Office of the U.S. Courts*

UNDER 18 U.S.C. §§ 3564(c) and 3583(e)(1), the court may terminate terms of probation in misdemeanor cases at any time and terms of supervised release or probation in felony cases after the expiration of one year of supervision, if satisfied that such action is warranted by the conduct of an offender and is in the interest of justice. As such, early termination is a practice that holds promise as a positive incentive for persons under supervision and as a measure to contain costs in the judiciary without compromising the mission of public safety.

## Policy Background

Over the past decade, the Judicial Conference has endorsed policies that encourage probation offices to terminate statutorily-eligible offenders from supervision early as a means to limit projected workload growth in probation and pretrial services, and has continued to fine-tune those policies as evidence suggests is appropriate. In 2003, the Judicial Conference approved a policy that encouraged probation officers to seek early termination as soon as offenders were statutorily eligible if the offender had satisfied the conditions of supervision, had successfully reintegrated into the community, and did not pose a foreseeable risk to public safety generally or to any individual third party. In 2005, the Judicial Conference approved policy changes that allowed offenders with outstanding balances on fines and restitutions to be considered for early termination as long as they were otherwise suitable and in compliance with their payment schedule. In 2005, the Committee

revisited the early termination policy, recommending provisions modeled after United States Parole Commission regulations. Specifically, the Conference approved creating a presumption in favor of early termination for non-career and non-violent offenders who 1) have been under supervision for at least 18 months, present no identified risk to the public or victims, and are free from any moderate- or high-severity violations; or 2) have been under supervision for at least 42 months and are free from any moderate- or high-severity violations. These policies remain in effect today.

Policies on early termination have clearly influenced practices in the courts. The number of early terminations granted by the courts increased 50 percent in the year following the Criminal Law Committee's formal endorsement in 2002 of early termination as a cost-containment measure. As Table 1 reports, by 2005, early terminations comprised 21.3 percent of successful closings (i.e., cases closed without revocation). From 2007 to 2011, which were relatively favorable budget years, the percentage fell to 17.9 percent. However, in 2012, perhaps as a response to austere budgets and renewed focus on early termination as a cost-containment strategy, early terminations rose nearly a percentage point to 18.7 percent, comparable to 2008 levels.

The overall decline in the percentage of early-term cases from 2005 may be the result of the changing nature of persons under supervision, as the average risk prediction and criminal history scores of persons under supervision have been steadily rising. Also, belying the

national trend is considerable district-to-district variation, with early termination rates ranging from 46 percent of successful closings in one district to zero in another.

The focus on early termination for purposes of cost containment has been based on the belief that, if limited to appropriate cases, early termination would not adversely affect community safety. A preliminary study conducted by the AO in 2009 seems to confirm that belief. In this study, the AO randomly selected 554 persons granted early termination in fiscal year 2005 and matched them to an equal number of persons who reached full expiration that same fiscal year with comparable criminal histories, Risk Prediction Index (RPI) scores, and personal characteristics. In the three-year follow-up period, persons granted early termination were charged with fewer new offenses than the comparison group, and any new charges were generally less serious. Specifically, 80 persons granted early termination (14.4 percent) had new criminal charges[1] filed against them, while 90 persons (16.2 percent) of the full-term group had new charges filed against them. Of the new charges filed against the early termination group, 30.3 percent were felonies, while 36.5 percent were felonies for the comparison group. There was only one case among the early termination group that resulted in a known conviction for a violent new offense. According to available records most of the new charges were for misdemeanor or petty offenses, and more than 20

---

[1] This study used new criminal charges recorded in PACTS as the recidivism event. At the time of this study, arrest data was not available to the research team.

**TABLE 1.**
*Percentage of Early Terminations of Successful Terminations (Closings) by Year*

| Year | Total Closings (excluding Revocations) | Early Terminations | |
|------|------|------|------|
| | | Number | Percent |
| 1995 | 25,656 | 4,214 | 16.4 |
| 1996 | 26,844 | 4,061 | 15.1 |
| 1997 | 26,307 | 3,875 | 14.7 |
| 1998 | 25,687 | 3,668 | 14.3 |
| 1999 | 26,594 | 3,524 | 13.3 |
| 2000 | 26,670 | 3,422 | 12.8 |
| 2001 | 27,951 | 3,222 | 11.5 |
| 2002 | 29,363 | 3,458 | 11.8 |
| 2003 | 31,354 | 5,217 | 16.6 |
| 2004 | 34,421 | 7,057 | 20.5 |
| 2005 | 33,472 | 7,119 | 21.3 |
| 2006 | 36,595 | 7,560 | 20.7 |
| 2007 | 35,403 | 6,809 | 19.2 |
| 2008 | 35,666 | 6,626 | 18.6 |
| 2009 | 35,835 | 6,494 | 18.1 |
| 2010 | 36,414 | 6,738 | 18.5 |
| 2011 | 37,522 | 6,710 | 17.9 |
| 2012 | 38,713 | 7,239 | 18.7 |

percent of the charges were either dismissed or ended in acquittal.

Armed with initial empirical evidence suggesting that early termination of appropriate offenders does not compromise public safety, the Judicial Conference continues to pursue early termination as a cost-containment measure. Public safety, of course, remains a paramount concern, however, and the AO continues to monitor the effectiveness of early termination as a measure that permits probation offices to focus supervision resources on persons most likely to recidivate, without compromising the statutory purposes of probation and supervised release.

This year, the AO conducted a similar but considerably broader-scale study on offenders who were granted early termination to determine if the results are consistent with the earlier, more preliminary, study. Using a more recent cohort of offenders whose supervision terminated in 2008, the researchers compared rearrest rates of 1,436 early-termed offenders with a matched group of offenders who served their entire supervision term. A three-year follow-up period was used to examine the rate at which offenders from the two comparison groups were arrested for new criminal behavior.

## Methodology

There were 15,266 supervised release (TSR) and probation cases closed in fiscal year 2008, of which 3,814 were for early termination and 11,452 were for successful expiration of term. This total excludes cases with missing RPI and criminal history scores, offenders younger than 18 years of age, as well as sex and violent offenders. Sex offenses included cases coded in the Probation and Pretrial Services Case Management System (PACTS) as rape or sex offense. Violent offenses included cases coded in PACTS as assault, firearms, homicide, kidnapping, racketeering, robbery, and simple assault. Of the 3,814 early-term cases, 1,436 were successfully matched to full-term cases by RPI category score (low, medium, high), criminal history category, gender, age category (5-year intervals), and district supervised. In total, this analysis includes 2,872 early- and full-term cases.

The research team leveraged the infrastructure built to support its Results-Based Framework (Baber, 2010). Under this framework, arrest records are assembled from criminal history databases and matched with data from PACTS. Consistent with the definition of recidivism established under this framework, the first arrest for new criminal

conduct[2] within three years following the end of the supervision is analyzed for the two comparison groups.

## Description of Study Population

### Age

As a result of the matching for this study, average ages of early-term and full-term offenders are nearly identical (Table 2). Full-term cases have an average age of 39.1 years at the start of supervision and 41.5 years at the end of supervision. Early-term cases have an average age of 39.5 at the start of supervision and 41.5 years at the end of supervision. Offenders who completed a full term of supervision were roughly the same age as their early-term counterparts (36.3 years old and 36.25 years old, respectively) at the time of their post-supervision arrest.

### Type of Supervision

The proportion of probation and supervised release cases is similar for both study groups. Probation cases accounted for 32.7 percent of all full-term cases and 35 percent of all early-term cases (Table 3).

### Risk Level

Because early termination criteria heavily favor low-risk offenders, as expected, low-risk offenders accounted for the majority of offenders in this study (74.4 percent). Medium-risk offenders accounted for 23.7 percent and high-risk offenders accounted for 1.8 percent (Table 4).

## Findings

As Table 5 illustrates, almost 15 percent (14.7) of all cases in the study cohort had a new arrest and offenders who served their entire supervision term had a rate nearly twice that of the offenders who received early termination (19.2 percent to 10.2 percent, respectively). Similarly, the rearrest rates for both study groups for major offenses only were tabulated (see Table 6). When minor offenses are excluded, the recidivism rates for both early-term and full-term offenders are considerably lower, but the proportion of rearrests between the two groups is consistent. Only 5.9 percent of early-term offenders were rearrested for a major offense following their release from supervision compared to 12.2 percent of full-term offenders.

---

[2] Arrests pursuant to a warrant for a technical violation of federal, state, or local probation or parole were ignored.

**TABLE 2.**
*Age at Start and End of Supervision for All Cases and Cases with a Post-Supervision Arrest*

| | All Cases | | | | Post-Supervision Arrest | | | |
| | Full term | | Early term | | Full term | | Early term | |
| | Start | End | Start | End | Start | End | Start | End |
|---|---|---|---|---|---|---|---|---|
| N | 1,436 | 1,436 | 1,436 | 1,436 | 276 | 276 | 147 | 147 |
| Mean | 39.1 | 41.5 | 39.5 | 41.5 | 34.0 | 36.3 | 34.3 | 36.3 |
| Median | 38.0 | 40.0 | 38.0 | 40.0 | 32.0 | 34.0 | 34.0 | 35.0 |

**TABLE 3.**
*Supervision Type for All Cases*

| | All Cases | | | |
| | Full term | | Early term | |
| Supervision Type | Freq. | Pct. | Freq. | Pct. |
|---|---|---|---|---|
| Probation | 470 | 32.7 | 502 | 35.0 |
| TSR | 966 | 67.3 | 934 | 65.0 |
| **Total** | **1,436** | **100.0** | **1,436** | **100.0** |

**TABLE 4.**
*Risk Level of All Offenders*

| | All Cases | | | |
| | Full term | | Early term | |
| RPI category | Freq. | Pct. | Freq. | Pct. |
|---|---|---|---|---|
| Low risk | 1,069 | 74.4 | 1,069 | 74.4 |
| Medium risk | 341 | 23.7 | 341 | 23.7 |
| High risk | 26 | 1.8 | 26 | 1.8 |
| **Total** | **1,436** | **100.0** | **1,436** | **100.0** |

**TABLE 5.**
*Rearrest Rate for Full-Term and Early-Term Offenders (All Offenses)*

| | Post-Supervision Arrest | | | | | |
| | All Cases | | Full term | | Early term | |
| New Arrest | Freq. | Pct. | Freq. | Pct. | Freq. | Pct. |
|---|---|---|---|---|---|---|
| No | 2,449 | 85.3 | 1,160 | 80.8 | 1,289 | 89.8 |
| Yes | 423 | 14.7 | 276 | 19.2 | 147 | 10.2 |
| **Total** | **2,872** | **100.0** | **1,436** | **100.0** | **1,436** | **100.0** |

**TABLE 6.**
*Rearrest Rate for Full-Term and Early-Term Offenders (Major Offenses Only)*

| | Full term | | Early term | |
| | Freq. | Pct. | Freq. | Pct. |
|---|---|---|---|---|
| No | 1,261 | 87.8 | 1,351 | 94.1 |
| Yes | 175 | 12.2 | 85 | 5.9 |
| **Total** | **1,436** | **100.0** | **1,436** | **100.0** |

## Rearrest Rates by Supervision Type

Rearrest rates for offenders serving terms of supervised release (TSR) cases are slightly higher than for probation cases for both early-term and full-term cases. Of the 470 full-term probationers, 17.7 percent (n = 83) were arrested within 36 months of completing their supervision term (see Table 7). In comparison, 9.2 percent (n = 46) of the 502 early-termed probationers were rearrested within 36 months of completing their supervision term. Of the 966 offenders on TSR who completed a full term of supervision, 20 percent (n = 193) were rearrested within 36 months of completing their supervision term. In comparison, 10.8 percent (n = 101) of the 934 early-term TSR cases resulted in a post-supervision rearrest.

### Time to Rearrest

As shown in Table 8, the time to post-supervision rearrest is slightly longer for early-term offenders. On average, full-term offenders were arrested 18.8 months after completing their supervision term while early-term offenders were arrested 19.4 months after being released from supervision.

### Risk Level

As expected, an accurate prediction of the risk of re-offending as indicated by the Risk Prediction Index (RPI) holds true for both early-term and full-term offenders who have completed supervision (Table 9). That is, high-risk offenders in both study groups have the highest rearrest rates. However, high-risk offenders who were granted early term were much less likely to be rearrested than their full-term high-risk counterparts. Though only six high-risk early-term offenders were rearrested, high-risk offenders accounted for 53.8 percent (n = 14) of the post-supervision arrests for full-term offenders but only 23.1 percent of arrests for early-term offenders.

### Time under Supervision

Early-term offenders were sentenced to supervision terms that were 12 months longer than offenders who completed a full term of supervision (39.8 months to 27.8 months, respectively). Although early-term offenders had longer supervision sentences, on average, they were on supervision 3.8 months fewer than full-term offenders (24 months to 27.8 months, respectively). On average, arrest-free early-term offenders were released from supervision 15.7 months before their scheduled supervision term was set to expire (Table 10).

**TABLE 7.**
*Supervision Type for Cases with a Post-Supervision Arrest*

| | Post-Supervision Arrest | | | | | |
| | Full term | | Early term | | Total | |
| Supervision Type | Freq. | Pct. | Freq. | Pct. | Freq. | Pct. |
|---|---|---|---|---|---|---|
| Probation | 83 | 17.7 | 46 | 9.2 | 129 | 13.3 |
| TSR | 193 | 20.0 | 101 | 10.8 | 294 | 15.5 |
| Total | 276 | 19.2 | 147 | 10.2 | 423 | 14.7 |

**TABLE 8.**
*Time to Post-Supervision Arrest*

| | Days to Arrest | | Months to Arrest | |
| | Full term | Early term | Full term | Early term |
|---|---|---|---|---|
| N | 276 | 147 | 276 | 147 |
| Mean | 586.9 | 604.9 | 18.8 | 19.4 |
| Median | 576.5 | 647.0 | 18.0 | 21.0 |

**TABLE 9.**
*Risk Level of Offenders with a Post-Supervision Arrest*

| | Post-Supervision Arrest | | | | | |
| | Full term | | Early term | | Total | |
| RPI category | Freq. | Pct. | Freq. | Pct. | Freq. | Pct. |
|---|---|---|---|---|---|---|
| Low risk | 147 | 13.8 | 77 | 7.2 | 224 | 10.5 |
| Medium risk | 115 | 33.7 | 64 | 18.8 | 179 | 26.2 |
| High risk | 14 | 53.8 | 6 | 23.1 | 20 | 38.5 |
| Total | 276 | 19.2 | 147 | 10.2 | 423 | 14.7 |

**TABLE 10.**
*Supervision Term, Months Supervised, and Months Saved by Early Termination for Offenders with No Post-Supervision Arrest*

| | Supervision Term—Months | | Months Supervised | | Months Saved | |
| | Full term | Early term | Full term | Early term | Full term | Early term |
|---|---|---|---|---|---|---|
| N | 1,160 | 1,289 | 1,160 | 1,289 | 1,160 | 1,289 |
| Mean | 27.8 | 39.8 | 27.8 | 24.0 | 0.0 | 15.7 |
| Median | 35.0 | 35.0 | 35.0 | 24.0 | 0.0 | 14.0 |

### Types of Offenses

As shown in Figure 1, when both major and minor offenses are included, the proportions of offense types for which the two groups are rearrested are similar. Public order offenses comprise the majority, followed by drugs, and then property offenses. Early-term offenders have a slightly higher percentage of public-order offenses, compared to their full-term counterparts (28.6 percent and 24.6 percent respectively). Drug offenses accounted for nearly an identical percentage of offenses for both study groups (20.4 percent for early-term offenders and 21 percent for full-term offenders.) Property offenses represented the third most frequent offense for both groups and the percentage of property crimes for early-term offenders was slightly lower than the percentage for the comparison group (15 percent and 17.8 percent, respectively). Violent offenses were a close fourth in terms of most frequent post-supervision arrest for both groups, with a slightly lower percentage of early-term offenders arrested for violence offenses (14.3 percent and 15.2 percent, respectively).

### Types of Major Offenses

When arrests for minor offenses[3] are excluded from the tabulations, drug, property, and violence offenses remain the most prevalent offenses for which both comparison groups are arrested (Figure 2). Major drug offenses accounted for a slightly greater percentage of arrests for early-term offenders than for full-term offenders (35.3 percent of arrests for early-term offenders and 33.1 percent for full-term offenders.) Property offenses represented the second most frequent major offense for both study groups and early-term offenders were arrested at a slightly lower rate than their counterparts for those property offenses (25.9 percent and 28 percent, respectively). Violent offenses were a close third most frequent arrest for a major offense for both groups, with early-term offenders having a slightly greater percentage than full-term offenders (24.7 percent and 24 percent, respectively).

### Months Saved on Supervision for Offenders Who Were Not Rearrested

Early-terminated offenders in fiscal year 2008 who had no post-supervision arrest were released 15.7 months earlier than their scheduled expiration date, which was one month earlier than early-term offenders released in fiscal year 2005. This suggests that even though early-term offenders were released sooner, their risk of re-offending did not increase (see Table 11).

### Discussion

Results from the AO's most recent study of offenders terminated in 2008 are compelling. The results suggest that offenders granted early termination under the current policies pose no greater danger to the community than offenders who serve a full term of supervision. These findings reaffirm the notion that early termination policies allow officers to make responsible decisions about which offenders to recommend for an early termination of their supervision term. Nearly twice as many full-term offenders were rearrested for major or minor offenses within three years as their counterparts who were terminated early (19.2 percent versus 10.2 percent respectively, see Table 5). When minor offenses are excluded from the tabulations, the relative proportion

---

[3] When the arrest records lacked information about the level of offense associated with the arrest event, researchers used imputation to make the major versus minor distinction. If the offense is designated as a misdemeanor or lower more than 75 percent of the time across all states, the offense was categorized as minor for purposes of these tabulations.



**FIGURE 1.**
*Offense Type for Post-Supervision Arrest Early- and Full-Term Offenders (All Offenses)*



**FIGURE 2.**
*Types of Offense for Post-Supervision Arrest by Close Type (Major Offenses Only)*

**TABLE 11.**
*Comparison of Months Saved by Early Termination for Offenders with No Post-Supervision Arrest—FY 2005 and FY 2008*

| | FY 2005 Cases Months Saved | | FY 2008 Cases Months Saved | |
|---|---|---|---|---|
| | Full term | Early term | Full term | Early term |
| N | 443 | 463 | 1,160 | 1,289 |
| Mean | 0.0 | 14.7 | 0.0 | 15.7 |
| Median | 0.0 | 12.0 | 0.0 | 14.0 |

of rearrest rates for the two groups remains consistent, but the rates themselves are considerably lower for both groups. Specifically, only 5.9 percent of early-termed offenders were rearrested for major offenses compared to 12.2 percent of their full-term counterparts (Table 6). This suggests that probation officers should strongly consider offenders' actuarially predicted risk in the decision to recommend early termination of supervision.

Not only are early-terminated offenders arrested less frequently than their full-term counterparts, the time to rearrest is slightly greater. Specifically, early-term offenders remained arrest free for an average of 19.4 months compared to 18.8 for those who were full term. (See Table 8. Median times to arrest were 18 months for full term and 21 months for early term.) Further, the proportions of the types of offenses that constituted the arrests were nearly identical for both groups. For both groups, drug, property, and violent offenses comprised over 85 percent of all first arrests (Figure 2).

Because early termination criteria heavily favor persons at low risk to recidivate as indicated by the RPI or Post Conviction Risk Assessment (PCRA), approximately three-quarters (74.4 percent) of the offenders in this study group were low risk, 23.7 percent were medium risk, and 1.8 percent were high risk (Table 4). Overall, of the 423 offenders who were arrested from both comparison groups, high-risk offenders accounted for nearly 40 percent (38.5 percent) of those who were rearrested in the follow-up period (Table 9). In comparison, low-risk offenders accounted for 10.5 percent of those rearrested.

Perhaps more significantly, the results of the study indicate that while the early termination policy does not, as currently administered, compromise community safety, the attributable cost avoidance is significant. Although early-terminated offenders in the study originally received longer supervision sentences by approximately a year (39.8 months versus 27.8 months, see Table 10), on average they served 3.8 fewer months than full-term offenders (24 months to 27.8 months, respectively). At the most-recently published monthly cost of supervision of $286.11 per offender,[4] this equates to $1,087 per offender terminated early, for a total of $7,754,039 for the 7,132

---

[4] Source: April 10, 2012 memorandum reporting the fiscal year 2011 cost of supervision. The cost of supervision is calculated using the updated work measurement formula, probation/pretrial services officer salary costs, law enforcement account obligations, and miscellaneous operating expenses.

offenders who received early termination in calendar year 2012 alone.

The results of this study may inform other initiatives that are being considered by the Criminal Law Committee and the AO. For example, the Committee and AO staff may wish to consider whether early termination—and the risk principle generally—should be built into the next version of the staffing formula. Also, the Committee may want to consider whether changes to policy or legislation should be recommended to allow for the early termination of supervision for inmates who are compassionately released from prison under 18 U.S.C. § 3582(c). A recent report by the Inspector General of the Department of Justice critiqued the BOP's management of the compassionate release program. The BOP is currently reviewing its policies, and the courts should anticipate an increase in the number of inmates who are released from prison early under this authority. Because many of the inmates who are compassionately released are suffering from terminal illnesses, it may be unnecessary from a public safety perspective and inefficient from a resource perspective to continue to provide supervision in these cases.

# EXHIBIT D

## 4.   SUPERVISED RELEASE

**Reason for Amendment:** This amendment updates the *Guidelines Manual*'s approach to supervised release by revising Part D (Supervised Release) of Chapter Five (Determining the Sentence) and Chapter Seven (Violations of Probation and Supervised Release).

The Sentencing Reform Act of 1984 established "supervised release" as a tool a court could use to impose post-release supervision on a defendant sentenced to a term of imprisonment. *See* 18 U.S.C. § 3583. The primary goal of supervised release is to "ease the defendant's transition into the community after the service of a long prison term for a particularly serious offense, or to provide rehabilitation to a defendant who has spent a fairly short period in prison . . . but still needs supervision and training programs after release." S. Rep. No. 225, 98th Cong., 1st Sess. 54 (1983). Supervised release also functions as an important tool to promote public safety. *See* 18 U.S.C. §§ 3583(c), 3553(a)(2)(C).

While statutes mandate the imposition and minimum length of supervised release in some cases, courts generally have discretion to determine whether to impose supervised release, to set its length and conditions, modify those conditions, and to extend, revoke, or terminate the term. In making these decisions, the Act requires courts to examine a set of factors similar, but not identical, to those considered when imposing a sentence. *Compare* 18 U.S.C. § 3553(a) *with* 18 U.S.C. § 3583(c)–(e).

In November 2024, the Commission held a roundtable on supervised release attended by judges, retired federal probation officers, providers of reentry services, academics, federal probation, government and defense community representatives, and a reentry program graduate. The Commission also received extensive public comment and testimony from members of Congress, the Committee on Criminal Law of the Judicial Conference of the United States, the Department of Justice, the Federal Public and Community Defenders, the Commission's advisory groups, law professors, currently and formerly incarcerated individuals, and other criminal justice system stakeholders.

The amendment makes several overarching changes in response to this feedback and consistent with the statutory purposes and framework. First, it emphasizes the importance of judges making individualized decisions about supervised release at all relevant stages— including imposition, modification or extension, and revocation. Second, it underscores the authority of courts, in consultation with the probation officer, to reassess supervised release decisions after a defendant's release from imprisonment, including decisions about the length and conditions of supervision. Third, it underscores the rehabilitative purposes of supervised release by dividing the provisions addressing violations of probation and violations of supervised release into separate parts of Chapter Seven and providing courts with greater discretion to respond to a violation of a condition of supervised release, including where appropriate, through alternatives to revocation and imprisonment.

The amendment's specific changes to Chapters Five and Seven are discussed further below.

### Chapter Five, Part D (Supervised Release)

The amendment revises Chapter Five, Part D of the *Guidelines Manual* to provide courts with greater discretion to impose a term of supervised release that is appropriate for the individual defendant. The amendment adds Introductory Commentary, revises each existing guideline, and adds a new policy statement at §5D1.4, which addresses extending or terminating supervised release or modifying the conditions thereof.

### Introductory Commentary

The amendment adds Introductory Commentary to Part D of Chapter Five emphasizing that supervised release is intended to ease a defendant's transition into the community, provide needed rehabilitation, and promote public safety. It highlights the importance of conducting an individualized assessment to determine whether a defendant needs supervision and how to appropriately tailor the term and conditions, as required by 18 U.S.C. § 3583(c).

### §5D1.1 (Imposition of a Term of Supervised Release)

The amendment revises §5D1.1 to provide greater judicial discretion in determining whether any term of supervised release is warranted. The amendment removes the requirement to impose supervised release whenever the sentence of imprisonment is more than one year and instead requires supervised release only when mandated by statute. In any other case, "the court should order a term of supervised release when warranted by an individualized assessment of the need for supervision." Application Note 1 defines the "individualized assessment" by reference to the 18 U.S.C. § 3553(a) factors that courts must consider under 18 U.S.C. § 3583(c). The Commentary to §5D1.1 continues to instruct courts to consider the defendant's criminal history, substance abuse history, and history of domestic violence in determining whether to impose a term of supervised release.

These changes respond to widespread concern that supervised release often is ordered reflexively, potentially diverting supervision resources from individuals who most need them. Commission data shows that courts currently impose supervised release in most cases (82.5%). This focus on an individualized assessment aims to "assure that [individuals] who will need post-release supervision will receive it" while "prevent[ing] probation system resources from being wasted on supervisory services for releasees who do not need them," as Congress intended. *See* S. Rep. No. 225, 98th Cong., 1st Sess. 54 (1983).

The amendment also adds new §5D1.1(d), which instructs that "the court should state in open court the reasons for imposing or not imposing a term of supervised release," consistent with 18 U.S.C. § 3553(c).

Finally, it adds new Application Note 7, which alerts courts to the fact that the decision whether to impose a term of supervised release could affect subsequent application of First Step Act earned time credits.

### §5D1.2 (Term of Supervised Release)

The amendment revises §5D1.2 to provide courts with greater discretion in determining the appropriate length of the term of supervised release. It removes the recommended minimum terms by class of offense from §5D1.2(a) and instead instructs the court to conduct an individualized assessment to determine the length of the term, which shall be not less than any statutorily required minimum term. It continues to list the maximum terms of supervised release by offense class, noting that some statutes may provide for a different term. Application Note 1 provides that the factors considered for purposes of determining the length of the term are the same as the factors considered in determining whether to impose a term and—consistent with 18 U.S.C. §§ 3583(c) and 3553(a)—instructs that the court should ensure the term "is sufficient, but not greater than necessary, to address the purposes of imposing supervised release on the defendant."

Similar to the changes made to §5D1.1, the amendment adds a new instruction to §5D1.2 that "the court should state in open court the reasons for the length of the term imposed."

Additionally, the amendment removes the policy statement recommending the statutory maximum term of supervised release for sex offense cases. Although imposition of a statutory maximum term may be warranted in certain cases, the amendment leaves the appropriate term to the court's discretion. As a related change, the amendment deletes a similar maximum-term recommendation in the Commentary to §4B1.5 (Repeat and Dangerous Sex Offender Against Minors), but it continues to recommend that treatment and monitoring be considered as special conditions of supervised release for individuals sentenced under that guideline.

Finally, in Application Notes 2 and 3, the amendment advises that Congress has authorized higher statutory maximum and/or minimum terms of supervised release for certain terrorism and sex offenses and for some drug offenses.

### §5D1.3 (Conditions of Supervised Release)

Section 5D1.3 sets forth mandatory and discretionary conditions of supervised release. Discretionary conditions currently are further subdivided into "standard," "special," and additional conditions. The amendment restructures and revises the discretionary conditions of supervised release in four ways. First, it adds a general instruction at §5D1.3(b)(1), which provides that the court "should conduct an individualized assessment to determine what, if any," discretionary conditions are warranted. Second, in §5D1.3(b)(2), it removes the instruction that "standard" conditions "are recommended for supervised release" and instead clarifies that they "may be modified, omitted, or expanded in appropriate cases." Third, in §5D1.3(b)(3), it removes the recommendation of imposing "special" conditions for listed circumstances and instead provides that "[o]ne or more conditions from the . . . non-exhaustive list of 'special conditions' may be appropriate in a particular case, including" the described circumstances. Fourth, it removes the "additional conditions" subheading and incorporates those conditions into the list of "special" conditions in §5D1.3(b)(3).

These changes emphasize that any standard, special, or other discretionary conditions of supervised release—i.e., those not required by statute—should be imposed only when warranted by an individualized assessment, reflecting the requirements of 18 U.S.C.

§ 3583(d) and feedback that certain conditions are at times imposed by default. The Commission nonetheless recognizes the value of a list of "standard" conditions that establish basic behavioral expectations and facilitate probation officers' supervision. Accordingly, the amendment maintains the list of "standard" conditions without change but notes the court's authority to impose and adjust them as appropriate.

The amendment also adds three "special" conditions in response to commenters' concerns about cases where victims need special protection and cases where defendants could benefit from educational programs. The revised §5D1.3 lists the following as "special" conditions: (1) a condition prohibiting the defendant from interacting with any victim if the instant conviction is a sex offense; (2) a condition prohibiting the defendant from interacting with any identifiable victim, applicable to all offenses generally; and (3) a condition that the defendant participate in a General Education Development (or similar) program, vocational training, or skills training if the court has reason to believe it would be appropriate and would equip the defendant for suitable employment.

### New §5D1.4 (Modification, Early Termination, and Extension of Supervised Release (Policy Statement))

The Commission sought to address with this amendment potential issues surrounding the fact that the terms and conditions of supervised release are imposed at original sentencing, often years before the defendant begins supervision. People and their circumstances may change in and after prison, such that the original term and conditions may no longer be appropriate after the defendant's release. Courts are encouraged to consider modifying the terms and conditions of supervised release whenever changed individual circumstances so warrant.

While Commentary to §5D1.2 previously noted the court's authority to terminate or extend supervised release and encouraged courts to "exercise this authority in appropriate cases," the amendment adds a new policy statement at §5D1.4 to more directly address a court's statutory authority to modify conditions or to terminate or extend the term of supervised release.

Subsection (a) (Modification of Conditions) restates the court's authority under 18 U.S.C. § 3583(e)(2) to modify, reduce, or enlarge the conditions of supervised release and encourages the court to conduct an individualized assessment, in consultation with the probation officer, to determine whether any change to the conditions is warranted after a defendant's release from imprisonment. The Commission received feedback that while probation officers often meet with defendants approaching and after their release, judicial involvement varies by jurisdiction and individual court practice. The Commission believes that more consistent judicial participation in revisiting the conditions of supervised release will facilitate successful reintegration, increase compliance, and promote public safety, and, therefore, it is encouraged as a best practice.

To encourage appropriate use of early termination, subsection (b) (Early Termination) restates the court's authority under 18 U.S.C. § 3583(e)(1) to terminate the remaining term of supervision any time after one year of supervised release if the court determines, following consultation with the government and the probation officer, that termination is warranted by the conduct of the defendant and in the interest of justice. Application

Note 1(B) specifies factors a court might consider in determining whether to terminate the remaining term of supervised release, which are modeled in part after the factors in the *Guide to Judiciary Policy*, Vol. 8E, Ch. 3, § 360.20. Considering early termination at appropriate intervals will help ensure that resources are allocated to the individuals most in need of continued supervision and that the term is "sufficient, but not greater than necessary" to fulfill the purposes of imposing supervision. *See* 18 U.S.C. § 3583(c); 18 U.S.C. § 3553(a); USSG §5D1.2 comment. (n.1) (as revised by this amendment).

Subsection (c) (Extending a Term of Supervised Release) provides that the court may extend the term of supervised release any time before the expiration of a term if less than the maximum term was imposed and extension is warranted by an individualized assessment of the need for further supervision. Application Note 3 notes that extending a term may be more appropriate than revoking a term of supervised release in some cases.

Application Note 2 encourages the court, in coordination with the government, to ensure that any victim is reasonably, accurately, and timely notified, and provided, to the extent practicable, with an opportunity to be reasonably heard, unless any such victim previously requested not to be notified.

### Conforming Changes

The amendment also makes conforming changes to §1B1.10 (Reduction in Term of Imprisonment as a Result of Amended Guideline Range (Policy Statement)), §5B1.3 (Conditions of Probation), §5H1.3 (Mental and Emotional Conditions (Policy Statement)), and §5H1.4 (Physical Condition, Including Drug or Alcohol Dependence or Abuse; Gambling Addiction (Policy Statement)).

### Chapter Seven (Violations of Probation and Supervised Release)

The amendment revises Chapter Seven of the *Guidelines Manual* in two main ways to underscore the different purposes of probation and supervised release. First, it divides Chapter Seven into Part B (Violations of Probation) and Part C (Violations of Supervised Release) to reflect that probation serves all the goals of sentencing, including punishment, while supervised release primarily "fulfills rehabilitative ends, distinct from those served by incarceration." *United States v. Johnson*, 529 U.S. 53, 59 (2000). Second, it responds to stakeholder feedback on the need for a more flexible, individualized approach to supervised release violations by encouraging courts to consider a graduated response to a defendant's non-compliant behavior.

### Chapter Seven – Part A (Introduction to Chapter Seven)

The amendment revises the Introduction to Chapter Seven to explain the Commission's updated approach that treats violations of probation and supervised release differently. To highlight the primarily rehabilitative purposes of supervised release, the new introductory language encourages courts to consider graduated responses to non-compliant behavior before revoking supervised release. The Commission believes that a graduated approach will better allocate resources, promote public safety, and facilitate the reentry and rehabilitation of defendants on supervised release.

Supervised Release

*Chapter Seven – Part B (Violations of Probation)*

The amendment removes references to supervised release from Chapter Seven, Part B and adds an example to the commentary of §7B1.4 (criminal history calculation) that mirrors an addition to the commentary of new §7C1.5. The provisions in Chapter Seven, Part B are otherwise unchanged, reflecting the Commission's determination that violations of probation and supervised release should be treated differently.

*Chapter Seven – Part C (Violations of Supervised Release), Introductory Commentary*

The amendment includes Introductory Commentary to new Part C of Chapter Seven, which explains that in responding to a report of non-compliance, addressing a violation found during revocation proceedings, or imposing a sentence upon revocation, the court should conduct the same kind of individualized assessment used when imposing supervised release. The introduction highlights the Commission's view that courts should consider a wide array of options to address violations of supervised release and that any sentence imposed upon revocation should be tailored to address the failure to abide by supervision conditions, as imposition of an appropriate punishment for new criminal conduct is not the primary goal of a revocation sentence.

*New §7C1.1 (Classification of Violations (Policy Statement)) and §7C1.2 (Reporting of Violations of Supervised Release (Policy Statement))*

The amendment duplicates §§7B1.1 and 7B1.2 into new §§7C1.1 and 7C1.2 and retains the three existing grades of supervised release violations.

*§7C1.3 (Responses to Violations of Supervised Release (Policy Statement))*

New §7C1.3 identifies actions a court may take in response to a report of non-compliance with supervised release conditions or a finding of a violation. This new policy statement underscores the importance of using a graduated response to non-compliant behavior.

Subsection (a) instructs the court to conduct an individualized assessment to determine what, if any, response is appropriate to a report of non-compliance. New §7C1.3(a) reflects feedback that supervision is a dynamic process and often benefits from regular communication between the defendant, the probation officer, and the court.

Subsection (b) instructs the court to (1) revoke supervised release upon a finding of a violation for which revocation is required by statute, and (2) upon a finding of any other violation, conduct an individualized assessment, taking into consideration the grade of the violation, to determine whether to revoke supervised release for any other violation. New §7C1.3(b) further provides that revocation is generally appropriate for a Grade A violation, often appropriate for a Grade B violation, and may be appropriate for a Grade C violation. While revocation previously was required for both Grade A or B violations—and Commission data shows similar rates of prison-only revocations for both grades in recent years, *see* U.S. Sent'g Comm., Federal Probation and Supervised Release Violations 35 & Fig.13 (2020)—the amendment provides flexibility to assess the seriousness of the

underlying conduct and account for any jurisdictional differences affecting the grade assigned to similar conduct.

For both reports of non-compliance and findings of a violation, Application Note 2 references the court's authority to "take any appropriate action provided under 18 U.S.C. § 3583" and lists certain informal responses the court also may consider.

New Application Note 3 encourages the court to consider issuing a summons, rather than an arrest warrant, when appropriate, reflecting concerns that an arrest may result in unnecessary collateral consequences.

### §7C1.4 (Revocation of Supervised Release (Policy Statement))

The amendment adds new §7C1.4, which, in subsection (a), instructs the court to conduct an individualized assessment to determine the appropriate length of the term of imprisonment upon revocation, given the recommended ranges set forth in §7C1.5 (Term of Imprisonment—Supervised Release (Policy Statement)).

Subsection (b) directs that any term of imprisonment "generally should" be ordered to be served consecutively to any sentence of imprisonment that the defendant is currently serving. This language replaces the former instruction that terms of imprisonment upon revocation "shall" be ordered to be served consecutively. This new provision continues to underscore the seriousness of violation conduct while reserving flexibility for courts to run sentences concurrently in extraordinary cases where justified.

Subsection (c) retains the instruction from the prior version of §7B1.3(g)(2) which, consistent with 18 U.S.C. § 3583(h), allows a court to reimpose a term of supervised release upon release from a term of imprisonment imposed upon revocation.

New Application Note 3 adopts and modifies §7B1.3(c)(3) to state that "[i]n the case of a revocation based, at least in part, on a violation of a condition specifically pertaining to community confinement, intermittent confinement, or home detention, use of the same or a less restrictive sanction *generally* is not recommended" (emphasis added).

New Application Note 4 adopts and modifies §7B1.3(d) to instruct that sentencing obligations that remain unpaid or unserved at the time of revocation "should" be ordered to be paid or served in addition to any sentence imposed upon revocation.

### §7C1.5 (Term of Imprisonment—Supervised Release (Policy Statement))

The new §7C1.5 adopts and modifies §7B1.4 to set forth the Supervised Release Revocation Table and affirms the importance of conducting an individualized assessment to determine the length of a revocation sentence, in addition to consulting the recommended ranges in the Supervised Release Revocation Table.

The amendment adds an example to Application Note 1 to clarify that a defendant's criminal history category for purposes of determining the applicable range of imprisonment is not recalculated to reflect an amendment made retroactive under §1B1.10 (Reduction of Imprisonment as a Result of Amended Guideline Range (Policy Statement)). It adds the

Supervised Release

same example to the commentary to §7B1.4 (Term of Imprisonment—Probation (Policy Statement)).

§7C1.6 (No Credit for Time Under Supervision (Policy Statement))

The amendment adds §7C1.6, which duplicates §7B1.5(b) and (c).

**Amendment:**

## §1B1.10.  Reduction in Term of Imprisonment as a Result of Amended Guideline Range (Policy Statement)

\*     \*     \*

**Commentary**

**Application Notes:**

\*     \*     \*

8.    **Supervised Release.—**

(A)    **Exclusion Relating to Revocation.—**Only a term of imprisonment imposed as part of the original sentence is authorized to be reduced under this section. This section does not authorize a reduction in the term of imprisonment imposed upon revocation of supervised release.

(B)    **Modification Relating to Early Termination.—**If the prohibition in subsection (b)(2)(C) relating to time already served precludes a reduction in the term of imprisonment to the extent the court determines otherwise would have been appropriate as a result of the amended guideline range determined under subsection (b)(1), the court may consider any such reduction that it was unable to grant in connection with any motion for early termination of a term of supervised release under 18 U.S.C. § 3583(e)(1). *See* §5D1.4 (Modification, Early Termination, and Extension of Supervised Release (Policy Statement)). However, the fact that a defendant may have served a longer term of imprisonment than the court determines would have been appropriate in view of the amended guideline range determined under subsection (b)(1) shall not, without more, provide a basis for early termination of supervised release. Rather, the court should take into account the totality of circumstances relevant to a decision to terminate supervised release, including the term of supervised release that would have been appropriate in connection with a sentence under the amended guideline range determined under subsection (b)(1).

\*     \*     \*

## §4B1.5.  Repeat and Dangerous Sex Offender Against Minors

\*     \*     \*

Supervised Release

**Commentary**

**Application Notes:**

\* \* \*

5.    **Treatment and Monitoring.—**

(A)    ~~Recommended Maximum Term of Supervised Release.—The statutory maximum term of supervised release is recommended for offenders sentenced under this guideline.~~

(B)    ~~Recommended Conditions of Probation and Supervised Release.—~~Treatment and monitoring are important tools for supervising offenders and should be considered as special conditions of any term of probation or supervised release that is imposed.

\* \* \*

## §5B1.3.    Conditions of Probation

\* \* \*

(d)    "SPECIAL" CONDITIONS (POLICY STATEMENT)

The following "special" conditions of probation are recommended in the circumstances described and, in addition, may otherwise be appropriate in particular cases:

\* \* \*

(7)    SEX OFFENSES

If the instant offense of conviction is a sex offense~~, as defined in Application Note 1 of the Commentary to §5D1.2 (Term of Supervised Release)~~—

(A)    A condition requiring the defendant to participate in a program approved by the United States Probation Office for the treatment and monitoring of sex offenders.

(B)    A condition limiting the use of a computer or an interactive computer service in cases in which the defendant used such items.

(C)    A condition requiring the defendant to submit to a search, at any time, with or without a warrant, and by any law enforcement or probation officer, of the defendant's person and any property, house, residence, vehicle, papers, computer, other electronic communication or data storage devices or media, and effects, upon reasonable suspicion concerning a violation of a condition

of probation or unlawful conduct by the defendant, or by any probation officer in the lawful discharge of the officer's supervision functions.

\* \* \*

### Commentary

**Application Notes:**

1.  **Application of Subsection (c)(4).—**Although the condition in subsection (c)(4) requires the defendant to "answer truthfully" the questions asked by the probation officer, a defendant's legitimate invocation of the Fifth Amendment privilege against self-incrimination in response to a probation officer's question shall not be considered a violation of this condition.

2.  **Application of Subsection (d)(7).—**For purposes of subsection (d)(7):

    *"Sex offense"* means (A) an offense, perpetrated against a minor, under (i) chapter 109A of title 18, United States Code; (ii) chapter 110 of such title, not including a recordkeeping offense; (iii) chapter 117 of such title, not including transmitting information about a minor or filing a factual statement about an alien individual; (iv) an offense under 18 U.S.C. § 1201; or (v) an offense under 18 U.S.C. § 1591; or (B) an attempt or a conspiracy to commit any offense described in subparagraphs (A)(i) through (v) of this note. Such term does not include an offense under 18 U.S.C. § 2250 (Failure to register).

    *"Minor"* means (A) an individual who had not attained the age of 18 years; (B) an individual, whether fictitious or not, who a law enforcement officer represented to a participant (i) had not attained the age of 18 years; and (ii) could be provided for the purposes of engaging in sexually explicit conduct; or (C) an undercover law enforcement officer who represented to a participant that the officer had not attained the age of 18 years.

\* \* \*

# PART D — SUPERVISED RELEASE

### Introductory Commentary

The Sentencing Reform Act of 1984 requires the court to assess a wide range of factors "in determining whether to include a term of supervised release, and, if a term of supervised release is to be included, in determining the length of the term and the conditions of supervised release." 18 U.S.C. § 3583(c). These determinations aim to make the imposition and scope of supervised release "dependent on the needs of the defendant for supervision." *See* S. Rep. No. 225, 98th Cong., 1st Sess. 124 (1983). In conducting such an individualized assessment, the court can "assure that [those] who will need post-release supervision will receive it" while "prevent[ing] probation system resources from being wasted on supervisory services for releasees who do not need them." *Id.* at 54; *see also Johnson v. United States,* 529 U.S. 694, 709 (2000) ("Supervised release departed from the parole system it replaced by giving district courts the freedom to provide postrelease supervision for those, and only those, who needed it . . . . Congress aimed, then, to use the district courts' discretionary judgment to allocate supervision to those releasees who needed it most."). Supervised release "fulfills rehabilitative ends, distinct from those served by incarceration." *United States v. Johnson,*

Supervised Release

529 U.S. 53, 59 (2000). Accordingly, a court should consider whether the defendant needs supervision in order to ease transition into the community or to provide further rehabilitation and whether supervision will promote public safety. *See* 18 U.S.C. §§ 3583(c), 3553(a)(2)(C)); *see also* S. Rep. No. 225, 98th Cong., 1st Sess. 124 (1983) (indicating that a "primary goal of [a term of supervised release] is to ease the defendant's transition into the community after the service of a long prison term for a particularly serious offense, or to provide rehabilitation to a defendant who has spent a fairly short period in prison for punishment or other purposes but still needs supervision and training programs after release").

\*　　\*　　\*

## §5D1.1.　Imposition of a Term of Supervised Release

(a)　The court shall order a term of supervised release to follow imprisonment⸺

(1)　when required by statute (*see* 18 U.S.C. § 3583(a)); ~~or~~

~~(2)　except as provided in subsection (c), when a sentence of imprisonment of more than one year is imposed.~~

(b)　~~The~~When a term of supervised release is not required by statute, the court ~~may~~should order a term of supervised release to follow imprisonment ~~in any other case~~when warranted by an individualized assessment of the need for supervision. ~~*See* 18 U.S.C. § 3583(a).~~

(c)　The court ordinarily should not impose a term of supervised release in a case in which supervised release is not required by statute and the defendant is a deportable alien who likely will be deported after imprisonment.

(d)　The court should state in open court the reasons for imposing or not imposing a term of supervised release. *See* 18 U.S.C. § 3553(c).

### Commentary

**Application Notes:**

1.　**Application of Subsection (a).**—~~Under subsection (a), the court is required to impose a term of supervised release to follow imprisonment when supervised release is required by statute or, except as provided in subsection (c), when a sentence of imprisonment of more than one year is imposed. The court may depart from this guideline and not impose a term of supervised release if supervised release is not required by statute and the court determines, after considering the factors set forth in Note 3, that supervised release is not necessary.~~

2.　~~**Application of Subsection (b)**~~**Individualized Assessment.**—~~Under subsection (b), the court may impose a term of supervised release to follow a term of imprisonment in any other case, after considering the factors set forth in Note 3.~~

3. ~~Factors to Be Considered.~~—

    (A) ~~Statutory Factors.~~—~~In determining whether to impose a term of supervised release, the court is required by statute to consider, among other factors:~~The statutory framework of supervised release aims to "assure that [those] who will need post-release supervision will receive it" while "prevent[ing] probation system resources from being wasted on supervisory services for releasees who do not need them." *See* S. Rep. No. 225, 98th Cong., 1st Sess. 54 (1983). To that end, 18 U.S.C. § 3583(c) requires the court to, "in determining whether to include a term of supervised release, and, if a term of supervised release is to be included, in determining the length of the term and the conditions of supervised release," consider the following:

        (~~i~~A) the nature and circumstances of the offense and the history and characteristics of the defendant (18 U.S.C. § 3553(a)(1));

        (~~ii~~B) the need to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner (18 U.S.C. § 3553(a)(2)(B)–(D));

        (C) the kinds of sentence and the sentencing range established for the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines (18 U.S.C. § 3553(a)(4));

        (D) any pertinent policy statement issued by the Sentencing Commission (18 U.S.C. § 3553(a)(5));

        (~~iii~~E) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct (18 U.S.C. § 3553(a)(6)); and

        (~~iv~~F) the need to provide restitution to any victims of the offense (18 U.S.C. § 3553(a)(7)).

      *See* 18 U.S.C. § 3583(c).

(~~B~~)2. **Criminal History.**—The court should give particular consideration to the defendant's criminal history (which is one aspect of the "history and characteristics of the defendant" in ~~subparagraph (A)(i),~~Application Note 1(A) above). In general, the more serious the defendant's criminal history, the greater the need for supervised release.

(~~C~~)3. **Substance Abuse.**—In a case in which a defendant sentenced to imprisonment is an abuser of controlled substances or alcohol, it is highly recommended that a term of supervised release also be imposed. *See* §5H1.4 (Physical Condition, Including Drug or Alcohol Dependence or Abuse; Gambling Addiction).

(~~D~~)4. **Domestic Violence.**—If the defendant is convicted for the first time of a domestic violence crime as defined in 18 U.S.C. § 3561(b), a term of supervised release is required by statute. *See* 18 U.S.C. § 3583(a). Such a defendant is also required by statute to attend an approved rehabilitation program, if available within a 50-mile radius of the legal residence of the defendant. *See* 18 U.S.C. § 3583(d); §5D1.3(a)(3). In any other case involving domestic violence or stalking in which the defendant is sentenced to imprisonment, it is highly recommended that a term of supervised release also be imposed.

Supervised Release

45. **Community Confinement or Home Detention Following Imprisonment.**—A term of supervised release must be imposed if the court wishes to impose a "split sentence" under which the defendant serves a term of imprisonment followed by a period of community confinement or home detention pursuant to subsection (c)(2) or (d)(2) of §5C1.1 (Imposition of a Term of Imprisonment). In such a case, the period of community confinement or home detention is imposed as a condition of supervised release.

5~~6~~. **Application of Subsection (c).**—In a case in which the defendant is a deportable alien specified in subsection (c) and supervised release is not required by statute, the court ordinarily should not impose a term of supervised release. Unless such a defendant legally returns to the United States, supervised release is unnecessary. If such a defendant illegally returns to the United States, the need to afford adequate deterrence and protect the public ordinarily is adequately served by a new prosecution. The court should, however, consider imposing a term of supervised release on such a defendant if the court determines it would provide an added measure of deterrence and protection based on the facts and circumstances of a particular case.

7. **Evidence-Based Recidivism Reduction Programming.**—Whether a defendant's sentence includes a term of supervised release may impact the application of time credits earned by the defendant under the First Step Act of 2018, Pub. L. 115–391. The First Step Act of 2018 allows individuals in custody who successfully complete evidence-based recidivism reduction programming or productive activities to earn time credits. *See* 18 U.S.C. § 3632(d)(4)(A). Regarding the application of those time credits, the First Step Act of 2018 provides: "If the sentencing court included as a part of the prisoner's sentence a requirement that the prisoner be placed on a term of supervised release after imprisonment pursuant to [18 U.S.C. § 3583], the Director of the Bureau of Prisons may transfer the prisoner to begin any such term of supervised release at an earlier date, not to exceed 12 months, based on the application of time credits under [18 U.S.C. § 3632]." 18 U.S.C. § 3624(g)(3).

*   *   *

## §5D1.2.    Term of Supervised Release

(a) ~~Except as provided in subsections (b) and (c), if~~If a term of supervised release is ordered, ~~the length of the term shall be~~the court shall conduct an individualized assessment to determine the length of the term, which shall not be less than any statutorily required minimum term. Except as otherwise provided by statute, the maximum term of supervised release is as follows:

   (1) ~~At least two years but not~~Not more than five years for a defendant convicted of a Class A or B felony. *See* 18 U.S.C. § 3583(b)(1).

   (2) ~~At least one year but not~~Not more than three years for a defendant convicted of a Class C or D felony. *See* 18 U.S.C. § 3583(b)(2).

   (3) ~~One~~Not more than one year for a defendant convicted of a Class E felony or a ~~Class A~~ misdemeanor (other than a petty offense). *See* 18 U.S.C. § 3583(b)(3).

(b) ~~Notwithstanding subdivisions (a)(1) through (3), the length of the term of supervised release shall be not less than the minimum term of years specified~~

Supervised Release

~~for the offense under subdivisions (a)(1) through (3) and may be up to life, if the offense is—~~

~~(1)    any offense listed in 18 U.S.C. § 2332b(g)(5)(B), the commission of which resulted in, or created a foreseeable risk of, death or serious bodily injury to another person; or~~

~~(2)    a sex offense.~~

~~(Policy Statement) If the instant offense of conviction is a sex offense, however, the statutory maximum term of supervised release is recommended.~~

(c)    ~~The term of supervised release imposed shall be not less than any statutorily required term of supervised release.~~The court should state in open court the reasons for the length of the term imposed. *See* 18 U.S.C. § 3553(c).

### Commentary

**Application Notes:**

1.    ~~**Definitions.**—For purposes of this guideline:~~

~~"*Sex offense*" means (A) an offense, perpetrated against a minor, under (i) chapter 109A of title 18, United States Code; (ii) chapter 110 of such title, not including a recordkeeping offense; (iii) chapter 117 of such title, not including transmitting information about a minor or filing a factual statement about an alien individual; (iv) an offense under 18 U.S.C. § 1201; or (v) an offense under 18 U.S.C. § 1591; or (B) an attempt or a conspiracy to commit any offense described in subdivisions (A)(i) through (v) of this note. Such term does not include an offense under 18 U.S.C. § 2250 (Failure to register).~~

~~"*Minor*" means (A) an individual who had not attained the age of 18 years; (B) an individual, whether fictitious or not, who a law enforcement officer represented to a participant (i) had not attained the age of 18 years; and (ii) could be provided for the purposes of engaging in sexually explicit conduct; or (C) an undercover law enforcement officer who represented to a participant that the officer had not attained the age of 18 years.~~

**Individualized Assessment.**—When conducting an individualized assessment to determine the length of a term of supervised release, the factors to be considered are the same as the factors considered in determining whether to impose such a term. *See* 18 U.S.C. § 3583(c); Application Note 1 to §5D1.1 (Imposition of a Term of Supervised Release). The court should ensure that the term imposed on the defendant is sufficient, but not greater than necessary, to address the purposes of imposing supervised release on the defendant.

2.    **Terrorism and Sex Offenses.**—Congress has authorized a term of supervised release that exceeds the maximum terms described in subsection (a) for certain serious offenses. *See* 18 U.S.C. § 3583(j), (k). For certain terrorism offenses, the authorized term of supervised release is any term of years or life. 18 U.S.C. § 3583(j). For certain sex offenses, the authorized term of supervised release is any term of years not less than five, or up to life. 18 U.S.C. § 3583(k).

3.    **Drug Offenses.**—For certain drug offenses, Congress has established statutory minimum terms of supervised release. *See, e.g.,* 21 U.S.C. §§ 841(b), 960(b) (providing minimum terms of supervised release depending on drug type and quantity and criminal history).

~~2~~4.    **Safety Valve Cases.**—A defendant who qualifies under §5C1.2 (Limitation on Applicability of Statutory Minimum Sentence in Certain Cases) is not subject to any statutory minimum sentence of supervised release. *See* 18 U.S.C. § 3553(f). In such a case, the term of supervised release ~~shall be~~is determined under subsection (a).

~~3~~5.    **Substantial Assistance Cases.**—Upon motion of the Government, a defendant who has provided substantial assistance in the investigation or prosecution of another person who has committed an offense may be sentenced to a term of supervised release that is less than any minimum required by statute ~~or the guidelines~~. *See* 18 U.S.C. § 3553(e), §5K1.1 (Substantial Assistance to Authorities).

~~4.    Factors Considered.—The factors to be considered in determining the length of a term of supervised release are the same as the factors considered in determining whether to impose such a term. See 18 U.S.C. § 3583(c); Application Note 3 to §5D1.1 (Imposition of a Term of Supervised Release). The court should ensure that the term imposed on the defendant is long enough to address the purposes of imposing supervised release on the defendant.~~

~~5~~6.    **Early Termination and Extension.**—The court has authority to terminate or extend a term of supervised release. *See* 18 U.S.C. § 3583(e)(1), (2); §5D1.4 (Modification, Early Termination, and Extension of Supervised Release (Policy Statement)). ~~The court is encouraged to exercise this authority in appropriate cases. The prospect of exercising this authority is a factor the court may wish to consider in determining the length of a term of supervised release. For example, the court may wish to consider early termination of supervised release if the defendant is an abuser of narcotics, other controlled substances, or alcohol who, while on supervised release, successfully completes a treatment program, thereby reducing the risk to the public from further crimes of the defendant.~~

~~6.    Application of Subsection (c).—Subsection (c) specifies how a statutorily required minimum term of supervised release may affect the minimum term of supervised release provided by the guidelines.~~

~~For example, if subsection (a) provides a range of two years to five years, but the relevant statute requires a minimum term of supervised release of three years and a maximum term of life, the term of supervised release provided by the guidelines is restricted by subsection (c) to three years to five years. Similarly, if subsection (a) provides a range of two years to five years, but the relevant statute requires a minimum term of supervised release of five years and a maximum term of life, the term of supervised release provided by the guidelines is five years.~~

~~The following example illustrates the interaction of subsections (a) and (c) when subsection (b) is also involved. In this example, subsection (a) provides a range of two years to five years; the relevant statute requires a minimum term of supervised release of five years and a maximum term of life; and the offense is a sex offense under subsection (b). The effect of subsection (b) is to raise the maximum term of supervised release from five years (as provided by subsection (a)) to life, yielding a range of two years to life. The term of supervised release provided by the guidelines is then restricted by subsection (c) to five years to life. In this example, a term of supervised release of more than five years would be a guideline sentence. In addition, subsection (b) contains a policy statement recommending that the maximum — a life term of supervised release — be imposed.~~

~~**Background:** This section specifies the length of a term of supervised release that is to be imposed. Subsection (c) applies to statutes, such as the Anti-Drug Abuse Act of 1986, that require imposition of a specific minimum term of supervised release.~~

Supervised Release

\*   \*   \*

## §5D1.3.   Conditions of Supervised Release

(a)  MANDATORY CONDITIONS

(1)  The defendant shall not commit another federal, state or local offense (*see* 18 U.S.C. § 3583(d)).

(2)  The defendant shall not unlawfully possess a controlled substance (*see* 18 U.S.C. § 3583(d)).

(3)  The defendant who is convicted for a domestic violence crime as defined in 18 U.S.C. § 3561(b) for the first time shall attend a public, private, or private non-profit offender rehabilitation program that has been approved by the court, in consultation with a State Coalition Against Domestic Violence or other appropriate experts, if an approved program is available within a 50-mile radius of the legal residence of the defendant (*see* 18 U.S.C. § 3583(d)).

(4)  The defendant shall refrain from any unlawful use of a controlled substance and submit to one drug test within 15 days of release on supervised release and at least two periodic drug tests thereafter (as determined by the court) for use of a controlled substance, but the condition stated in this paragraph may be ameliorated or suspended by the court for any individual defendant if the defendant's presentence report or other reliable information indicates a low risk of future substance abuse by the defendant (*see* 18 U.S.C. § 3583(d)).

(5)  If a fine is imposed and has not been paid upon release to supervised release, the defendant shall adhere to an installment schedule to pay that fine (*see* 18 U.S.C. § 3624(e)).

(6)  The defendant shall (A) make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A, or any other statute authorizing a sentence of restitution; and (B) pay the assessment imposed in accordance with 18 U.S.C. § 3013. If there is a court-established payment schedule for making restitution or paying the assessment (*see* 18 U.S.C. § 3572(d)), the defendant shall adhere to the schedule.

(7)  If the defendant is required to register under the Sex Offender Registration and Notification Act, the defendant shall comply with the requirements of that Act (*see* 18 U.S.C. § 3583(d)).

(8)  The defendant shall submit to the collection of a DNA sample from the defendant at the direction of the United States Probation Office if

the collection of such a sample is authorized pursuant to section 3 of the DNA Analysis Backlog Elimination Act of 2000 (34 U.S.C. § 40702).

(b)  DISCRETIONARY CONDITIONS

(1)  IN GENERAL.—The court ~~may impose~~ should conduct an individualized assessment to determine what, if any, other conditions of supervised release are warranted.

Such conditions are warranted to the extent that ~~such conditions~~ they (~~1~~A) are reasonably related to (~~A~~i) the nature and circumstances of the offense and the history and characteristics of the defendant; (~~B~~ii) the need for the sentence imposed to afford adequate deterrence to criminal conduct; (~~C~~iii) the need to protect the public from further crimes of the defendant; and (~~D~~iv) the need to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; and (~~2~~B) involve no greater deprivation of liberty than is reasonably necessary for the purposes set forth above and are consistent with any pertinent policy statements issued by the Sentencing Commission. *See* 18 U.S.C. § 3583(d).

(~~e~~2)  "STANDARD" CONDITIONS (POLICY STATEMENT)

The following are "standard" conditions of supervised release, which the court may modify, expand, or omit in appropriate cases ~~are recommended for supervised release. Several of the conditions are expansions of the conditions required by statute~~:

(~~1~~A) The defendant shall report to the probation office in the federal judicial district where he or she is authorized to reside within 72 hours of release from imprisonment, unless the probation officer instructs the defendant to report to a different probation office or within a different time frame.

(~~2~~B) After initially reporting to the probation office, the defendant will receive instructions from the court or the probation officer about how and when to report to the probation officer, and the defendant shall report to the probation officer as instructed.

(~~3~~C) The defendant shall not knowingly leave the federal judicial district where he or she is authorized to reside without first getting permission from the court or the probation officer.

Supervised Release

(4D) The defendant shall answer truthfully the questions asked by the probation officer.

(5E) The defendant shall live at a place approved by the probation officer. If the defendant plans to change where he or she lives or anything about his or her living arrangements (such as the people the defendant lives with), the defendant shall notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, the defendant shall notify the probation officer within 72 hours of becoming aware of a change or expected change.

(6F) The defendant shall allow the probation officer to visit the defendant at any time at his or her home or elsewhere, and the defendant shall permit the probation officer to take any items prohibited by the conditions of the defendant's supervision that he or she observes in plain view.

(7G) The defendant shall work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses the defendant from doing so. If the defendant does not have full-time employment he or she shall try to find full-time employment, unless the probation officer excuses the defendant from doing so. If the defendant plans to change where the defendant works or anything about his or her work (such as the position or the job responsibilities), the defendant shall notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, the defendant shall notify the probation officer within 72 hours of becoming aware of a change or expected change.

(8H) The defendant shall not communicate or interact with someone the defendant knows is engaged in criminal activity. If the defendant knows someone has been convicted of a felony, the defendant shall not knowingly communicate or interact with that person without first getting the permission of the probation officer.

(9I) If the defendant is arrested or questioned by a law enforcement officer, the defendant shall notify the probation officer within 72 hours.

(10J) The defendant shall not own, possess, or have access to a firearm, ammunition,    destructive    device,    or    dangerous    weapon

Supervised Release

(*i.e.*, anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person, such as nunchakus or tasers).

(~~11~~K) The defendant shall not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.

(~~12~~L) If the probation officer determines that the defendant poses a risk to another person (including an organization), the probation officer may require the defendant to notify the person about the risk and the defendant shall comply with that instruction. The probation officer may contact the person and confirm that the defendant has notified the person about the risk.

(~~13~~M) The defendant shall follow the instructions of the probation officer related to the conditions of supervision.

(~~d~~3) "Special" Conditions (Policy Statement)

~~The~~One or more conditions from the following non-exhaustive list of "special" conditions of supervised release ~~are recommended~~may be appropriate in a particular case, including in the circumstances described ~~and, in addition, may otherwise be appropriate in particular cases~~therein:

(~~1~~A) Support of Dependents

(~~A~~i) If the defendant has one or more dependents — a condition specifying that the defendant shall support his or her dependents.

(~~B~~ii) If the defendant is ordered by the government to make child support payments or to make payments to support a person caring for a child — a condition specifying that the defendant shall make the payments and comply with the other terms of the order.

(~~2~~B) Debt Obligations

If an installment schedule of payment of restitution or a fine is imposed — a condition prohibiting the defendant from incurring new credit charges or opening additional lines of credit without approval of the probation officer unless the defendant is in compliance with the payment schedule.

Supervised Release

(3C) ACCESS TO FINANCIAL INFORMATION

If the court imposes an order of restitution, forfeiture, or notice to victims, or orders the defendant to pay a fine — a condition requiring the defendant to provide the probation officer access to any requested financial information.

(4D) SUBSTANCE ABUSE

If the court has reason to believe that the defendant is an abuser of narcotics, other controlled substances or alcohol — (Ai) a condition requiring the defendant to participate in a program approved by the United States Probation Office for substance abuse, which program may include testing to determine whether the defendant has reverted to the use of drugs or alcohol; and (Bii) a condition specifying that the defendant shall not use or possess alcohol.

(5E) MENTAL HEALTH PROGRAM PARTICIPATION

If the court has reason to believe that the defendant is in need of psychological or psychiatric treatment — a condition requiring that the defendant participate in a mental health program approved by the United States Probation Office.

(6F) DEPORTATION

If (Ai) the defendant and the United States entered into a stipulation of deportation pursuant to section 238(c)(5) of the Immigration and Nationality Act (8 U.S.C. § 1228(c)(5)*); or (Bii) in the absence of a stipulation of deportation, if, after notice and hearing pursuant to such section, the Attorney General demonstrates by clear and convincing evidence that the alien is deportable — a condition ordering deportation by a United States district court or a United States magistrate judge.

*So in original. Probably should be 8 U.S.C. § 1228(d)(5).

(7G) SEX OFFENSES

If the instant offense of conviction is a sex offense, as defined in Application Note 1 of the Commentary to §5D1.2 (Term of Supervised Release) —

(Ai) A condition requiring the defendant to participate in a program approved by the United States Probation Office for the treatment and monitoring of sex offenders.

Supervised Release

(~~B~~ii) A condition limiting the use of a computer or an interactive computer service in cases in which the defendant used such items.

(~~C~~iii) A condition requiring the defendant to submit to a search, at any time, with or without a warrant, and by any law enforcement or probation officer, of the defendant's person and any property, house, residence, vehicle, papers, computer, other electronic communication or data storage devices or media, and effects upon reasonable suspicion concerning a violation of a condition of supervised release or unlawful conduct by the defendant, or by any probation officer in the lawful discharge of the officer's supervision functions.

(iv)    A condition prohibiting the defendant from communicating, or otherwise interacting, with any victim of the offense, either directly or through someone else.

(~~8~~H) UNPAID RESTITUTION, FINES, OR SPECIAL ASSESSMENTS

If the defendant has any unpaid amount of restitution, fines, or special assessments, the defendant shall notify the probation officer of any material change in the defendant's economic circumstances that might affect the defendant's ability to pay.

(I)    EDUCATIONAL OR VOCATIONAL TRAINING

If the court has reason to believe that a course of study or vocational training would be appropriate and would equip the defendant for suitable employment, a condition specifying that the defendant participate in a General Education Development (or similar) program, vocational training, or skills training, unless the probation officer excuses the defendant from doing so.

(J)    VICTIM CONTACT

If there is an identifiable victim of the offense, a condition prohibiting the defendant from communicating, or otherwise interacting, with any of the victims, either directly or through someone else.

~~(e)    ADDITIONAL CONDITIONS (POLICY STATEMENT)~~

~~The following "special conditions" may be appropriate on a case-by-case basis:~~

(1̶K) COMMUNITY CONFINEMENT

Residence in a community treatment center, halfway house or similar facility may be imposed as a condition of supervised release. *See* §5F1.1 (Community Confinement).

(2̶L) HOME DETENTION

Home detention may be imposed as a condition of supervised release, but only as a substitute for imprisonment. *See* §5F1.2 (Home Detention).

(3̶M)COMMUNITY SERVICE

Community service may be imposed as a condition of supervised release. *See* §5F1.3 (Community Service).

(4̶N) OCCUPATIONAL RESTRICTIONS

Occupational restrictions may be imposed as a condition of supervised release. *See* §5F1.5 (Occupational Restrictions).

(5̶O) CURFEW

A condition imposing a curfew may be imposed if the court concludes that restricting the defendant to his place of residence during evening and nighttime hours is necessary to protect the public from crimes that the defendant might commit during those hours, or to assist in the rehabilitation of the defendant. Electronic monitoring may be used as a means of surveillance to ensure compliance with a curfew order.

(6̶P) INTERMITTENT CONFINEMENT

Intermittent confinement (custody for intervals of time) may be ordered as a condition of supervised release during the first year of supervised release, but only for a violation of a condition of supervised release in accordance with 18 U.S.C. § 3583(e)(2) and only when facilities are available. *See* §5F1.8 (Intermittent Confinement).

**Commentary**

**Application Notes:**

1.  **Individualized Assessment.**—When conducting an individualized assessment under this section, the court must consider the same factors used to determine whether to impose a term of

Supervised Release

supervised release, and shall impose conditions of supervision not required by statute only to the extent such conditions meet the requirements listed at 18 U.S.C. § 3583(d). *See* 18 U.S.C. § 3583(c), (d); Application Note 1 to §5D1.1 (Imposition of a Term of Supervised Release).

2.   **Application of Subsection ~~(c)(4)~~(b)(2)(D).**—Although the condition in subsection ~~(c)(4)~~(b)(2)(D) requires the defendant to "answer truthfully" the questions asked by the probation officer, a defendant's legitimate invocation of the Fifth Amendment privilege against self-incrimination in response to a probation officer's question shall not be considered a violation of this condition.

3.   **Application of Subsection (b)(3)(G).**— For purposes of subsection (b)(3)(G):

*Sex offense*" means (A) an offense, perpetrated against a minor, under (i) chapter 109A of title 18, United States Code; (ii) chapter 110 of such title, not including a recordkeeping offense; (iii) chapter 117 of such title, not including transmitting information about a minor or filing a factual statement about an alien individual; (iv) an offense under 18 U.S.C. § 1201; or (v) an offense under 18 U.S.C. § 1591; or (B) an attempt or a conspiracy to commit any offense described in subparagraphs (A)(i) through (v) of this note. Such term does not include an offense under 18 U.S.C. § 2250 (Failure to register).

*Minor*" means (A) an individual who had not attained the age of 18 years; (B) an individual, whether fictitious or not, who a law enforcement officer represented to a participant (i) had not attained the age of 18 years; and (ii) could be provided for the purposes of engaging in sexually explicit conduct; or (C) an undercover law enforcement officer who represented to a participant that the officer had not attained the age of 18 years.

*     *     *

# §5D1.4.   Modification, Early Termination, and Extension of Supervised Release (Policy Statement)

(a)   MODIFICATION OF CONDITIONS.—At any time prior to the expiration or termination of the term of supervised release, the court may modify, reduce, or enlarge the conditions of supervised release whenever warranted by an individualized assessment of the appropriateness of existing conditions. *See* 18 U.S.C. § 3583(e)(2). The court is encouraged to conduct such an assessment in consultation with the probation officer after the defendant's release from imprisonment.

(b)   EARLY TERMINATION.—Any time after the expiration of one year of supervised release and after an individualized assessment of the need for ongoing supervision, the court may terminate the remaining term of supervision and discharge the defendant if the court determines, following consultation with the government and the probation officer, that the termination is warranted by the conduct of the defendant and in the interest of justice. *See* 18 U.S.C. § 3583(e)(1).

(c)   EXTENDING A TERM OF SUPERVISED RELEASE.—The court may, at any time prior to the expiration or termination of a term of supervised release, extend the term

of supervised release if less than the maximum authorized term of supervised release was previously imposed and the extension is warranted by an individualized assessment of the need for further supervision. *See* 18 U.S.C. § 3583(e)(2).

## Commentary

**Application Notes:**

1.  **Individualized Assessment.—**

    (A)  **In General.—**When making an individualized assessment under this section, the factors to be considered are the same factors used to determine whether to impose a term of supervised release. *See* 18 U.S.C. § 3583(c), (e); Application Note 1 to §5D1.1 (Imposition of a Term of Supervised Release).

    (B)  **Early Termination.—**When determining whether to terminate the remaining term of supervised release under subsection (b), the court may wish to consider such factors as:

    (i)   any history of court-reported violations over the term of supervision;

    (ii)  the ability of the defendant to lawfully self-manage (*e.g.*, the ability to problem-solve and avoid situations that may result in a violation of a condition of supervised release or new criminal charges);

    (iii) the defendant's substantial compliance with all conditions of supervision;

    (iv)  the defendant's engagement in appropriate prosocial activities and the existence or lack of prosocial support to remain lawful beyond the period of supervision;

    (v)   a demonstrated reduction in risk level or maintenance of the lowest category of risk over the period of supervision; and

    (vi)  whether termination will jeopardize public safety, as evidenced by the nature of the defendant's offense, the defendant's criminal history, the defendant's record while incarcerated, the defendant's efforts to reintegrate into the community and avoid recidivism, any statements or information provided by the victims of the offense, and other factors the court finds relevant.

2.  **Notification of Victims.—**When determining whether to modify any condition of supervised release that would be relevant to a victim or to terminate the remaining term of supervised release, the Commission encourages the court, in coordination with the government, to ensure that any victim of the offense is reasonably, accurately, and timely notified, and provided, to the extent practicable, with an opportunity to be reasonably heard, unless any such victim previously requested not to be notified.

3.  **Application of Subsection (c).—**Subsection (c) addresses a court's authority to extend a term of supervised release. In some cases, extending a term may be more appropriate than taking other measures, such as revoking the term of supervised release.

\*   \*   \*

# EXHIBIT E

ALLERGY, ASTHMA & ARTHRITIS ASSOCIATES
600 MT PLEASANT AVE, STE C
DOVER, NJ 07801-1621

September 9, 2025

RE: JOSEPH GOOCH

To whom it may concern,

Mr. Gooch has been followed in my office for many years.   He has a long history of active severe rheumatoid arthritis which is only partially controlled.    Currently Joseph requires Orencia, a disease modifying biologic drug, and steroids to control partially his symptoms. Additionally he has had significant infections that were life-threatening, involving his pulmonary tract, in the last year.    There have been multiple operations on his back and spine which is causing him great difficulty with ambulation.   His disease remains only partially under control and requires intense follow-up.   He has been completely compliant with his medications as well as being extremely cooperative.    Joseph has always followed my instructions and recommendations faithfully.

Sincerely,

*David Widman MD*

Dr. David Widman

# EXHIBIT F

Mary Beth Gooch
112 Fish Pond Rd.
Sewell, NJ 08080

October 29, 2025

The Honorable Judge Renee Marie Bumb
United States District Court
District of New Jersey
401 Market St.
Camden, NJ 08101

Deary Judge Bumb:

I am writing you on behalf of my brother, Joseph Gooch. I live with Joe, and I see his daily struggles, and would be the main family member to explain his condition. I would like to respectfully request your consideration for leniency and if possible, early termination of his probation.

Joseph has taken full responsibility for his past actions and has complied with the requirements of his sentence. He successfully completed his period of house supervision, paid all fines in full, and dedicated over 300 hours to community service. His community service work was at a farm for rescued animals. His work, because of his mechanical capabilities was doing facility repairs, which was all manual labor.

Joe is a proud veteran of the United States Marine Corps. His years of service came at a significant cost to his health. He continues to face ongoing medical challenges that have greatly affected his daily life. He has undergone four spinal surgeries, one of which was shortly after finishing his service at the farm. They had to fuse another two disks, and he now has four sets of rods and 16 screws in his spine. He continues to manage chronic pain and limited mobility. Earlier this year, in May, Joe was hospitalized with a serious lung infection linked to his autoimmune disorder. This was his third lung infection, so they gave him a stronger antibiotic, Levofloxacin. He was never advised this drug would weaken his tendons, and while working on a family vehicle repair, he tore both of his Achilles. He spent three months wearing medical boots, then six weeks in therapy and now they have him in a health club to rebuild his leg muscles. Doctors have also diagnosed him with a skin condition (Lichen Simplex Chronicus) related to the autoimmune disorder. They've placed him on another bio drug (Dupixent), and he must give himself injections every two weeks. Just this week they found another growth in his mouth, and he is currently waiting for the biopsy results. These medical issues have made daily life difficult, yet Joe has shown remarkable effort in following his treatment plans, scheduling & attending appointments, and striving to rebuild his stability and peace of mind.

Joe has lost four of his military friends to cancer, and a fifth one was recently diagnosed with lymph node cancer. He worries that with all his medical conditions they are going to find cancer in him soon as well. Despite these hardships, Joe has remained committed to rebuilding his life and contributing positively to his family and his community. I truly believe continuing his probation adds strain, as he focuses on managing his health dealing with the long-term consequences of his military service. Allowing him relief from this burden would help him fully dedicate his time and energy to recovery.

Your compassion and understanding in granting early termination of his probation would allow Joe to continue his treatment and live with a greater sense of stability and peace. Our family deeply appreciates the Court's time and consideration of this request.

Thank you, Your Honor, for taking the time to read this letter and consider my request. I have the utmost respect for the court and trust your judgement.

Respectfully,

Mary Beth Gooch

# EXHIBIT G



# Recidivism of Offenders on Federal Community Supervision
**2010-BJ-CX-K069**

December 21, 2012

*Prepared for:*
**Bureau of Justice Statistics**
And
**Office of Probation and Pretrial Services**
Administrative Office of the US Courts

*Prepared by:*
William Rhodes, Ph.D., Project Director
Christina Dyous, M.A., Deputy Project Director
Ryan Kling, M.A.
Dana Hunt, Ph.D.
Jeremy Luallen, Ph.D.
**Abt Associates Inc.**
55 Wheeler St.
Cambridge, MA 02155

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

Recidivism of Offenders on Federal Community Supervision 2010-BJ-CX-K069

## Recidivism of Offenders on Federal Community Supervision

## Table of Contents

**Introduction** ........................................................................................................... 1

    Overview of Federal Community Supervision and Offenders on Supervision .......................... 2

        Description of Federal Community Supervision ................................................... 2

        Offender Terms of Federal Community Supervision ............................................. 2

        Characteristics of Offenders ............................................................................ 3

    Measures of Recidivism ....................................................................................... 7

**Findings** ..................................................................................................................... 8

    Overall Recidivism Rates (Recidivism During and Post-Supervision) ......................... 8

    Recidivism Rates of Offenders While on Supervision .............................................. 9

    Predicting Recidivism:  Offender Risk and Protective Factors ................................. 11

        Identifying Risk and Protective Factors ........................................................... 11

        How well do Risk and Protective Factors Predict Recidivism? ........................... 13

        How good are Predictions by Offense Type? ..................................................... 15

    Contextual Factors as Predictors of Recidivism ..................................................... 16

        Recidivism and District Effects ....................................................................... 16

        Recidivism and The Offender's Environment .................................................... 18

        Recidivism and Probation Officer Characteristics .............................................. 18

**Appendix.  Data and Methodology** ...................................................................... 20

    Data Assembly .................................................................................................. 20

        Offenders in the Analysis File ........................................................................ 20

        Assembly of Offender Data (Offender Supervision Terms and Characteristics of Offenders) ................................................................................................... 20

        Assembly of Recidivism Data:  Arrests and Revocations .................................... 23

        Assembly of District-Level Data, Data on Offender's Environments, and Officer Characteristics .............................................................................................. 25

    Definitions and Additional Technical Details ......................................................... 26

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

Recidivism of Offenders on Federal Community Supervision 2010-BJ-CX-K069

Arrests.................................................................................................................................. 28

Risk and Protective Factors ................................................................................................. 28

Responsible Officer ............................................................................................................. 29

This document is a research report submitted to the U.S. Department of Justice. This report has not
been published by the Department. Opinions or points of view expressed are those of the author(s)
and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

Recidivism of Offenders on Federal Community Supervision 2010-BJ-CX-K069

## Introduction

The Office of Probation and Pretrial Services (OPPS) of the Administrative Office of the U.S. Courts (AOUSC) provides community supervision for offenders convicted of federal crimes and conditionally released to the community. Between October 1, 2004 and September 30, 2010 245,362 offenders commenced a term of federal community supervision – 56,361 began a term of probation following a conviction for a federal offense and 189,001 began a term of supervised release following a prison sentence.

This report examines criminal recidivism, defined as an arrest for a new crime or a revocation, for these 245,362 offenders. Specifically this report examines:

- The rates of recidivism among offenders who entered federal community supervision between October 1, 2004 and September 30, 2010.
- How recidivism rates vary with risk and protective factors and the accuracy of using risk and protective factors to predict recidivism.
- How contextual factors (i.e., district, offender's environment, and probation officer characteristics) affect recidivism rates.

### Highlights

38% of offenders received for supervision between October 1, 2004 and September 30, 2005 recidivated within five years of commencing supervision.
- 24 percent were re-arrested and almost 13 percent were revoked.
- Most were re-arrested for drug (30%), property (25%) and violent (23%) offenses.

30% of offenders received for supervision between October 1, 2004 and September 30, 2007 recidivated during their term of supervision (within three years of commencing supervision).
- 16 percent were re-arrested for a new crime and almost 14 percent were revoked.
- They were most often arrested for drug (28%), violent (25%) and property (24%) offenses.

Several risk factors increase offenders' risks of committing new offenses or being revoked during their period of supervision including a history of criminal behavior, gender, race, drug abuse problems, mental health issues, unemployment, and basic needs (e.g., financial assistance, temporary housing, and/or transportation assistance).

Several protective factors can decrease offenders' risks of committing new offenses or being revoked including having a strong social support system, marketable skills (i.e., strong educational foundation or life skills), motivation to change, and age.

These risk and protective factors distinguish between offenders who will and will not recidivate during their term of supervision and the seriousness of future offenses.

Arrest and revocations rates vary significantly across the 90 federal districts studied, after taking risk and protective factors into account. Several district-level variables explain variation in arrest and revocation rates across the districts including the population size, proportion of American Indians, and average household income in a district.

Offenders who return to neighborhoods that are seen as impoverished and transient have higher failure rates.

Arrest and revocation rates increase with officer experience in the federal probation system. Similarly, arrest and revocations rates increase when an officer has an advanced degree.

---

Abt Associates Inc.                                                                                    pg. 1

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

Recidivism of Offenders on Federal Community Supervision 2010-BJ-CX-K069

## Overview of Federal Community Supervision and Offenders on Supervision

### Description of Federal Community Supervision

*Federal community supervision* refers to the post-conviction period during which an offender is actively supervised by a federal community corrections officer (referred to as a probation officer in the federal system and throughout this report).   Federal probation officers are responsible for the supervision of offenders in 94 judicial districts, which include the U.S. territories and the District of Columbia.

This study examines recidivism rates for offenders on *terms of supervised release (TSR)* and offenders on *probation*.  TSR is a "term of supervision served after a person is released from prison. The court imposes supervised release during sentencing in addition to the sentence of imprisonment. Unlike parole, supervised release does not replace a portion of the sentence of imprisonment but is in addition to the time spent in prison." [1]   TSR replaced parole for most offenders sentenced after 1987.  "With probation, instead of sending an individual to prison, the court releases the person to the community and orders him or her to complete a period of supervision monitored by a U.S. probation officer and to abide by certain conditions." [2] Federal probation officers also supervise a few other types of offenders (including parolees), but these types of supervision are rare and are excluded in this study.  Analysis is also limited to offenders in 90 of the 94 judicial districts (the four territories are excluded).  (See Methodology for additional discussion of offenders excluded from the analysis.)

### Offender Terms of Federal Community Supervision

Seventy-seven percent of offenders on community supervision were serving a term of supervised release (TSR); the other 23 percent were on probation

For offenders in the FY2005- FY2010 cohort, the typical term of community supervision is about three years; 95 percent of supervision terms are five years or less.  Probation terms are slightly less time (average of 2.4 years) than TSR (average of 3.4 years).  In reality, many offenders serve only a proportion of their court imposed supervision terms.  This is because a number of them are revoked for technical violations or new criminal arrests during their supervision terms and some have their terms terminated early by the court.

For those who "successfully" completed supervision in the FY 2005-FY 2007 cohort, the average amount of time served on supervision was 2.4 years – offenders on TSR spent about 2.7 years on supervision and probationers spent an average of 1.8 years.

---

[1] http://www.uscourts.gov/FederalCourts/ProbationPretrialServices/CommonlyUsedTerms.aspx

[2] Ibid.

Abt Associates Inc.                                                                                                    pg. 2

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

Characteristics of Offenders

*Most offenders are male (80 percent), white (59 percent), and are in their thirties (the average age of offenders is 37 years).  Seventy percent have a high-school diploma/GED or higher level of education.*

*Offenders typically have a history of criminal activity.*
- They have an average of 4.8 prior arrests.
- 8 percent absconded during a previous term of supervision.
- About 16 percent were previously arrested or revoked while on supervision for new criminal conduct.
- 10 percent have a history of engaging in domestic violence.

*The majority of offenders were on supervision for drug (41 percent), property/white collar offenses (22 percent), and firearms (13 percent) offenses.*

*Offenders on federal supervision have considerable needs.*[3]
- 34 percent of offenders are unemployed when they begin supervision.
- Many have substance abuse issues – over one-quarter have a history of or current problem abusing opiates, methamphetamine or cocaine and 43 percent have a history of or current alcohol abuse problem.
- 27 percent have a historical or current mental health diagnoses.
- 10 percent have medical problems that interfere with his/her ability to work or establish constructive community ties.
- Almost 20 percent are in need of financial assistance, temporary housing, and/or transportation assistance.

*Despite these obstacles, many offenders have a number of strengths/protective factors.*
- Almost half have a strong positive social support network.
- About 10 percent have an advanced professional degree or are certified in a technical area.
- 47 percent are characterized as being motivated to change.
- 14 percent have  skills or talents that could be used to improve his/her employment prospects and/or promote pro-social connections

Table 1 summarizes the characteristics of offenders on federal supervision between October 1, 2004 and September 30, 2010 who were sentenced to different lengths of supervision (approximately one year, two years, three years and over four years).   (The appendix defines the variables presented in the table.)

---

[3] Data on offender needs and strengths are based on probation officers' clinical assessments recorded in offender case plans.  OPPS now collects data from a dynamic risk assessment instrument, the PCRA, that uses objective criteria to determine the dynamic factors that influence the offenders' risk to recidivate but these data were not available for this study.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

Recidivism of Offenders on Federal Community Supervision 2010-BJ-CX-K069

**Table 1: Profile of offenders sentenced to One, Two, Three, and Four Years of Community Supervision[a]**

| | One Year | Two Years | Three Years | Four or More Years | Total All Years |
|---|---|---|---|---|---|
| | (n=31,200) | (n=34,162) | (n=105,776) | (n=71,528) | (n=242,666) |
| **Gender** | | | | | |
| Male | 75.6% | 77.1% | 80.4% | 83.4% | 80.2% |
| **Race** | | | | | |
| White | 64.6% | 64.6% | 61.5% | 51.0% | 59.2% |
| Black | 29.0% | 27.7% | 32.0% | 44.7% | 34.7% |
| Other | 6.5% | 7.7% | 6.5% | 4.4% | 6.0% |
| **Ethnicity** | | | | | |
| Hispanic | 16.0% | 22.9% | 21.1% | 19.0% | 20.1% |
| **Age at start of supervision** | | | | | |
| 18-21 years | 10.2% | 5.5% | 3.7% | 1.6% | 4.2% |
| 22 to 25 years | 16.0% | 12.7% | 11.1% | 7.2% | 10.8% |
| 26 to 34 years | 27.7% | 30.3% | 31.5% | 33.8% | 31.6% |
| 35 to 45 years | 23.4% | 26.3% | 28.3% | 32.7% | 28.6% |
| 46 to 65 years | 20.6% | 22.9% | 23.2% | 22.3% | 22.6% |
| **Education level** | | | | | |
| Less than High School Diploma/GED | 21.4% | 29.4% | 30.3% | 32.0% | 29.5% |
| High School Diploma/GED | 62.4% | 58.8% | 59.5% | 61.0% | 60.2% |
| More than High School Diploma/GED | 16.2% | 11.8% | 10.2% | 7.0% | 10.3% |
| **Mean Number of Prior Arrests** | 3.0 | 4.2 | 5.2 | 5.4 | 4.8 |

Abt Associates Inc.

pg. 4

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

Recidivism of Offenders on Federal Community Supervision 2010-BJ-CX-K069

**Table 1. Profile of offenders sentenced to One, Two, Three, and Four Years of Community Supervision[a]**

| | One Year | Two Years | Three Years | Four or More Years | Total All Years |
|---|---|---|---|---|---|
| | (n=31,200) | (n=34,162) | (n=105,776) | (n=71,528) | (n=242,666) |
| History of Absconding while on Supervision | 5.7% | 10.4% | 8.8% | 7.1% | 8.1% |
| History of Criminal Activity on Supervision | 9.6% | 16.6% | 17.2% | 17.0% | 16.1% |
| History of Domestic Violence | 6.7% | 10.1% | 11.2% | 10.3% | 10.2% |
| **Most Serious Incident Offense[4]** | | | | | |
| Drugs | 24.9% | 24.1% | 30.5% | 71.1% | 40.9% |
| Property/White Collar | 17.9% | 28.0% | 26.5% | 14.2% | 22.0% |
| Firearms | 3.8% | 17.2% | 19.8% | 4.8% | 12.9% |
| Public Order | 39.8% | 9.4% | 4.0% | 1.9% | 8.7% |
| Immigration | 3.9% | 8.6% | 6.3% | 0.8% | 4.7% |
| Violence | 4.0% | 6.1% | 7.8% | 4.1% | 5.9% |
| Other | 4.3% | 4.0% | 2.2% | 0.8% | 2.3% |
| Sex Offense | 0.9% | 1.7% | 2.6% | 2.1% | 2.1% |
| Escape/Obstruction | 0.3% | 0.8% | 0.5% | 0.1% | 0.4% |
| Technical Violation | 0.1% | 0.1% | 0.0% | 0.0% | 0.0% |
| Unemployed | 25.7% | 36.5% | 37.1% | 33.1% | 34.4% |
| Strong Educational Foundation | 12.8% | 10.8% | 9.5% | 7.7% | 9.6% |
| Difficulty Meeting Basic Needs | 12.7% | 20.1% | 20.6% | 18.0% | 18.7% |
| Medical Problems | 6.9% | 10.2% | 11.2% | 10.5% | 10.3% |

[4] This is the most serious offense of conviction that originally led to federal community supervision.

Abt Associates Inc.                                                    | pg. 5

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

Recidivism of Offenders on Federal Community Supervision 2010-BJ-CX-K069

**Table 1. Profile of offenders sentenced to One, Two, Three, and Four Years of Community Supervision[a]**

|  | One Year | Two Years | Three Years | Four or More Years | Total All Years |
|---|---|---|---|---|---|
|  | (n=31,200) | (n=34,162) | (n=105,776) | (n=71,528) | (n=242,666) |
| Drug Abuse Problem | 13.6% | 21.6% | 28.3% | 33.3% | 26.9% |
| Alcohol Abuse Problem | 36.3% | 39.4% | 44.2% | 47.1% | 43.4% |
| Mental Health Problem | 19.2% | 28.1% | 30.3% | 24.3% | 26.8% |
| Institutional Adjustment Problems | 1.0% | 2.3% | 3.2% | 3.9% | 3.0% |
| Strong Pro-Social Support | 38.5% | 45.5% | 48.6% | 52.1% | 47.9% |
| Highly Motivated to Change | 35.5% | 41.6% | 47.3% | 54.0% | 47.0% |
| Demonstrates Life Skills | 11.8% | 13.5% | 14.5% | 14.6% | 14.1% |

[a] Statistics are provided for offenders with approximately one year supervision terms (offenders sentenced between 0.5 and 1.5 years), two year terms (offenders sentenced between 1.5 and 2.5 years), three year terms (offenders sentenced between 2.5 and 3.5 years), and four year terms (offenders sentenced two 3.5 years or more). Most supervision terms fall exactly at yearly increments, a minority fall at half-year increments, and a few fall between these increments.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

Recidivism of Offenders on Federal Community Supervision 2010-BJ-CX-K069

## Measures of Recidivism

This study uses three measures of *recidivism*: (1) the *first arrest* for a new *serious* crime; (2) a *revocation* during the period of supervision; and (3) *any failure* (i.e., an arrest for a new crime or a revocation). [5]  When offenders were arrested for multiple offenses, the most serious offense is counted as the offense of interest for this study.  Also, the analysis only includes arrests for a serious offense.  The following offenses were classified as "minor" offenses and were therefore excluded from the analysis:  traffic violation, obstruction of justice, liquor law violation, public peace offense, invasion of privacy and prostitution.  Crimes that fell into the less serious category were principally traffic violation and obstruction of justice.  Many of these crimes ultimately resulted in a revocation. (See the appendix for additional discussion about the classification of offenses as minor and serious and description of data sources for criminal recidivism measures.)

The data are for supervision terms that began between October 1, 2004 and September 30, 2010. Consequently, the length of time that offenders in the analysis have to recidivate varies, ranging from less than a month for some offenders (e.g., for those who started supervision in September 2010) to almost six years for others (e.g., for those who started in October 2004). The study distinguishes between *overall recidivism* (i.e., recidivism during and post-supervision within five years of commencing supervision) and recidivism *during supervision* (within three years).  For purposes of tabulation:

> *Overall recidivism* rates are calculated for offenders received for supervision between October 1, 2004 and September 30, 2005 (i.e., the FY2005 cohort of offenders) since those offenders could be observed for five years (n=38,896).

> *Recidivism rates during supervision* include only those offenders received for supervision between October 1, 2004 and September 30, 2007 since those offenders could be observed for three years (n= 119,126).  Many of the offenders who began supervision after that time were still under supervision (i.e., their terms are censored) so failure rates would be underestimated if we included them.

Recidivism statistics are provided for offenders sentenced to one, two and three years of federal supervision.  However, this report also employs inferential statistics (survival analysis) to identify risk and protective factors and to summarize predictive accuracy.  All supervision terms enter into the survival analysis because right-hand censoring deals with terms that are abbreviated by the limited follow-up period. [6]

---

[5] A detailed definition of recidivism is provided in the appendix.

[6] See report prepared for BJS and OPPS for details:  Rhodes, W., C. Dyous, R. Kling, J. Luallen, and D. Hunt. *Estimating Criminal Recidivism*. A report prepared for BJS and OPPS, Forthcoming.

---

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

Recidivism of Offenders on Federal Community Supervision 2010-BJ-CX-K069

## Findings

### Overall Recidivism Rates (Recidivism During and Post-Supervision)

***Thirty-eight percent of offenders in the FY2005 cohort (sentenced to one, two, or three years of supervision) recidivated within five years of commencing supervision*** – 25 percent were re-arrested and almost 13 percent were revoked. Of those offenders re-arrested within five years, many were re-arrested in another state than where they began their supervision. This is especially pronounced in states in close proximity to each other and states with a high proportion of offenders on supervision. For example, 40 percent of offenders who were supervised in DC within the five years were re-arrested in contiguous states (23 percent in Maryland and 10 percent in Virginia); 46 percent of offenders supervised in New York were re-arrested in another state; 40 percent of offenders in Pennsylvania were arrested in other states; and 38 percent of offenders supervised in California were re-arrested in another state.

Table 2 shows the recidivism rates (within five years, by year) for offenders sentenced to one, two and three years of supervision. Offenders sentenced to three years have higher recidivism rates within five years than offenders sentenced to one and two years. One reason for these differences is that offenders sentenced to longer terms have greater opportunity to have their supervision revoked. Another explanation is that longer terms are reserved for more recidivistic offenders.

Not surprisingly recidivism rates increase over time – 18 percent of offenders sentenced to two years recidivated in the first year; twice as many recidivated within five years.

| Table 2. Recidivism Rates for Offenders Sentenced to One, Two and Three Years of Supervision (for the FY2005 Cohort) | | | | | |
|---|---|---|---|---|---|
| Sentenced | Recidivism Rates (Arrests, Revocations, and Overall) | | | | |
| | Within 1 year | Within 2 years | Within 3 years | Within 4 years | Within 5 years |
| **1 Year** | | | | | |
| Overall | 16.2% | 21.3% | 25.1% | 27.8% | 29.7% |
| Arrest | 7.6% | 12.4% | 16.2% | 18.9% | 20.8% |
| Revocation | 8.6% | 8.9% | 8.9% | 8.9% | 8.9% |
| **2 Years** | | | | | |
| Overall | 18.4% | 28.2% | 32.4% | 35.5% | 37.8% |
| Arrest | 9.1% | 14.1% | 18.2% | 21.3% | 23.7% |
| Revocation | 9.4% | 14.1% | 14.2% | 14.2% | 14.2% |
| **3 Years** | | | | | |
| Overall | 18.3% | 28.1% | 34.3% | 37.8% | 41.0% |
| Arrest | 10.3% | 16.1% | 19.9% | 23.3% | 26.4% |
| Revocation | 8.0% | 12.1% | 14.4% | 14.5% | 14.5% |
| **Total** | | | | | |
| Overall | 18.0% | 26.9% | 32.3% | 35.6% | 38.4% |
| Arrest | 9.6% | 15.1% | 18.9% | 22.2% | 24.9% |

Abt Associates Inc.                                                                                     pg. 8

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

Recidivism of Offenders on Federal Community Supervision 2010-BJ-CX-K069

**Table 2. Recidivism Rates for Offenders Sentenced to One, Two and Three Years of Supervision (for the FY2005 Cohort)**

| Sentenced | Recidivism Rates (Arrests, Revocations, and Overall) | | | | |
|---|---|---|---|---|---|
| | Within 1 year | Within 2 years | Within 3 years | Within 4 years | Within 5 years |
| Revocation | 8.3% | 11.9% | 13.4% | 13.5% | 13.5% |

*Most offenders re-arrested within five years, were re-arrested for drug, property and violent offenses* (see Figure 1).

**Figure 1. Five-Year Recidivism Rates for Offenders Sentenced to One, Two and Three Years of Supervision by Type of Offense (for the FY2005 Cohort)**



Note. The re-arrest rate and the revocation rate sum to the total failure rate. Tabulations for specific offense types are conditional on an arrest so they sum to 100 percent.

## Recidivism Rates of Offenders While on Supervision

*Thirty percent of offenders received for supervision between October 1, 2004 and September 30, 2007 (i.e. sentenced to one, two, or three years of supervision) recidivated within three years of commencing supervision* – 16 percent were re-arrested and almost 14 percent were revoked.

Table 3 provides one, two and three year recidivism rates for offenders sentenced to one, two and three years of supervision. Offenders sentenced to three years have somewhat higher re-arrest rates than offenders sentenced to one and two years.

Arrest and revocation rates increase over time – about 18 percent of offenders sentenced to three years recidivated in the first year; over 33 percent recidivated within three years.

Abt Associates Inc.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

Recidivism of Offenders on Federal Community Supervision 2010-BJ-CX-K069

| Table 3. Recidivism Rates, While on Supervision for Offenders Sentenced to One, Two and Three Years of Supervision (for the FY2005-FY2007 Cohorts). | | | |
|---|---|---|---|
| Sentenced | Recidivism Rates (Arrest and Revocation) | | |
| | Within 1 year | Within 2 years | Within 3 years |
| **1 Year** | | | |
| Arrest | 7.7% | -- | -- |
| Revocation | 9.0% | -- | -- |
| **2 Years** | | | |
| Arrest | 8.9% | 13.4% | -- |
| Revocation | 9.8% | 14.5% | -- |
| **3 Years** | | | |
| Arrest | 10.3% | 16.0% | 19.1% |
| Revocation | 7.9% | 11.9% | 14.2% |

*Offenders who were re-arrested during their period of supervision (within three years) were most often arrested for drug, violent and property offenses.*

**Figure 2. Three-Year Recidivism Rates for Offenders Sentenced to One, Two and Three Years of Supervision by Type of Offense (for the FY2005-FY2007 Cohorts)**



Note. The re-arrest rate and the revocation rate sum to the total failure rate. Tabulations for specific offense types are conditional on an arrest so they sum to 100 percent.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.



Recidivism of Offenders on Federal Community Supervision 2010-BJ-CX-K069

## Predicting Recidivism: Offender Risk and Protective Factors

### Identifying Risk and Protective Factors

Statistical model building led to a model that identified twenty risk and protective factors that predicted a new arrest during the period of supervision.[7,8] Although predictions were calibrated for new arrests, the predictions are applicable to all failures (i.e., revocations as well as arrests). Figure 3 identifies the risk and protective factors that were identified. A risk factor has a score of less than 1; the lower the score, the larger the effect. A protective factor has a score greater than 1; the higher the score, the larger the effect. All these effects are statistically significant at p<0.001. (See the appendix for a more details on interpretation of the figure.)

**Figure 3. Risk of Recidivating for Each Risk and Protective Factor**



---

[7] See report prepared for BJS and OPPS for details: Rhodes, W., C. Dyous, R. Kling, J. Luallen, and D. Hunt. *Estimating Criminal Recidivism.* A report prepared for BJS and OPPS, Forthcoming.

[8] As noted previously, these data are based on probation officers' clinical assessments and not OPPS' dynamic risk assessment instrument, the PCRA.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

Recidivism of Offenders on Federal Community Supervision 2010-BJ-CX-K069

The figure identifies a unit change and a *standard* unit change. A unit change is literally a change of one unit in the variable being represented. For example, for women the Male variable is coded zero and for men the Male variable is coded one. A unit change is 1. A standard unit change is based on a change of one standard deviation. For example, about three of every four offenders are men. Because gender is a binary variable, the standard deviation is 0.433. Therefore the standard unit change is 0.433 of the unit change for the risk factor Male.

The offender's age and prior arrests are continuous variables that are entered into the model as quadratic terms. The bars in Figure 3 are the effects evaluated at one standard deviation about the mean values of age and prior arrests. The figure only shows standard unit changes for those two variables.

**Several risk factors increase offenders' risks of committing new offenses or being revoked during their period of supervision. These are partial effects, that is, effects associated with a variable after using a regression to hold all other variables constant.**

*Criminal Histories*:

- o  Offenders with extensive criminal histories/patterns of criminal behavior have a greater risk of being arrested for a new crime and being revoked – offenders with more prior arrests have the greater risks;
- o  Offenders who were previously arrested or had their supervision revoked for new criminal conduct while under active community supervision are more likely to have a re-arrest for a new crime or be revoked;
- o  Offenders with a history of minor or multiple infractions while incarcerated are more likely to fail while on supervision;
- o  Offenders who previously absconded while on supervision have higher risk of failure; and
- o  Offenders with a history of engaging in domestic violence are more likely to have an arrest for a new crime.

- *Gender*:
  - o  Men have higher rates of recidivism for new offenses and revocations than woman.

- *Race*:
  - o  Blacks are more likely than other offenders to have an arrest for a serious offense while on supervision.
  - o  Blacks have revocation rates that are the same as other offenders (when all other factors are taken into account).

- *Substance Abuse Problems*:
  - o  Offenders with a history or current drug abuse problem (for methamphetamine, opiates, and/or cocaine) have higher re-arrest and revocation rates.
  - o  Offenders with a history or current alcohol abuse problems are associated with lower rates of recidivism.

- *Mental Health Issues*:
  - o  Identified mental health problems are associated with higher re-arrest and revocation rates.

- *Unemployment/Basic Needs*:

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

- o Unemployed offenders and offenders with basic needs (such financial assistance, temporary housing, and/or transportation assistance) have higher re-arrest and revocation rates than their counterparts.

**Protective factors can decrease offenders' risks of criminal recidivism or revocations.**

- *Social support:*
    - o Offenders with a strong social support system (either an individual or support group in the community committed to helping the offender) are less likely to be re-arrested or revoked.
- *Strong Skills and Motivation:*
    - o Marketable skills (strong educational foundation or life skills) and offenders who are highly motivated to change are associated with better outcomes (i.e., fewer re-arrests and revocations).
- *Medical Needs*:
    - o Offenders with medical needs are less likely to recidivate or be revoked,
- *Age:*
    - o Older offenders are less likely to be re-arrested for a new offense and be revoked from supervision than younger offenders.

### How well do Risk and Protective Factors Predict Recidivism?

Predicting criminal recidivism is instrumental to the larger goal of classifying offenders to distinguish between those who are at high and low risk of criminal recidivism.   This section examines how well the statistical model presented above predicts recidivism.[9]

Table 4 shows results: offenders were sorted based on their predicted risk to recidivate during their term of supervision and then classified into 10 equal categories sorted from high risk to low risk; each category has 22,628 offenders.  The table then compares the proportion of offenders who actually recidivated (i.e., proportion arrested, revoked and overall failure) with the predictions. Table 4 comprises all offenders in the analysis file, some of whom were under supervision for short periods that ended with the closure of data collection.  That is, many were still under supervision at the time of analysis.

**The table shows that risk and protective factors do a good job of distinguishing between offenders who will recidivate during their terms of supervision and offenders who will not recidivate.**

- Of the 10 percent of offenders who had the *highest* predicted probability of recidivating, about 64 percent were arrested or had their supervision revoked during their term of supervision – 34 percent were arrested for a new crime and 30 percent were revoked from supervision.

---

[9] Summarizing how well the model predicts is difficult.  The problem is that data are censored, especially by revocation practices, so the recidivism that is predicted by the survival model is not actually observable. Nevertheless, we can approximate prediction power.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

Recidivism of Offenders on Federal Community Supervision 2010-BJ-CX-K069

- Of the 10 percent of offenders who had the *lowest* predicted probability of recidivating, about 4 percent failed on supervision – 2 percent were re-arrested for a new crime and two percent had their supervision revoked.

**Table 4. Predictions and Observed Recidivism by Risk Category for All Offenders**

| Risk Categories | Number of Offenders (Predicted) | Proportion of Offenders (Actual) | | |
|---|---|---|---|---|
| | | Arrested | Revoked | Overall Failure |
| 10% (highest risk) | 22,628 | 33.8% | 30.1% | 63.9% |
| 20% | 22,628 | 24.3% | 24.4% | 48.7% |
| 30% | 22,628 | 18.7% | 20.1% | 38.8% |
| 40% | 22,628 | 15.1% | 16.4% | 31.5% |
| 50% | 22,628 | 11.8% | 12.9% | 24.7% |
| 60% | 22,628 | 9.5% | 9.4% | 18.9% |
| 70% | 22,628 | 7.4% | 7.3% | 14.8% |
| 80% | 22,628 | 5.4% | 5.3% | 10.7% |
| 90% | 22,628 | 4.0% | 3.3% | 7.3% |
| 100% (lowest risk) | 22,628 | 2.2% | 1.7% | 3.9% |

Many of the offenders in Table 4 were still under supervision (i.e., their terms are censored) so their failure rates are underestimated. The table is nevertheless informative because it uses the full complement of data.

Table 5 is similar to table 4 but is limited to offenders who were received for supervision between October 1, 2004 and September 30, 2007 (i.e., the FY2005-FY2007 cohort) since most of those offenders had completed their terms of supervision by the end of the study period.[10]

**Table 5. Predictions and Observed Recidivism by Risk Category for the FY2005-FY2007 Offenders**

| Risk Categories | Number of Offenders (Predicted) | Proportion of Offenders (Actual) | | |
|---|---|---|---|---|
| | | Arrested | Revoked | Overall Failure |
| 10% (highest risk) | 10,014 | 39.1% | 35.3% | 74.4% |
| 20% | 10,417 | 28.1% | 29.3% | 57.5% |
| 30% | 10,502 | 22.0% | 24.7% | 46.7% |
| 40% | 10,762 | 17.4% | 20.3% | 37.7% |
| 50% | 11,051 | 14.1% | 15.5% | 29.6% |
| 60% | 11,114 | 11.1% | 11.8% | 22.9% |

---

[10] Table 5 does not partition the sample exactly into deciles because the deciles were established before the selection rule was applied. Otherwise the calculations are the same as table 4.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

Recidivism of Offenders on Federal Community Supervision 2010-BJ-CX-K069

| Table 5. Predictions and Observed Recidivism by Risk Category for the FY2005-FY2007 Offenders | | | | |
| --- | --- | --- | --- | --- |
| Risk Categories | Number of | Proportion of Offenders (Actual) | | |
| 70% | 11,331 | 8.8% | 8.9% | 17.7% |
| 80% | 11,669 | 6.2% | 6.7% | 12.9% |
| 90% | 11,671 | 4.7% | 4.2% | 8.9% |
| 100% (lowest risk) | 11,835 | 2.5% | 2.0% | 4.5% |

**Again, the table illustrates that risk and protective factors do a good job of distinguishing between high and low risk offenders.**

- Of the roughly 10 percent of offenders who had the *highest* predicted probability of recidivating, about 74 percent were arrested or had their supervision revoked during their term of supervision – 39 percent were arrested for a new crime and 35 percent were revoked from supervision.
- Of the approximately 10 percent of offenders who had the *lowest* predicted probability of recidivating, only about 4-5 percent failed on supervision – 2-3 percent were re-arrested for a new crime and two percent had their supervision revoked.

### How good are Predictions by Offense Type?

The statistical model predicts recidivism in general, but how well does it predict the "dangerousness" of an offender. To answer this question, we classified recidivism into five offense categories: violent, property, sex, drug and other. (The appendix describes these offense categories, including the specific offenses that comprise the categories.)

Table 6 is the counterpart to Table 4; as in Table 4, the table shows actual recidivism rates across all offenders. The number of observations entering the two tables is the same. The difference between Tables 4 and 6 is that the former reports recidivism without distinguishing the offense; the latter reports recidivism distinguishing the offense.

| Table 6. Predictions by Offense Type for All Offenders | | | | | |
| --- | --- | --- | --- | --- | --- |
| Risk Categories | Proportion of Offenders (Actual) | | | | |
| | Violent | Property | Drugs | Sex | Other |
| 10% (highest risk) | 10.5% | 7.0% | 11.2% | 0.7% | 4.3% |
| 20% | 7.3% | 5.3% | 7.7% | 0.4% | 3.5% |
| 30% | 5.2% | 4.2% | 5.9% | 0.5% | 2.9% |
| 40% | 4.1% | 3.6% | 4.6% | 0.3% | 2.5% |
| 50% | 3.1% | 3.0% | 3.4% | 0.3% | 2.0% |
| 60% | 2.4% | 2.6% | 2.6% | 0.3% | 1.7% |
| 70% | 1.6% | 2.1% | 1.9% | 0.3% | 1.5% |
| 80% | 1.3% | 1.5% | 1.3% | 0.2% | 1.2% |
| 90% | 0.7% | 1.2% | 0.9% | 0.2% | 1.0% |
| 100% (lowest risk) | 0.4% | 0.9% | 0.3% | 0.1% | 0.6% |

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

Recidivism of Offenders on Federal Community Supervision 2010-BJ-CX-K069

Similarly, table 7 is the counterpart to table 5.  The bottom part of the table shows actual recidivism rates for offenders who entered supervision during the first three years of the study (i.e., the FY2005-FY2007 cohort).

| Table 7. Predictions by Offense Type for the FY2005-FY2007 Offenders | | | | | |
|---|---|---|---|---|---|
| Risk Categories | Proportion of Offenders (Actual) | | | | |
| | Violent | Property | Drugs | Sex | Other |
| 10% (highest risk) | 12.4% | 8.2% | 13.1% | 0.8% | 4.7% |
| 20% | 8.2% | 6.3% | 9.2% | 0.5% | 3.9% |
| 30% | 6.0% | 5.0% | 7.1% | 0.5% | 3.4% |
| 40% | 4.7% | 4.2% | 5.3% | 0.4% | 2.8% |
| 50% | 3.8% | 3.6% | 4.1% | 0.3% | 2.4% |
| 60% | 2.9% | 3.0% | 2.8% | 0.4% | 1.9% |
| 70% | 1.8% | 2.6% | 2.3% | 0.3% | 1.7% |
| 80% | 1.5% | 1.7% | 1.5% | 0.2% | 1.3% |
| 90% | 0.9% | 1.5% | 1.0% | 0.2% | 1.1% |
| 100% (lowest risk) | 0.4% | 1.0% | 0.4% | 0.1% | 0.6% |

**The tables illustrate that risk and protective factors do a fairly good job of distinguishing recidivism by offense type.**

- Over ten percent of those offenders who are classified in the highest two deciles (10% and 20%) were arrested for a crime of violence exclusive of sexual crimes.

- Less than 1.5 percent of those offenders who are classified in the lowest two deciles (90% and 100%) were arrested for a violent crime.

## Contextual Factors as Predictors of Recidivism

### Recidivism and District Effects

The study examined cross-sectional variation in recidivism across the 90 districts and district-level variables that account for the variation.

**Results indicate a statistically significant variation in arrest and revocation rates across the 90 federal districts, after taking risk and protective factors into account.**  Researchers sometime reference such analysis as hierarchical, in which case each district is represented by a dummy

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

Recidivism of Offenders on Federal Community Supervision 2010-BJ-CX-K069

variable.[11]  In fact, the addition of districts is statistically significant at p<0.001 but the addition of districts makes almost no improvement to predictions of recidivism.[12]

**Several district-level variables explain this variation in arrest and revocation rates across the districts** (see figure 4).[13]

- Figure 4 shows estimates (the first set of bars) of how re-arrests and revocations differ with population (millions).  *Districts with large populations have lower arrest rates and revocation rates* when risk and protective factors are held constant.  Although both effects are statistically significant, the substantive differences are small.

- Districts that experienced an *increase in population between 2000 and 2006 had higher rates of re-arrests and revocations* when offender risk and protective factors were held constant.  The effects shown in the figure are for a 10 percent increase/decrease in population.  The effects are significant at p<0.001 and appear large.

- The figure shows the effect of increasing the percentage of Native Americans in a district by 1 percent.  There is no statistically significant effect on arrests.  There is a statistically significant increase in revocations – i.e., districts with a larger proportion of Native Americans have higher revocation rates.

- Finally the figure shows how arrests and revocations vary with household income.  The figure shows the effect attributable to a $10,000 difference in average family incomes.  Both effects are statistically significant at p<0.001.  *New arrests increase with income but revocations decrease with income.*

---

[11] This is known as a *fixed-effect model*.  Researchers sometimes use *random-effect models* instead, but whatever the merits of the random-effect model over the fixed-effect model (i.e. efficiency), the computing software (Stata) will not estimate a gamma survival model with random effects.

[12] A survival model provides no equivalent statistics to an explained variance.  The likelihood is improved by about one percent, implying that the addition of districts does not greatly improve explanatory power.  A chart of district-specific confidence intervals for the fixed-effects shows that the confidence intervals practically overlap.  As is often the case with large samples, a finding that is statistically significant does not necessarily imply that the finding is materially important.

[13] The analysis file lacks good district-level variables.  Nevertheless, a small set of district-level variables from Census data were included in the analysis. Details are provided in the appendix.

---

Abt Associates Inc.                                                                                                ‖ pg. 17

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

Recidivism of Offenders on Federal Community Supervision 2010-BJ-CX-K069

**Figure 4.  Risk of Recidivating (Arrests and Revocations) for District-Level Variables**



While the analysis shows that recidivism and revocation rates differ with district characteristics, we lack any theoretical basis for interpreting these effects.

### Recidivism and The Offender's Environment

A problem with district-specific variables is that they may reflect nothing about the environment facing offenders.  For example, offenders in a high-income state may themselves live in relative poverty.  To examine the relationship between recidivism and offender living conditions, the study analyzed fourteen variables available at the Census tract.  (The offender's address determined the relevant Census tract.)  One factor score explained most of the variance across those fourteen variables, and inspection showed that the factor score essentially captures measures of *poverty and transience*.

When the factor score (poverty/transience) is added to the model, recidivism and revocations both increase.  The size of the effect for recidivism is 0.92, which is significant at P<0.001.  The size of the effect for revocations is 0.90, which is significant at P<0.001.  These effects are for a standard deviation change in the poverty/transience index.  Thus, **when other risk and protective factors are taken into account, the neighborhood where an individual returns for supervision is an important factor in the success of his or her supervision.  Offenders who return to neighborhoods that are seen as impoverished and transient have higher failure rates.**

### Recidivism and Probation Officer Characteristics

Plausibly offenders' outcomes may vary across probation officers.  One approach to investigate this would be to estimate a random-effect hierarchical model, but the computing software did not provide for a random-effect for the gamma survival model.  Furthermore, given the large number of probation officers employed by the federal system, using fixed-effects was impractical.

---

Abt Associates Inc.                                                                                                      pg. 18

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

Instead, the study also examined how arrests and revocations varied with officer characteristics, including years of experience (as a federal probation officer and additional years in law enforcement) and education (advanced degree of a Bachelor's degree or higher).

On average, a federal offender is supervised by a probation officer who has 10 years of experience in the federal probation system (mean=10.45). Twenty-five percent of offenders are supervised by officers with six or fewer years of experience. Twenty-five percent of offenders are supervised by officers with fifteen or more years of experience. When we take state or local law enforcement experience into account the average experience increases from 10 to 11 years.

Most officer are supervised by probation officers with an advanced degree –more than half have IBachelor's degrees, somewhat less than half have Masters degrees, and a few have doctorates.

**Contrary to what we would expect, findings show that both arrest and revocation rates increase with officer experience in the federal probation system. Similarly, arrest and revocations rates increase when an officer has an advanced degree.**

One might expect probation outcomes to improve with probation officer experience and professional training, but that is not the case. However, adding these variables to the model explains very little residual variance (the likelihood improves by less than 1 percent) and improvements in the predictions of recidivism are negligible. We can speculate about this finding from the research on Evidence-based Practices (EBP). The research suggests, that regardless of the education or experience level of officers, if supervision is not consistent with risk, needs, and responsivity principles, there is no theoretical basis to believe that officer education and experience by itself will impact offender outcomes (unless principles of EBP are entrenched in their education/experience). Furthermore, research has demonstrated that the most effective approach for changing behavior in the community supervision context is through cognitive behavioral techniques, which involve exercises and instructions designed to alter offenders' dysfunctional thinking patterns. Likewise, research suggests that the quality and nature of the relationship between the client and the officer have an impact on outcomes.[14]

---

[14] For a general discussion of community corrections programming see: National Research Council. (2008). *Parole, Desistance from Crime, and Community Integration.* Washington, D.C.: National Academies Press; Petersilia, J. (2009). *When Prisoners Come Home: Parole and Prisoner Reentry.* New York: Oxford University Press.

And for a meta-analysis of cognitive behavioral therapy see: Lipsey, M., Landenberger, N., & Wilson, S. (2007). *Effects of Cognitive-Behavioral Programs for Criminal Offenders.* www.campbellcollaboration.org/reviews_crime_justice/index.php: The Campbell Collaboration, Campbell Systematic Reviews.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

## Appendix. Data and Methodology

### Data Assembly

The analysis file was assembled for for OPPS from federal supervision records from OPPS's internal case management database (Probation and Pretrial Services Automated Case Management System or PACTS), demographic information on probation officers from OPPS's Officer Profile Survey, information about the communities to which offenders' return and district-level data from the U.S. Census Bureau, and arrest records from the AO's Access to law Enforcement Systems (ATLAS) database and the Federal Bureau of Investigations (FBI).

The analysis presented in this report uses multiple data sources (i.e., PACTS, Officer Profile Survey, , ATLAS, FBI, and Census data) from that analysis file.  The data used for the current study are described below.

#### Offenders in the Analysis File

This study is based on 245,362 terms of federal supervision commenced between October 1, 2004 and September 30, 2010.  A term of supervision refers to a *continuous period of community supervision*. Data on these supervision terms were current as of September 30, 2010 and almost 45 percent of the terms were ongoing at that time.  The analysis includes only offenders serving either a term of probation supervision (23 percent of offenders on supervision during the study period) or a term of supervised release (TSR, 77 percent of offenders).

We eliminated the following offenders from the analysis:  Offenders in Guam, Puerto Rico, Northern Marinara Islands and the U.S. Virgin Islands (criminal history information was poor in these districts); the few offenders who were older than 65 or under 18 (the vast majority of offenders are within the age cohort that we retained for analysis); offenders whose supervision terms began and ended on the same day (i.e. detainers); offenders without any rap sheets (i.e., they have no rap sheets pre- or post-dating their supervision terms); offenders with other charges pending, and non-citizens in the country illegally (we were not always certain of the deportation dates).

#### Assembly of Offender Data (Offender Supervision Terms and Characteristics of Offenders)

The Probation and Pretrial Services Automated Case Tracking System (PACTS) provided the basic building blocks for assembling histories for offenders serving terms of probation and supervised release.  For this study, we used the following PACTS data from the analysis file: offender characteristics including demographics and criminal histories and details about offender supervision terms including the type of supervision they are on and probation officers' assessment of offender risks, needs and strengths.  These variables are described in table A1 below. The items with an asterisk are from the probation officer's assessment of the offender.  Probation officers assess offenders' risks and needs on numerous dimensions including:  criminal patterns and violence; financial, employment, and educational needs; substance abuse issues (current problems and prior substance abuse); mental health issues (current and prior mental health problems); and, family, basic and medical needs.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

Recidivism of Offenders on Federal Community Supervision 2010-BJ-CX-K069

The analysis file also contains data from the BOP on offenders' prison terms including the time spent incarcerated.  We used these data from the analysis file for the current study (see table A1).

### Table A1.  Offender Data: Description of Study Variables

| Variable Label (Variable Name) | Variable Description |
| --- | --- |
| **Offender Sentences** | |
| Type of Supervision (TSR) | The type of federal supervision the offender was sentenced to (1=TSR, 0=Probation). |
| Time Spent Incarcerated (PRESUPV_INCAR_DY) | The total number of days the offender was spent incarcerated in federal prison before being released to federal supervision (only for offenders on TSR). |
| Sentence Length (SUPV_SENT_DY) | The total number of days the offender was sentenced to federal supervision. |
| **Demographic Characteristics** | |
| Offender Gender (GENDER) | Offender's gender (2=Male, 1=Female). |
| Ethnicity (HISP) | Offender's ethnicity (1=Hispanic, 0=Not Hispanic). |
| Black (BLACK) | Offender is black (1=Black, 0=Not Black). |
| White (WHITE) | Offender's race is white (1=White, 0=Not White). |
| Other (OTHER) | Offender's race is something other than "white" or "black" (1=Other, 0=Not White or Black). |
| Offender's Age (AGE) | Offender's age in years when supervision began. |
| Offender's Age: 18-21 Years (AGE1821) | Offender's age was between 18 and 21 years when supervision began. (1=Yes, 0=No). |
| Offender's Age: 22-25 Years (AGE2225) | Offender's age was between 22 and 25 years when supervision began. (1=Yes, 0=No). |
| Offender's Age: 26-34 Years (AGE2634) | Offender's age was between 26 and 34 years when supervision began. (1=Yes, 0=No). |
| Offender's Age: 35-45 Years (AGE3545) | Offender's age was between 35 and 45 years when supervision began. (1=Yes, 0=No). |
| Offender's Age: 46-65 Years (AGE4665) | Offender's age was between 46 and 65 years when supervision began. (1=Yes, 0=No). |
| Education Level (EDUCATION_LEVEL) | The highest level of education attained by the offender at the time supervision began. |
| **Criminal Histories** | |
| Number of Prior Arrests* (RPI_NUM_ARRESTS) | The number of times the offender was arrested prior to the instant offense that resulted in his/her term of supervision.   The maximum number arrests recorded is 15. |
| History of Absconding* (RPI_PREV_ABSCONDED) | The offender absconded from a previous period of supervision. (1=Yes, 0=No) |
| Criminal Activity on Supervision* (CRIMINAL_SUPER_ASSESS) | The offender was arrested or had his supervision revoked for new criminal conduct while under active criminal justice supervision in the community. (1=Yes, 0=No) |

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

Recidivism of Offenders on Federal Community Supervision 2010-BJ-CX-K069

## Table A1.  Offender Data: Description of Study Variables

| | |
|---|---|
| History of Domestic Violence*<br>(DOMESTIC ASSESS) | The current offense or offender's record includes charges that involve domestic violence and/or investigation uncovered indications of domestic violence corroborated by evidence such as calls to the police for domestic violence or disturbing the peace and/or sign/records of physical or psychological abuse of a domestic partner. (1=Yes, 0=No) |
| Most Serious Incident Offense<br>(OFFENSE_CODE1R) | The most serious offense that the offender was convicted of that resulted in the current term of supervision. |

### Other Risk/Protective Factors

| | |
|---|---|
| Unemployed*<br>(UNEMP_ASSESS) | The offender's probation officer has determined that the offender has the capacity to work but is not now employed. (1=Yes, 0=No) |
| Strong Educational Foundation*<br>(STRONG_EDUC_ASSESS) | The offender has an advanced professional degree or is certified in a technical area.  (1=Yes, 0=No) |
| Basic Needs*<br>(BASIC_NEEDS_ASSESS) | Assessment of offender needs for services in the area of stable housing, food, clothing, and or community associations.  The offender's probation officer has identified one or more of the following basic needs:  unstable residence, food/clothing/shelter needs, and/or lacks productive community associations. (1=Yes, 0=No) |
| Medical Problems*<br>(MEDICAL_NEEDS_ASSESS) | The offender has medical problems that interfere with his/her ability to work or establish constructive community ties.  (1=Yes, 0=No) |
| Drug Abuse Problem*<br>(DRUG_ABUSE2) | The offender reports current drug abuse or a history of drug abuse (including abuse of opiates, methamphetamines, cocaine) or there is documented evidence of past abuse (e.g., prior treatment experiences; prior positive drug tests; drug-related employment or family instability) or there is evidence that the offender is currently abusing drugs (e.g., positive drug test, physical signs) or the offender has a history of drug abuse and has been recently assessed to be at high risk of relapse at the current time.  (Does not include one or two instances of drug usage or very infrequent experimentation). (1=Yes, 0=No) |
| Alcohol Abuse*<br>(ALC_ABUSE) | The offender reports current alcohol abuse or a history of alcohol abuse or there is documented evidence of past abuse (e.g., prior treatment experiences; pattern of DUI arrests; alcohol-related employment or family instability) or there is evidence that the offender is currently abusing alcohol (e.g., positive alcohol test, physical signs) or the offender has a history of alcohol abuse and has been recently assessed to be at high risk of relapse at the current time.  (Does not include the casual use of alcohol). (1=Yes, 0=No) |
| Mental Health Problem*<br>(GEN_MH_ASSESS) | The offender has a current or historical mental health problem:  the offender's history includes a professionally diagnosed mental health disorder (depression, bi-polar disorder, schizophrenia, or other mental health problem); the offender is currently undergoing mental health treatment or counseling; the offender is currently or has been in the past on a prescribed regimen of psychotropic medication to stabilize professionally diagnosed mental health disorder;  the offender shows signs of mental illness such as threats of suicide or attempted suicide in the past, psychotic symptoms (e.g., auditory/visual hallucinations, delusions), or withdrawal (poor hygiene, refusal to leave home, drastic changes in physical appearance); or, there is documented evidence that the offender is currently a victim of abuse or was a victim in the past. (1=Yes, 0=No) |
| Institutional Adjustment Problems*<br>(INSTITUTIONAL_ADJUST) | Reports from prison authorities document disciplinary action take to address more than minor or multiple infractions of institutional or |

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

Recidivism of Offenders on Federal Community Supervision 2010-BJ-CX-K069

| Table A1.  Offender Data: Description of Study Variables | |
|---|---|
| | Community Correction Center rules.  (1=Yes, 0=No) |
| Strong Pro-Social Support* (STRONG_SOCIAL_ASSESS) | There is an individual or support group in the community aware of the offender's circumstances and committed to helping the offender meet objectives (including a family member, employer or co-worker, friend, church group, coach, AA sponsor, etc.).  (1=Yes, 0=No) |
| Highly Motivated to Change* (MOTIVATED_ASSESS) | The offender has a good attitude about moving forward, has been cooperative, and has taken an active role in setting objectives and making plans to accomplish them.  (1=Yes, 0=No) |
| Life Skills* (SKILLS_ASSESS) | The probation officer has identified skills or talents that the offender has that could be used to improve employment prospects and/or promote pro-social connections (includes skills that are self-taught or learned on-the-job as well as those gained through formal education training.  (1=Yes, 0=No) |

Source:  Administrative Office of U.S. Courts, Office of Probation and Pretrial Services. (October, 2004). *Probation Officer's Manual: Post-Conviction Supervision Case Planning Module*; and, Administrative Office of U.S. Courts, Office of Probation and Pretrial Services. *AOUSC Diagram Report:  PACTS Help Files 5.0*

## Assembly of Recidivism Data:  Arrests and Revocations

We assembled *arrest data* for offenders in the analysis file from arrest records extracted from ATLAS (Access to Law Enforcement Systems) and from the FBI's CCH system.  ATLAS is a web-based application used by probation officers to access criminal history information for supervised offenders.[15]  Although electronic, the ATLAS data are reported as text files.  Consequently, there were two phases to extracting the arrest records.  The first was to parse the arrest data from the text-based rap sheets (including the arrest date and arrest charge).  This first step provided literal descriptions of the charged offense:  *arrest strings*.  The second was to parse the myriad of arrest strings into meaningful offense categories – the National Crime Information Center (NCIC) codes. The NCIC maintains a list of Uniform Offense Codes in order to standardize criminal offenses at the national level.  As of May 29th 2007, there were 50 general categories employed by the NCIC.  The NCIC codes were then collapsed into ten broader offense categories used by the AOUSC:  Violent, Property, Drug, Sex Offense, Firearms, Escape/Obstruction, Public Order, Technical, Immigration, and Other.

---

[15] The ATLAS system accesses offenders' criminal histories through NLETS (formerly known as the National Law Enforcement Telecommunications System), a computer system that retrieves criminal history information from the FBI and state computer networks.  The Interstate Identification Index (III), a component of the Integrated Automated Fingerprint Identification System and maintained by the FBI, is an index system for identifying the location of automated criminal history records.  III maintains the dictionary of federal and state identifiers for each person, which ATLAS uses in its request for an offender's criminal history.  At the time these data were assemble, criminal histories from the District of Columbia, Maine, and Vermont were not available to ATLAS (they currently have data in ATLAS).  For these states, we extracted local arrest records from the FBI's Computerized Criminal History (CCH) database.   Otherwise we use the FBI's CCH data for arrests by federal agents, which do not get reported in the state databases.

Abt Associates Inc.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

Recidivism of Offenders on Federal Community Supervision 2010-BJ-CX-K069

For the study, we also examined how well the statistical model predicts the "dangerousness" of an offender. For this analysis, we classified recidivism into five offense categories: violent, property, sex, drug and other. The categories and their component parts are listed in table A2, below. The table reports the number of times that each of the specific offenses occurred. Placement of offenses into violent, property, drugs, sex and other is judgmental.

| Table A2.  Major Offense Categories and Component Parts | | | | | |
|---|---|---|---|---|---|
| **VIOLENT** | | **PROPERTY** | | **OTHER** | |
| Arson | 31 | Bribery | 8 | Antitrust | 1 |
| Assault | 5,907 | Burglary | 996 | Civil Rights | 6 |
| Crimes against Person | 35 | Damage Property | 353 | Conservation | 21 |
| Homicide | 236 | Embezzlement | 44 | Election Laws | 1 |
| Kidnapping | 299 | Extortion | 14 | Escape | 791 |
| Organized Crime | 5 | Forgery | 671 | Family Offense | 330 |
| Robbery | 912 | Fraud | 1,398 | Gambling | 35 |
| Threats | 112 | Larceny | 2,920 | General Conspiracy | 18 |
| Weapons | 726 | Money Laundering | 20 | Health/Safety | 17 |
| | | Property Crimes | 8 | Immigration | 785 |
| **SEX** | | Smuggling | 11 | Material Witness | 4 |
| Sex. Exploitation of Minor | 7 | Stolen Property | 333 | Military | 18 |
| Sexual Assault | 392 | Stolen Vehicle | 329 | Moral Decency | 59 |
| Sex Offense | 342 | Tax Revenue | 27 | Obscenity | 49 |
| | | | | Public Order | 381 |
| **DRUGS** | | | | Public Peace | 449 |
| Drugs | 9,003 | | | Sovereignty | 1 |
| | | | | Unknown | 1,834 |

We were unable to classify about 6 percent of the arrests; hence, they appear as "unknown" in the other category. Likely there exists a small amount of misclassification among the offenses identified in the table. Moreover, offenses such as "assault" include both assault with battery and simple assault. It is often difficult to distinguish between the more and less serious forms of offenses based on arrest records.

Thirty percent of the arrest charges are for drug-related crimes but it is difficult to distinguish between possession and sales, and within sales, by low-level and high-level distribution. Twenty-eight percent of the arrest charges are for violent crimes, and of those, assaults dominate (seventy-one percent of violent crimes). Property crimes account for about twenty-four percent of the arrest charges, and of those larceny and fraud predominate (sixty-seven percent). About three percent of the new charges are for sex offenses and about sixteen percent are classified as other.

Some of the other offenses are uniquely federal. Immigration offenses are an illustration. Analysis excluded all aliens who were within the country illegally else immigration violations would likely be a

Abt Associates Inc.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

Recidivism of Offenders on Federal Community Supervision 2010-BJ-CX-K069

larger category. Also arrests for technical violations of the conditions of supervision do not appear in this list.

Data on *revocations* were assembled from PACTS – probation officers provide a reason that supervision ended in PACTS, including a revocation.

**Assembly of District-Level Data, Data on Offender's Environments, and Officer Characteristics**

*District-level variables* were assembled from FedStats, an online database that provides statistics compiled from various Federal Government agencies, including the U.S. Census Bureau.[16] Table A3 below lists the district-level variables used for the analyses, and describes those variables.

| Table A3. District-Level Data: Description of Study Variables | |
|---|---|
| **Variable Label (Variable Name)** | **Variable Description** |
| Population (POPULATION) | The 2006 estimated number of people who live in the district from the U.S. Census Bureau, Population Estimates Program (PEP). |
| Net Change in Population (NET_CHANGE) | The net change in districts population from April 1, 2000 to July 1, 2006 (from the U.S. Census Bureau, PEP) |
| American Indian Population (INDIAN) | The proportion of American Indian/Alaskan Native persons in the district (from the U.S. Census Bureau, County Population Estimates by Demographic Characteristics) |
| Household Income (INC_HOUSEHOLD) | The average household income in the district (from the U.S. Bureau of Economic Analysis, Regional Economic Information System) |

Source: http://www.fedstats.gov/

To examine the relationship between recidivism and offenders' environments, the study analyzed fourteen variables (listed in table A4 below) from the U.S. Census Bureau that provide information on the communities offenders reside. These fourteen variables were available at the Census tract level. Offenders' addresses from PACTS were used to determine the relevant Census tract. Principal components factor analysis was used to create one factor score that explained most of the variance across those fourteen variables, and inspection showed that the factor score essentially captures measures of *poverty and transience*.

| Table A4. Census Variables in the Poverty/Transience Factor (POVERTY) | |
|---|---|
| **Census Variable** | **Variable Description** |
| c00t_pnhs | Percent of persons 25 years and over in the census tract in 2000 with less than 9th grade education (no high school education). |
| c00t_pdrop | Percent of persons 25 years and over in the census tract in 2000 with a 9th through 12th grade education but no diploma (some high school). |
| c00t_punemp | Percent of persons 16 years of age and over in the census tract in 2000 in the civilian labor force who were unemployed. |

[16] http://www.fedstats.gov/aboutfedstats.html

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

Recidivism of Offenders on Federal Community Supervision 2010-BJ-CX-K069

| Table A4. Census Variables in the Poverty/Transience Factor (POVERTY) | |
|---|---|
| Census Variable | Variable Description |
| c00t_pnotlf | Percent of families and subfamilies with children where no parent is in the labor force. |
| c00t_hhinc | Median household income in 1999 in the census tract in 2000. A median household income of 200,001 indicates > $200,000. |
| c00t_pwelf | Percent of households in the census tract in 2000 with public assistance income in 1999. |
| c00t_faminc | Median family income in 1999 in the census tract in 2000. A median value of 200,001 indicates > $200,000. |
| c00t_pcinc | Per capita income in 1999 in the census tract in 2000. |
| c00t_perpov | Percent of persons for whom poverty status is determined in the census tract in 2000 below the poverty level in 1999. |
| c00t_perpovh | Indicator that the poverty rate for the census tract in 2000 was high poverty (greater than or equal to 40 percent). |
| c00t_pinpov | Percent of persons for whom poverty status is determined in the census tract in 2000 whose ratio of income to the poverty level in 1999 is under 1.00. |
| c00t_prenoc | Percent of occupied housing units in the census tract in 2000 that were renter occupied. |
| c00t_ru200 | Percent of specified renter occupied housing units in the census tract in 2000 with monthly gross rent under $200. |
| c00t_hhval | Median value of specified owner occupied housing units in the census tract in 2000. A median value of 1,000,001 indicates > $1,000,000. |

Officer profile data came from a self-report survey administered to probation officers by the OPPS in 2010. Table A5 lists the variables in the study. We matched about 80% of the officer profile data with the supervision records. We presume that failure to match resulted from one of two reasons. First, not all active probation officers completed the officer profile survey. Second, some probation officers supervised offenders prior to 2010 but retired before the survey. Thus, there could be some selection bias but it seems unlikely that any biases would materially impact the study findings.

| Table A5. Officer Profile Survey Data: Description of Study Variables | |
|---|---|
| Variable Label (Variable Name) | Variable Description |
| Experience as a Federal Probation Officer | The number of years experience as a federal probation officer. |
| Experience in Law Enforcement | The number of years of additional experience in law enforcement (including state and local). |
| Education Level | The education level of the probation officer. |

## Definitions and Additional Technical Details

### Defining Recidivism

A supervision terms begins when an offender first enters active supervision. For offenders entering probation, the term typically follows sentencing. For offenders entering terms of supervision

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

release, the term typically follows release from prison. Therefore the beginning of a community supervision term, and hence the initiation of the time-at-risk for recidivism, is clearly identified. A term ends when the offender is removed from active supervision, but analysis is complicated by the fact that many offenders who appear in the analysis file have open terms; that is, they have not yet completed their terms. The offender is considered to be at risk between the date when he or she enters supervision and the date when he or she leaves active supervision, or the last observed date for active terms.

For the study, analysts were able to identify when an offender entered active supervision, when he or she left active supervision (or the last observed date when the term remained open), and arrests that occurred during active supervision. The term ended with an arrest provided an arrest occurred before the term ended and the arrest satisfied two criteria. First, the arrest had to be for a serious crime. At the time of this study, serious crimes excluded traffic violations, obstruction of justice, liquor law violations, public peace, invasion of privacy and prostitution. Traffic violations and obstruction of justice predominated. Second, the arrest could not have been for a technical violation of the conditions of supervision. Simply put, the computing algorithm ignored arrests for minor crimes and for technical violations.

When an arrest occurred for a serious crime during the period of active supervision, we defined this as criminal recidivism, and we associated the date of the arrest as the date of recidivism. When an arrest occurred, it defined the outcome. That is, community supervision may have been revoked following an arrest for a serious crime, but the computing algorithm would not define this as a revocation.

For the outcome to be defined as a revocation, the term had to satisfy two criteria. The first criterion is that the term could not have ended with an arrest. The second criterion is that the close code either had to indicate that the term ended with a revocation or there must have been an arrest for a revocation. When these two criteria were satisfied, we considered the term to end with a revocation. The remaining decision was to put a date on when the revocation occurred. If there was an arrest for a revocation, we used that date; otherwise, if there was an inactive date, we used that date; and finally, if there was neither an arrest for a revocation nor an inactive date, we used the date that the term was closed by the probation officer.

Subsequent to preparing this analysis file and performing the analysis reported in this paper, after further investigations and in continuing consultation with the Office of Probation and Pretrial Services, we modified the definition of a revocation. Currently, the definition of a revocation requires that the term end with a close code indicating a revocation; the date of the revocation is always the date the case was closed. We also exclude some types of cases, including offenders who had pending cases at the time they entered supervision and illegal immigrants, from the analysis of recidivism. Because of these changes, and because the analysis file developed for OPPS continues to change with time, recent tabulations of recidivism will not exactly match those reported in this paper.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

## Arrests

Offenders may have multiple arrests during the study period. For this study, we took the first arrest. Additionally, offenders may have multiple arrests on the same day. Where an offender has more than one arrest on the same day we took the most serious charge. The arrest data were coded into the National Crime Information Center (NCIC) codes. The NCIC codes are in order of seriousness and we used this ordering to select the most serious offense when there were multiple arrests on the same day. This selection process is described in more detail in a technical report titled: *A Study of Federal Post-Conviction Supervision:  Predicting Criminal Recidivism & Evaluating Supervision Strategies.*

The study provides arrest rates for serious offenses. There is no absolute standard for classifying offenses as more and less serious. Twenty-eight states report offense severity (e.g., felonies, misdemeanors, petty offenses, and infractions) for arrests. A crosstab between offense severity and the arrest categories, in these states, revealed that a number of arrests were often for misdemeanors, infractions, and petty offenses. Based on this finding, we established a rule that all arrests that were reported as misdemeanors, petty offenses or infractions 75% or more of the time would be categorized as a minor offense. Consequently, the following arrests were considered "minor" offenses for the purposes of the analysis and were excluded (i.e., if one of these offenses was the first arrest we used the first subsequent re-arrest offense that was a "serious" offense): traffic, liquor, obstructing police, obstruction, anti-trust, relatively minor crimes against persons (e.g., misdemeanors for harassment, reckless endangerment), election laws, invade privacy, military, public peace, and prostitution. Offense categorized as unknown and some of the offenses that fall under the category "other" might have been classified as less serious.

## Risk and Protective Factors

Statistical model building led to a model with twenty risk and protective factors that predicted recidivism defined as a new arrest during the period of supervision. Figure 3 in the body of the report identifies those risk and protective factors. The figure calibrates the risk and protective scores in two ways. The first approach is to assume that the risk/protective factor is a switch: It is either present or absent. For example, being male is a switch: the unit change is the risk factor of being male instead of female. The number of prior arrests and age are not switches, and for those, the figure shows the effect of the entire range for the number of arrests (0 to 15) and the figure suppresses the effect of age (18 to 65) to preserve the scale for the other effects.

The second approach is to measure the effect of the risk/protective factor as a standard deviation change (rather than a unit change). For the number of arrests and age the standard deviation change was computed about the mean value for arrests and age because the model was nonlinear for those two variables.

Regardless of the calibration, the interpretation is much the same. At one extreme, the number of prior arrests is clearly a risk factor. At the other extreme, being motivated to change and being older rather than young are strong protective factors.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Responsible Officer**

The analysis file identifies up to thirteen probation officers who sequentially had responsibility for supervising an offender. It is not unusual for an offender to move from officer-to-officer, but a single probation officer typically handles the offender throughout that offender's term. Even when multiple probation officers share responsibility, a single offender typically supervised the case for more than fifty percent of the term's duration.

All offenders had at least one probation officer; nearly 40 percent had two or more officers, about 17 percent three or more, about 7 percent four or more, about 3 percent had five or more, and less than 1 percent had six or more. Consequently, for meaningful analyses we needed to identify one officer who was responsible for the offender during their supervision term – the *responsible officer.*

For 60 percent of offenders, a single officer had responsibility for the offender and therefore is the *responsible officer* for those offenders.  When there is more than one officer, the officer who spent the largest proportion of calendar time on the case is identified as the *responsible officer* for the offender. (Calendar time is measured in days from when an officer took responsibility until data collection ended, the term ended, or case responsibility was transferred to another officer.) Across all cases, a single officer accounted for 87% of the time on average. In at least 90 percent of the cases, a single officer accounts for a majority of the time. Thus, it seems justifiable to identify the officer who spent the largest proportion of time on the cases as the *responsible officer*.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

# EXHIBIT H



# Recidivism Among Federal Offenders: A Comprehensive Overview

UNITED STATES SENTENCING COMMISSION

UNITED STATES SENTENCING COMMISSION
ONE COLUMBUS CIRCLE, N.E.
WASHINGTON, DC 20002
WWW.USSC.GOV

**Patti B. Saris**
*Chair*

**Charles R. Breyer**
*Vice Chair*

**Dabney L. Friedrich**
*Commissioner*

**Rachel E. Barkow**
*Commissioner*

**William H. Pryor, Jr.**
*Commissioner*

**Michelle Morales**
*Ex Officio*

**J. Patricia Wilson Smoot**
*Ex Officio*

**Kenneth P. Cohen**
*Staff Director*

**Glenn R. Schmitt**
*Director*
*Office of Research and Data*

**March 2016**



**Kim Steven Hunt, Ph.D**
*Senior Research Associate*

**Robert Dumville**
*Research Associate*

# TABLE OF CONTENTS

*PART I*     INTRODUCTION     2

*PART II*    SUMMARY OF KEY FINDINGS     4

*PART III*   DESCRIPTION OF METHODOLOGY AND STUDY GROUP     6

    *Defining and Measuring Recidivism*     7

    *Methodology*     8

    *The Study Group*     9

*PART IV*    DETAILED RECIDIVISM FINDINGS     14

    *General Recidivism Rates*     15

    *Most Serious Recidivism Offense*     17

    *Recidivism and Criminal History*     18

    *Recidivism and an Offender's Federal Offense*     20

    *Recidivism and Sentences Imposed*     22

    *Recidivism and Offender Characteristics*     23

*PART V*     CONCLUSION     26

    ENDNOTES     28

    APPENDIX     34

# PART I

## Introduction

*This report provides a broad overview of key findings from the United States Sentencing Commission's study of recidivism of federal offenders. The Commission studied offenders who were either released from federal prison after serving a sentence of imprisonment or placed on a term of probation in 2005. Nearly half (49.3%) of such offenders were rearrested within eight years for either a new crime or for some other violation of the condition of their probation or release conditions. This report discusses the Commission's recidivism research project and provides many additional findings from that project. In the future, the Commission will release additional publications discussing specific topics concerning recidivism of federal offenders.*

The United States Sentencing Commission[1] began studying recidivism shortly after the enactment of the Sentencing Reform Act of 1984 (SRA).[2] Past studies, together with ongoing multi-year research on this subject, advance the Commission's mission to conduct research on sentencing issues related to the purposes of sentencing set forth in the SRA.[3] Recidivism information is central to three of the primary purposes of punishment as described in the SRA – specific deterrence, incapacitation, and rehabilitation – purposes which focus on prevention of future crimes through correctional intervention.[4] Information about recidivism also is relevant to the Commission's obligation to formulate sentencing policy that "reflect[s], to the extent practicable, advancements in knowledge of human behavior as it relates to the sentencing process."[5]

Considerations of recidivism by federal offenders were central to the Commission's initial work, as it chose to develop the *Guidelines Manual's* criminal history provisions in significant part on offenders' risk of reoffending.[6] The Commission's 2004 report, *Measuring Recidivism*, served as a "performance review" of the predictive ability of these provisions, *i.e.*, the predictive statistical power of the criminal history measure to reflect subsequent recidivism among federal offenders. That report concluded that these provisions largely succeeded in predicting subsequent risk of reoffending.[7] Two additional Commission reports in that same period further investigated federal offender recidivism and reviewed features of the federal sentencing guidelines.[8] Two later publications examined recidivism by federal offenders sentenced under the guidelines for child pornography and crack cocaine.[9]

Recent developments have refocused the Commission's interest on the recidivism of federal offenders, particularly the recent public attention on the size of the federal prison population and the cost of incarceration.[10] Well over 1.5 million offenders have been sentenced under the federal sentencing guidelines since their inception in 1987. In recent years, approximately 80,000 offenders have been sentenced each year for federal felonies and Class A (non-petty) misdemeanor offenses.[11] Nine out of ten of those federal offenders today receive sentences of imprisonment, while one out of ten is sentenced to probation.[12] The federal prison population today is slightly under two hundred thousand inmates[13] (which is around one-eighth of the total prison and jail population in the United States).[14] As these numbers have grown, courts and correctional officials have sought greater information about reoffending. Recidivism information has recently been used in decisions by the Commission to reduce the periods of incarceration established for certain offenders through retroactive application of sentence reductions in the guidelines.[15] And changes in the sentencing guidelines at the policy level have a significant effect on the imposition of individual sentences.[16] It is in this policy climate that the Commission has begun its multi-year study of recidivism by federal offenders.

The Commission's current recidivism research substantially expands on the scope of previous Commission recidivism projects. In addition to a different set of offenders – U.S. citizen federal offenders released in 2005 – the current study group (25,431 offenders) is much larger than those in previous Commission studies. A larger study group provides the opportunity to develop statistically useful conclusions about many subgroups of federal offenders, including those sentenced under different provisions in the guidelines. This is the first report on the results of the Commission's study of the recidivism of the federal offenders released during this time period.

# PART II

## Summary of Key Findings

The key findings of the Commission's study are:

- Over an eight year follow-up period, almost one-half of federal offenders released in 2005 **(49.3%) were rearrested** for a new crime or rearrested for a violation of supervision conditions.

- Almost one-third **(31.7%)** of the offenders **were also reconvicted**, and one-quarter **(24.6%)** of the offenders **were reincarcerated** over the same study period.

- Offenders released from incarceration in 2005 had a rearrest rate of 52.5 percent, while offenders released directly to a **probationary sentence** had a **rearrest rate of 35.1 percent.**

- Of those offenders who recidivated, most did so within the first two years of the eight year follow-up period. The **median time to rearrest was 21 months.**

- About **one-fourth** of those rearrested had an **assault rearrest as their most serious charge** over the study period. Other common most serious offenses were drug trafficking, larceny, and public order offenses.

- A federal **offender's criminal history** was closely **correlated with recidivism** rates. Rearrest rates range from 30.2 percent for offenders with zero total criminal history points to 80.1 percent of offenders in the highest Criminal History Category, VI. **Each additional criminal history point was generally associated with a greater likelihood of recidivism.**

- A federal **offender's age** at time of release into the community was also **closely associated** with differences in **recidivism** rates. Offenders released prior to age 21 had the highest rearrest rate, 67.6 percent, while offenders over sixty years old at the time of release had a recidivism rate of 16.0 percent.

- Other factors, including **offense type and educational level,** were associated with differing rates of recidivism but less so than age and criminal history.

*More detailed findings are contained below in Part IV.*

## Recidivism Study Offenders

The offenders studied in this project are **25,431 federal offenders** who:

- are **citizens;**

- **re-entered the community during 2005** after discharging their sentence of incarceration or by commencing a term of probation in 2005;

- have **valid FBI numbers** which could be located in criminal history repositories (in at least one state, the District of Columbia, or federal records);

- are **not reported dead, escaped, or detained,** and

- have a pre-sentence investigation report that was **submitted** to the Commission with a federal **sentence that was not vacated.**

# PART III

## Description of Methodology and Study Group

# Defining and Measuring Recidivism

Recidivism "refers to a person's relapse into criminal behavior, often after the person receives sanctions or undergoes intervention for a previous crime."[17] Recidivism measures can provide policy makers with information regarding the relative threat to public safety posed by various types of offenders, and the effectiveness of public safety initiatives in (1) deterring crime and (2) rehabilitating or incapacitating offenders.[18] Recidivism measures are used by numerous public safety agencies to measure performance and inform policy decisions and practices on issues such as pretrial detention, prisoner classification and programming, and offender supervision in the community.[19]

Recidivism is typically measured by criminal acts that resulted in the rearrest, reconviction, and/or reincarceration of the offender over a specified period of time.[20] These are the three recidivism measures used in this report. Providing multiple measures of recidivism allows users to select the performance measure best suited to their outcome of interest.[21]

Rearrest classifies a person as a recidivist if he or she has been arrested for a new crime after being released into the community directly on probation or after serving a term of imprisonment. Rearrest also includes arrests for alleged violations of supervised release, probation, or state parole.[22] The number of rearrests in the Commission's analysis is based on the number of unique arrest dates, regardless of the number of individual charges arising from a single arrest event. Thus, if an offender was arrested on a single occasion for both driving under the influence and possession of cocaine, that arrest date would constitute a single rearrest event.

Reconviction classifies a person as a recidivist if an arrest resulted in a subsequent court conviction. Violations and revocations of supervision are not included in reconvictions since no formal prosecution occurred.

Reincarceration classifies a person as a recidivist if a conviction or revocation resulted in a prison or jail sentence as punishment. The reincarceration measure counts offenders who were reported returned to the Federal Bureau of Prisons, state prison, or local jail for any term of incarceration.

For example, many rearrests do not ultimately result in a reconviction or reincarceration for reasons relating to procedural safeguards (e.g., the suppression of evidence for an unconstitutional search or seizure), lack of sufficient evidence to convict or revoke, and prosecutorial or judicial resource limitations. To the extent that the rearrest event is an accurate indicator of relapse into criminal behavior, excluding events due to non-conviction or non-incarceration will result in underestimation of recidivism. Even using the least restrictive measure, rearrest, does not count the full extent of offender recidivism, as many crimes go unreported to police or, if reported, do not result in an arrest. For these reasons, no measure is perfect, and reporting several measures provides a more complete and nuanced picture of reoffending.[23] The three measures overlap in some areas – meaning all offenders who were reconvicted or reincarcerated also were necessarily rearrested, too. Some offenders who were reconvicted, however, were not reincarcerated. Generally speaking, however, the measure of rearrest is larger than the measure of reconviction, which in turn is larger than the measure of reincarceration.

Two principal research choices can affect the relative magnitude of recidivism as measured in any study: first, which events are being included as evidence of reversion to criminal behavior; and second, over what time period these events are counted. The period of time over which events are counted following release into the community is the "follow-up period." Recidivism analysis begins with a starting event, such as release from prison into the community, and may have one or more subsequent events, such as arrests, recorded before the close of the follow-up period. In some studies, follow-up periods may be quite short, for example six months. Other studies follow offenders in the community for substantially longer periods, which may extend to several years. The longer the follow-up period, the higher the reported recidivism rate, because some offenders who did not recidivate within the first year of release recidivate in the second year, and other offenders who did not recidivate during the first two years recidivated thereafter. Longer follow-up periods are in this sense less restrictive, and come closer to estimating true rate of desistance from crime.

The Commission selected an eight-year follow-up period for its research. The Commission also considered all recidivism events (including felonies, misdemeanors, and "technical" violations of the conditions of supervision) except the Commission excluded minor traffic offenses. In this report and accompanying appendices, the Commission will include findings using all three measures: rearrest, reconviction, and reincarceration. The measures of rearrest, reconviction, and reincarceration are reported as the percentage of offenders who recidivated by that measure. As noted, those measures overlap in some areas.

recidivism rates varied with the presence of various offender risk (*e.g.*, substance abuse issues) and protective (*e.g.*, positive social support) factors.

## Methodology

Technological advances have allowed the Commission to examine all U.S. citizen federal offenders released in 2005 who meet the study criteria discussed below, greatly expanding the number of federal offender records analyzed over past Commission analysis. Following a practice pioneered by the Bureau of Justice Statistics,[26] the Commission entered into a data sharing agreement with the FBI's Criminal Justice Information Services (CJIS) Division and the Administrative Office of the United States Courts to provide the Commission with electronic access to criminal history records (*i.e.*, RAP sheets) through the CJIS's Interstate Identification Index (III). The CJIS's III allows authorized agencies to determine whether any repository has criminal history records on an individual. Results received over this system provide an individual's criminal history record maintained by all U.S. states, the District of Columbia, and federal agencies. Once automated records were obtained, the Commission went through an extensive process to standardize offense descriptions across all reporting agencies, because states use a variety of state-specific text descriptions and other citations to report the type of offense. Disposition information received from law enforcement agencies and courts was also standardized.

Using an automated software program that analyzed and classified offender criminal records, the Commission identified and processed the criminal records of more than 35,000 offenders who had a valid FBI number in either Commission or Bureau of Prisons records and were released during the study period, which included primarily calendar year 2005 but was extended before and after this year to expand the sample for certain groups. To be included in the final cohort, study subjects must have been federal offenders:

- who are citizens;
- who re-entered the community after discharging their sentences of incarceration or by commencing a term of probation in 2005;[27]
- whose pre-sentence investigation report was submitted to the Commission;
- who have valid FBI numbers which could be located in criminal history repositories (in at least one of the 50 states, DC, or federal records); and

---

This report provides additional important information regarding the recidivism of federal offenders. First, the Commission reports the time to the first recidivism event for those offenders who recidivated. Studying the timing of recidivism can help understand the process of desistance, as some offenders may be able to remain in the community for a considerable time before recidivating, while others recidivate very quickly. The Commission also reports the median number of recidivism events for those who recidivated, again using the three recidivism measures. With a follow-up period of eight years, many offenders recidivate more than once. Knowing how often they recidivate and for what crimes can provide important information to policymakers. Finally, the Commission reports the most serious post-release event for those who recidivated, as some crimes represent greater harm to society than others.

This report presents the findings of a much larger group of offenders than previous Commission reports, due largely to recent technological advances described below that make this possible. As with previous Commission reports, the present multi-year study of recidivism of federal offenders seeks not only to describe recidivism results generally, but also to relate these results to current sentencing policy questions as may be appropriate in light of the information obtained.

Two other recent recidivism reports are particularly relevant to the present Commission study, although differing with respect to follow-up period and in some other ways. First, the Bureau of Justice Statistics of the U.S. Department of Justice began issuing reports on recidivism among prisoners released from state prisons in the 1980s with *Recidivism of Prisoners Released in 1983*, and recently issued *Recidivism of Prisoners Released in 30 States in 2005: Patterns from 2005 to 2010*.[24] Among state prisoners released in 2005, 67.8 percent of released prisoners were arrested for a new crime within three years, and 76.6 percent were arrested within five years. Many prisoners (36.8%) who were arrested during the five-year study period were arrested within the first six months, and 56.7 percent were arrested by the end of the first year.

Second, the Office of Probation and Pretrial Services of the Administrative Office of the U.S. Courts (AO) sponsored a report in 2012 on the recidivism of federal offenders prepared by Abt Associates. The AO study, *Recidivism of Federal Offenders on Federal Community Supervision*,[25] also followed federal offenders released into the community in fiscal year 2005. The AO found that 38 percent of offenders recidivated within five years, including 24 percent who were re-arrested for a new crime and 13 percent who were revoked from probation or supervised release. Unlike the Commission's present research, the AO study excluded most public order offenses from criminal acts counted in its recidivism measure. The report also examined how

- who were not reported dead, escaped, or detained; and
- whose federal sentence was not vacated.

The Commission examined all offenses committed by the offenders in the study group and ranked the offenses in order of seriousness. In general, the Commission followed a widely accepted ranking scheme used by the Bureau of Justice Statistics in prior recidivism research.[28] The ranking generally begins with the most serious violent crimes, proceeds to less serious violent crimes, next ranking property, drug, and public order crimes. The exception to this general pattern is that the Commission ranked drug trafficking just below violent crimes and above all property crimes.

The study expands on previous Commission practice in another sense. This study cohort was tracked in the community for eight years, compared to previous follow-up periods that ranged from two to five years. Because the risk of re-offending may extend for long periods after release into the community, longer follow-up periods may reveal recidivism that would otherwise be undetected. The longer period may also provide insight into offenders with multiple recidivism incidents, or periods of activity and inactivity.

## The Study Group

This report examines 25,431 offenders who were released into the community (either from federal prison or on to probation) in calendar year 2005 and met all of the above criteria. The advantages of this large study group are substantial. Having several thousand offenders allows more precise estimates of recidivism rates across different subgroups. For example, there are 4,664 female offenders in this study, and 1,048 released offenders were older than sixty years of age.

### Offender Demographics

Male offenders constituted more than four of every five (81.7%) offenders in this study. White offenders were the largest group (43.7%), followed by Black (33.9%), Hispanic (17.8%), and Other Race (4.6%).

The median age at the time of sentencing was 33 years for offenders in this study. The median age at release was 36 years. However, over four percent of offenders were released into the community after age sixty. Regarding the highest education level attained by released offenders, about one-third (34.3%) did not complete high school, while most (65.7%) completed at least high school, including some offenders (7.5%) who were college graduates.

*Figure 1.*
**Demographic Characteristics of Recidivism Study Offenders**

| Race/Ethnicity | |
|---|---|
| White | 43.7% |
| Black | 33.9% |
| Hispanic | 17.8% |
| Other | 4.6% |
| **Gender** | |
| Male | 81.7% |
| Female | 18.4% |
| **Education** | |
| Less Than High School Graduate | 34.3% |
| High School Graduate | 36.9% |
| Some College | 21.4% |
| College Graduate | 7.5% |



**Age at Sentencing**



**Age at Release**

SOURCE: U.S. Sentencing Commission's 2005 Recidivism Release Cohort Datafile, REFDDOS. Of the 25,431 cases in this study, the Commission excluded cases from this analysis that were missing information necessary to perform the analysis.

*Federal Offense Type and Criminal History*

Over two in five (41.7%) federal offenders released in 2005 and included in this study group were released after receiving a conviction for a federal offense of drug trafficking. Other federal offenses which were common to this study group are fraud (13.6%); unlawful receipt, possession, or transportation of firearms (12.8%); robbery (4.3%); larceny (3.9%); and immigration[29] (3.5%). All other offenses constituted the remaining 20.3 percent.

An offender's prior criminal record is an important consideration at sentencing. Offenders sentenced in the federal system usually receive criminal history points for each prior sentence based on the number and severity of past criminal conduct. For example, each prior sentence of imprisonment exceeding one year and one month generally receives three points. In addition to points for prior sentences, if the defendant committed the federal offense while under any criminal justice sentence, such as probation, two additional points are added. Some prior sentences are not counted because of staleness, their minor nature, or other reasons.[30] The total number of criminal history points determine the Criminal History Category (I-VI) to which the offender is assigned for the purpose of determine the sentencing guideline range.

Criminal History Category (CHC) I comprises 53.6 percent of the study group, and is assigned to offenders with zero or one criminal history point, the lowest or least serious level of past criminal conduct. In contrast, 7.6 percent of offenders in this study were assigned to CHC VI (13 or more criminal history points), indicating the highest or most serious level of past criminal conduct.

*Figure 2.*
**Offense Types and Criminal History Scores of Recidivism Study Offenders**

| Offense Type | |
|---|---|
| Drug Trafficking | 41.7% |
| Fraud | 13.6% |
| Firearms | 12.8% |
| Robbery | 4.3% |
| Larceny | 3.9% |
| Immigration | 3.5% |
| All Other | 20.3% |



SOURCE: U.S. Sentencing Commission's 2005 Recidivism Release Cohort Datafile, RECIDIVS. Of the 25,431 cases in this study, the Commission excluded cases from this analysis that were missing information necessary to perform the analysis.

## Sentences Originally Imposed

The offenders in this study were sentenced for their instant federal offenses between 1990 and 2005. About one-quarter of offenders were sentenced before 2002 while about three-quarters of offenders were sentenced before 2005. Of all the offenders in the study, over three-quarters (77.8%) were sentenced before the Supreme Court's January 12, 2005 decision in *United States v. Booker*,[31] which held that the sentencing guidelines were advisory only.

At their original sentencings for their instant federal offenses, 14.1 percent of the offenders in the study group were sentenced to probation only (*i.e.*, probation with no condition of confinement); 4.7 percent were sentenced to probation with a condition of confinement to be followed by a non-prison alternative "split" sentence of imprisonment to be followed by a non-prison alternative confinement; and 77.4 percent were sentenced to a term of imprisonment only.[32] Because the vast majority of offenders who received probation with a condition of confinement served that period of confinement in home detention or in a halfway house rather than in a jail or prison,[33] such offenders will be analyzed together with offenders who received probation without a condition of confinement. Furthermore, because offenders who received "split" sentences received a median term of imprisonment of 5 months, those offenders will be analyzed together with offenders who received sentences of imprisonment only.

Therefore, for ease of analysis and presentation, the discussion of recidivism rates of the study group by sentence type that appear in *Recidivism and Sentences Imposed* below will consider only the following two[34] larger groups of offenders: (1) offenders who received a probationary sentence, regardless of whether it had a condition of confinement (18.8 percent of the study group), or (2) offenders who received a sentence of imprisonment, regardless of whether it was a "split" sentence or a sentence of imprisonment only (81.2 percent of the study group).[35]

The median length of imprisonment for all released offenders was 37 months; however, one-tenth (12.3%) of the offenders received a sentence of ten years or more.

A term of supervised release may be ordered to follow any term of imprisonment, and must be ordered if required by statute.[36] The most common length of supervised release ordered at sentencing (54.0%) was three years. One-quarter (25.2%) of released offenders were ordered to serve five years or more of supervised release, including 0.6 percent ordered to serve ten years or more. Because the study follow-up period was eight years, and the typical length of supervision was not more than three years, most offenders completed their term of supervision, and were no longer on supervision for much of the follow-up period.

*Figure 3.*
**Sentences Imposed on Recidivism Study Offenders**



SOURCE: U.S. Sentencing Commission's 2005 Recidivism Release Cohort Datafile, RECID05. Of the 25,431 cases in this study, the Commission excluded cases from this analysis that were missing information necessary to perform the analysis.

The Criminal History Categories are also well-matched. CHC I is the most common category for both groups, 53.7 percent for the study group and 46.8 percent for 2014 sentenced offenders. Conviction for a federal offense of drug trafficking is the most common offense, 41.7 percent of the study group and 36.4 percent for the 2014 sentenced group. Offenses involving firearms (12.8% and 17.0%, respectively) and fraud (13.6% and 14.2%, respectively) are also well-matched. Given these similarities, it is reasonable to assume that the recidivism findings available from the study group analysis are relevant to currently sentenced offenders.

It is important to note that most sentenced offenders released during the study period, with the exception of most probationers, were sentenced prior to the *Booker* decision[37] that rendered the federal sentencing guidelines "effectively advisory."[38] The impact of this decision, as reported in the Commission's *Report on the Continuing Impact of U.S. v. Booker on Federal Sentencing*, is that "the rates of non-government sponsored below range sentences have increased in most districts."[39] Three-quarters (77.8%) of offenders discussed in this study were sentenced before *Booker*.

Although the study group was released several years ago, this group is generally well-matched to citizen offenders sentenced in 2014. Both the study group and citizen offenders sentenced in 2014 are predominantly male (81.7% and 81.2%, respectively). White offenders are the most numerous race/ethnicity group, 43.7 percent for the study group and 38.1 percent for the 2014 sentenced offenders. Black offenders (33.9% for the study group and 32.7% for the 2014 sentenced offenders, respectively) and Hispanic offenders (17.8% and 23.4%, respectively) are sufficiently well-matched. The median age at sentencing for the study group (33 years old) is close to the median for 2014 sentenced citizens (35 years old).

# PART IV

## Detailed Recidivism Findings

# General Recidivism Rates

As mentioned earlier, this report uses three different measures of recidivism—rearrest, reconviction, and reincarceration.

## Rearrest

Almost one-half of offenders released in 2005 (49.3%) were rearrested for a new crime or for an alleged violation of the conditions of their supervision over the eight year follow-up period. The median time to rearrest was 21 months, meaning that for one-half of the offenders rearrest occurred in less than two years following their initial release from prison or placement on probation. Among those who recidivated, the median number of rearrest events (events occurring on separate days) was two, but 21.2 percent of recidivist offenders were rearrested five times or more. When considering only the "most serious" offense committed by those who were rearrested, the most serious event that was most prevalent was assault. About one-fourth (23.3%) of those rearrested had an assault rearrest as their most serious charge over the study period. Other common "most serious" offenses were other public order (15.5%), drug trafficking (11.5%), and larceny (7.7%).

## Table 1.
### Overview of Recidivism Study Findings

| Recidivism Measure | Rearrest | Reconviction | Reincarceration |
|---|---|---|---|
| Percent | 49.3% | 31.7% | 24.6% |
| Median Time to Recidivism | 21 Months | 30 Months | 29 Months |
| Median Number of Recidivism Events | 2 | 1 | 1 |
| Most Serious Post-Release Event (%) | Assault (23.3%) | Assault (23.9%) | Assault (23.8%) |
| Median Age at Release | 33 | 32 | 32 |

SOURCE: U.S. Sentencing Commission's 2005 Recidivism Release Cohort Datafile, RECID05. Median age at release is shown for recidivist offenders only.

## Reconviction

Almost one-third (31.7%) of offenders were reconvicted over the study period. Most offenders who were reconvicted were reconvicted once. The median time to reconviction, as measured from the date of the arrest that led to the reconviction, was 30 months. About one-fourth (23.9%) of those reconvicted had an assault conviction as their most serious charge over the study period. Other common most serious offenses were drug trafficking (13.5%), other public order (8.7%), and larceny (8.5%).

## Reincarceration

One-quarter (24.6%) of offenders were reincarcerated over the study period. Most offenders who were reincarcerated were reincarcerated once. The median time to arrest for the offense that led to reincarceration was 29 months. More offenders (23.8%) were reincarcerated for an assault crime as their most serious offense than for any other offense. Other common most serious offenses were drug trafficking (14.5%), other public order (8.4%), and larceny (7.8%).

## Comparison to State Prisoners

Compared to a cohort of state prisoners released into the community in 2005 and tracked by the Bureau of Justice Statistics, federal offenders had a lower recidivism rate. BJS found that 76.6 percent of offenders released from state prison were rearrested within five years. The Commission, using a comparable five year follow-up period and including only federal offenders released from prison (i.e., excluding those sentenced to probation or a fine-only), found the recidivism rate for these federal offenders was 44.9 percent.[40]

Using reconviction as the measure of recidivism, BJS found that 55.4 percent of state offenders had an arrest within five years that led to a conviction. The reconviction rate for federal offenders over the same length of time was 26.0 percent. When recidivism is measured by reincarceration, BJS found a 28.2 recidivism rate for state offenders within five years that led to an incarceration, compared to 20.7 percent of the federal offenders in the Commission's study.

*Time to First Recidivism Event*

The measure of the time to first recidivism event can be useful in distinguishing offenders who recidivate early from those who eventually recidivate, but are apparently crime-free for a longer interval. Tracking the length of time to failure can also help policymakers determine an appropriate period of supervision after the release from prison, for example by extending supervision through the peak crime-prone interval.[41] Time from release to first arrest is shown for all rearrests, reconvictions, and reincarcerations.

During the first year following release into the community, 16.6 percent of the offenders in the Commission's study were rearrested for the first time. Each subsequent year fewer people were rearrested for the first time than in the previous year, going out to year seven. For example, 10.5 percent of the total were rearrested in the second year, and 6.6 percent of the total were rearrested in the third year. An additional 1.8 percent of offenders who were not previously arrested were rearrested in the eighth year, as demonstrated below.

*Table 2.*
**Rearrest Rates for Recidivism Study Offenders**

| Years After Release | % | Cumulative % |
|---|---|---|
| One Year After Release | 16.6% | 16.6% |
| Two Years After Release | 10.5% | 27.1% |
| Three Years After Release | 6.6% | 33.7% |
| Four Years After Release | 4.7% | 38.4% |
| Five Years After Release | 3.7% | 42.1% |
| Six Years After Release | 3.0% | 45.1% |
| Seven Years After Release | 2.3% | 47.5% |
| Eight Years After Release | 1.8% | 49.3% |

SOURCE: U.S. Sentencing Commission's 2005 Recidivism Release Cohort Datafile, RECID05.

*Figure 4.*
**Time to First Rearrest of Recidivism Study Offenders**



*Median Time to First Rearrest:*
**21 Months**

Rearrest, 49.3%

Reconviction, 31.7%

*Reincarceration, 24.6%*

*Years After Release*

SOURCE: U.S. Sentencing Commission's 2005 Recidivism Release Cohort Datafile, RECID05. The reconviction and reconfinement lines indicate time to first arrest that led to a conviction and time to first arrest that led to a confinement, respectively.

# Most Serious Recidivism Offense

The Commission ranked new offenses in order of seriousness for those who reoffended. When considering only the "most serious" post-release offense committed by those who were rearrested, assault was the most prevalent. About one-fourth (23.3%) of those rearrested had an assault rearrest as their most serious post-release event over the study period. Other common "most serious" offenses were public order (15.5%), drug trafficking (11.5%), and larceny (7.7%).

*Figure 5.*
**Recidivism Study Offenders by Most Serious Recidivism Offense**



*Most Serious Recidivism Offense*

SOURCE: U.S. Sentencing Commission's 2005 Recidivism Release Cohort Datafile, RECID05. Of the 25,431 cases in this study, the Commission excluded cases from this analysis that were missing information necessary to perform the analysis.

## Recidivism and Criminal History

The relationship between prior criminal record and recidivism has been recognized by the Commission since its inception in the mid-1980s, as discussed in Chapter Four of the *Guidelines Manual*.[42] Empirical research assessing correlates of recidivism and criminal career behavior was consulted in formulating the criminal history scoring system[43] and recent research confirms this relationship.[44] The previously referenced Commission study, *Measuring Recidivism* (2004), confirmed that Chapter Four's criminal history provisions were working as designed, and recidivism rates rise as criminal history points increase and as Criminal History Categories increase. The present analysis confirms that these criminal history provisions continue to work as designed.

An offender's total criminal history points, which determines the CHC to which the offender is assigned for the purpose of calculating the sentencing range under the guidelines, is designed in part to reflect recidivism potential. In order "to protect the public from further crimes of the particular defendant, the likelihood of recidivism and future criminal behavior must be considered."[45] Fully consistent with its previous recidivism studies, the Commission's present study found that recidivism rates are most closely correlated with total criminal history points. For example, 30.2 percent of offenders with zero total criminal history points were rearrested within eight years, compared to 81.5 percent of offenders with more than 10 total criminal history points. In fact, each additional criminal history point is generally associated with a greater likelihood of recidivism. For example, the rearrest rate of offenders with three total criminal history points is 52.7 percent, compared to 59.4 percent for four point offenders. This pattern continues even at higher total points, with rearrest rates ranging from 71.1 percent (seven point offenders), 74.0 percent (eight point offenders), and 76.1 percent (nine point offenders).[46]

*Figure 6.*
**Rearrest Rates for Recidivism Study Offenders by Criminal History Points**



SOURCE: U.S. Sentencing Commission's 2005 Recidivism Release Cohort Datafile. RECIDOS. Of the 25,431 cases in this study, the Commission excluded cases from this analysis that were missing information necessary to perform the analysis.

Because an offender's criminal history score determines the CHC to which he or she is assigned, recidivism rates are also correlated with the CHC. That is, the higher the CHC (a result of more prior crimes and/or more serious crimes), the higher the recidivism rate. Rearrest rates ranged from a low of 33.8 percent for those in CHC I to a high of 80.1 percent for those in CHC VI.

Other guideline provisions that account for an offender's prior crimes also serve as good predictors of future recidivism. For example, offenders designated under the guidelines as career offenders[47] and armed career criminals[48] receive substantially increased sentences because they are repeat offenders with serious criminal backgrounds. These offenders have substantially higher recidivism rates than other offenders in the study group. In fact, those two groups of offenders have the highest recidivism rates of any group in this report. Taken together, these offenders had a rearrest rate of 69.5 percent, compared to a rearrest rate of 48.7 percent for all other offenders.

*Figure 74.*
**Rearrest Rates for Recidivism Study Offenders by Criminal History Category**





*Figure 7B.*
**Rearrest Rates for Recidivism Study Offenders by Career Offender/Armed Career Criminal Status**

SOURCE: U.S. Sentencing Commission's 2005 Recidivism Release Cohort Datafile, RECIDI05. Of the 25,431 cases in this study, the Commission excluded cases from this analysis that were missing information necessary to perform the analysis.

## Recidivism and an Offender's Federal Offense

The Commission did not find a strong correlation between the severity of the offender's federal offense conduct, as determined under the sentencing guidelines, and future recidivism. Under the guidelines, the seriousness of an offender's federal crime is measured by a final offense level score ranging from one to 43. There is not a strong correspondence between final offense level and recidivism. For example, offenders whose federal offense was assigned to the lowest final offense levels (one through eight) had a rearrest rate of 45.2 percent, almost the same rearrest rate as those assigned the highest final offense levels of 31 through 43 (45.7%). It should be noted, however, that the offense levels in the federal sentencing guidelines were intended to reflect multiple purposes of punishment, including just punishment and general deterrence (which are unrelated to offender recidivism).[49]

Although the specific numerical offense severity determined under the sentencing guidelines appears to not be correlated with recidivism, the type of crime the offender committed does have some correlation with the risk of future crime. Offenders who were rearrested (68.3%) under the sentencing guidelines involved firearms were most likely to be rearrested for robbery (67.3%), followed by those arrested for robbery (67.3%), immigration (55.7%), drug trafficking (49.9%), larceny (44.4%), other (42.0%), and fraud (34.2%).

Offenders who received an enhanced sentence for a weapon, either through a conviction under 18 U.S.C. § 924(c) or by application of a specific offense characteristic in the guidelines for having a weapon present during commission of a crime,[50] had higher recidivism rates than other offenders. Offenders with such a weapon enhancement had a rearrest rate of 55.4 percent, compared to 48.6 percent for all other offenders.

*Figure 8.*
**Rearrest Rates for Recidivism Study Offenders by Final Offense Level and Federal Offense Type**



SOURCE: U.S. Sentencing Commission's 2005 Recidivism Release Cohort Datafile, RECID05. Of the 25,431 cases in this study, the Commission excluded cases from this analysis that were missing information necessary to perform the analysis.

Offenders who were organizers, leaders, managers, or supervisors of an offense received an aggravating role adjustment of 2, 3, or 4 levels[51] under the guidelines, increasing their total offense level. Those with such an aggravating role adjustment were less likely to recidivate than other offenders. Those receiving no adjustment (93.6 percent of all offenders in the study) had a rearrest rate of 50.2 percent. However, those receiving aggravating role adjustments had recidivism rates of: 37.3 percent (two level increase); 35.6 percent (three level increase); and 33.7 percent (four level increase).

Offenders who were found to have a minor or minimal role in an offense received a mitigating role adjustment of 2, 3, or 4 levels[52] under the guidelines, decreasing their total offense level. Offenders in the study with such a mitigating role adjustment (10.6% of all offenders) were somewhat less likely to recidivate than other offenders. Those receiving no adjustment had a rearrest rate of 49.7 percent. However, those receiving mitigating role adjustments had recidivism rates of: 47.2 percent (two level decrease); 37.5 percent (three level decrease); and 43.6 percent (four level decrease).

An offender who demonstrates acceptance of responsibility for his offense can receive a reduction in offense level of 2 or 3 levels.[53] The vast majority of all offenders in the Commission's study (90.7%) received a reduction in their guideline range for acceptance of responsibility. Such an adjustment was not associated with lower recidivism rates. Offenders with no adjustment under §3E1.1 had a rearrest rate of 46.3 percent. Offenders who received a two-level decrease had a rearrest rate of 46.6 percent, and those with a three level decrease were higher still (50.9%).

**Figure 9.**
**Rearrest Rates for Recidivism Study Offenders by Selected Guideline Characteristics**



SOURCE: U.S. Sentencing Commission's 2005 Recidivism Release Cohort Datafile, RECID05. Of the 25,431 cases in this study, the Commission excluded cases from this analysis that were missing information necessary to perform the analysis.

## Recidivism and Sentences Imposed

Recidivism rates differ according to the type of sentence imposed. As previously noted, 81.2 percent of the study group were sentenced to some amount of imprisonment. These offenders had the highest rate of rearrest, 52.5 percent. Conversely, offenders sentenced to probationary sentences (18.8 percent of the study group) had a rearrest rate of 35.1 percent.[54]

Offenders with shorter lengths of imprisonment generally had lower recidivism rates. For instance, offenders with sentences of imprisonment of fewer than six months had the lowest rearrest rate at 37.5 percent, followed by offenders with sentences from six to 11 months (50.8 percent), and 12 to fewer than 24 months (50.8%). Conversely, the highest recidivism rates are generally found among offenders with longer sentences. Those with sentences from 60 months to fewer than 120 months had the highest rate (55.5%), followed closely by those with 24 to fewer than 60 months (54.0%), and 120 months or more (51.8%).[55]

The correlation between sentence type and length and recidivism is not, of course, entirely a coincidence. The guidelines are intended, in part, to incapacitate offenders whose criminal records indicate a greater risk of future criminality. Those with prison sentences are incapacitated in a manner that those receiving no term of incarceration are not, and those receiving longer terms of incarceration as a result of their higher CHCs are also at greater risk of recidivism than those receiving no incarceration or a shorter period of incarceration who generally had lower CHCs.

The most common length of supervised release imposed for those offenders who received terms of supervised release to follow their terms of imprisonment was 36 months. Offenders ordered to serve a term of supervised release of three years were the majority of offenders, and this group had the highest rearrest rate, 55.4 percent. The lowest rearrest rate was found among offenders serving a term of supervised release of ten years or more (42.7%), and the second lowest rate occurred with offenders serving two year terms (46.8%).

*Figure 10.*
Rearrest Rates for Recidivism Study Offenders by Federal Sentences Originally Imposed



Length of Federal Sentence Imposed

Length of Federal Supervised Release Imposed

SOURCE: U.S. Sentencing Commission's 2005 Recidivism Release Cohort Datafile, RECID005. Of the 25,431 cases in this study, the Commission excluded cases from this analysis that were missing information necessary to perform the analysis.

## Recidivism and Offender Characteristics

Studies have repeatedly shown that older offenders at sentencing are at lower risk for reoffending, and the Commission's research confirms these findings.[56] Offenders sentenced when younger than twenty-one had a 71.1 percent rearrest rate, compared to 14.0 percent of offenders who are sentenced after age sixty.

Age at release also is associated with different rates of recidivism. Those released into the community who were below age twenty-one had the highest rearrest rate, 67.6 percent. Conversely, those oldest at age of release, over sixty years old, had the lowest recidivism rate, 16.0 percent. For each age grouping shown below, the older the age group, the lower the rearrest rate. The same pattern holds for reconviction and reincarceration.

*Figure 11.*
**Rearrest Rates for Recidivism Study Offenders by Age at Sentencing and Release**



SOURCE: U.S. Sentencing Commission's 2005 Recidivism Release Cohort Datafile, RECIDIVS. Of the 25,431 cases in this study, the Commission excluded cases from this analysis that were missing information necessary to perform the analysis.

*Page 23*

Male offenders (52.2%) were rearrested at higher rates than females (36.4%).

Eight years after release into the community, Black offenders had been arrested at the highest rates (59.1%), followed by Other Race (49.4%), Hispanic (49.1%), and White (41.7%) offenders. However, the apparent relationship between race/ethnicity and recidivism is much less pronounced if the prior criminal history of these offenders is also examined. For offenders assigned to higher CHCs, recidivism results are similar, regardless of race or ethnicity. Rearrest rates for White, Black, and Hispanic offenders in CHC IV are 69.7 percent, 77.6 percent, and 75.4 percent, respectively. At CHC V for the same three groups, the rearrest rates are 75.6, 78.5, and 79.9 percent, respectively. At CHC VI for the same three groups, the rearrest rates are 77.1, 82.4, and 79.3 percent, respectively. Much of the difference in overall recidivism rates appears to be the result of the differing proportion of Black offenders in CHC I (38.9%), compared to White offenders (59.7%) and Hispanic offenders (62.2%).

Education levels are also associated with different rates of recidivism. Offenders with less than a high school diploma had the highest recidivism rates (60.4%), followed by high school graduates (50.7%) and those with some college (39.3%). College graduates had the lowest rates (19.1%).

*Figure 12.*
**Rearrest Rates for Recidivism Study Offenders by Selected Demographic Characteristics**



SOURCE: U.S. Sentencing Commission's 2005 Recidivism Release Cohort: Deadfile, RECID05. Of the 25,431 cases in this study, the Commission excluded cases from this analysis that were missing information necessary to perform the analysis.

# PART V

## Conclusion

## Conclusion

The study of recidivism by federal offenders directly relates to multiple statutory purposes of punishment as set forth in the Sentencing Reform Act of 1984. Using automated criminal history data, the Commission tracked 25,431 federal offenders who either discharged a federal prison sentence or commenced a term of probation in 2005 during an eight-year follow-up period. The Commission found that almost one-half of these federal offenders who reentered the community in 2005 (49.3%) were rearrested for a new crime or rearrested for a violation of supervision conditions during the follow-up period.

The Commission found that, consistent with existing research,[57] two factors – offenders' criminal histories and their ages at the time of release into the community – were most closely associated with differences in recidivism rates. Younger offenders recidivated at significantly higher rates than older offenders, and offenders with more extensive criminal histories recidivated at significantly higher rates than offenders with lesser criminal histories. Regarding criminal history in particular, the Commission found that an offenders' total criminal history points, as determined under Chapter Four of the Commission's *Guidelines Manual*, were closely correlated with recidivism rates.

Other factors, including educational achievement and offense type, also were associated with differences in recidivism rates, but less so than age and criminal history. Certain factors related to provisions in Chapters Two and Three of the *Guidelines Manual* – including adjustments in an offender's offense level as well as the total offense level – were not associated with differences in rates of recidivism. However, unlike Chapter Four's provisions – which were based in large part on recidivism data – the guideline's offense level computations are based on several purposes of punishment, some of which are unrelated to recidivism, including general deterrence and retributivist concerns.

In the coming months, the Commission will issue additional reports based on its recidivism study.

ENDNOTES

¹ The United States Sentencing Commission ("Commission") is an independent agency in the judicial branch of government. Established by the Sentencing Reform Act of 1984, its principal purposes are (1) to establish sentencing policies and practices for the federal courts, including guidelines regarding the appropriate form and severity of punishment for offenders convicted of federal crimes; (2) to advise and assist Congress, the federal judiciary, and the executive branch in the development of effective and efficient crime policy; and (3) to collect, analyze, research, and distribute a broad array of information on federal crime and sentencing issues. *See* 28 U.S.C. §§ 995(a)(14), (15), (20).

² *See* U.S. Sentencing Comm'n, Supplementary Report on the Initial Sentencing Guidelines and Policy Statements 41–44 (1987), http://www.ussc.gov/sites/default/files/pdf/guidelines-manual/1987/manual-pdf/1987_Supplementary_Report_Initial_Sentencing_Guidelines.pdf (hereinafter Supplementary Report); *see also* U.S. Sentencing Comm'n, Recidivism Among Offenders Receiving Retroactive Sentence Reductions: The 2007 Crack Cocaine Amendment (2014), http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/miscellaneous/20140527_Recidivism_2007_Crack_Cocaine_Amendment.pdf (hereinafter Crack Cocaine Recidivism Report); U.S. Sentencing Comm'n, Report to Congress: Federal Child Pornography Offenses 293–310 (2012), http://www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-and-reports/sex-offense-topics/201212-federal-child-pornography-offenses/Full_Report_to_Congress.pdf (hereinafter Child Pornography Report); U.S. Sentencing Comm'n, A Comparison of the Federal Sentencing Guidelines Criminal History Category and the U.S. Parole Commission Salient Factor Score (2005), http://www.ussc.gov/sites/default/files/pdf/research-and-publications/2005/20051004_Recidivism_Salient_Factor_Computation.pdf (hereinafter Salient Factor Score); U.S. Sentencing Comm'n, Recidivism and the "First Offender" (2004), http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_First_Offender.pdf (hereinafter First Offender); U.S. Sentencing Comm'n, Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines (2004), http://www.ussc.gov/sites/default/files/pdf/research-and-publications/2004/200405_Recidivism_Criminal_History.pdf (hereinafter Measuring Recidivism).

³ 18 U.S.C. § 3553(a)(2)(C).

⁴ The SRA provides that:

The court, in determining the particular sentence to be imposed, shall consider. . . the need for the sentence imposed—

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

*Id.*; *see also* 28 U.S.C. § 991(b) ("[T]he United States Sentencing Commission [shall] establish sentencing policies and practices for the Federal criminal justice system that . . . assure the meeting of the purposes of sentencing as set forth in section 3553(a)(2) of title 18, United States Code."). The SRA requires courts and the Commission to consider both general and specific deterrence. *See United States v. Martin*, 455 F.3d 1227, 1240 (11ᵗʰ Cir. 2006).

⁵ 28 U.S.C. § 991(b)(2).

⁶ *See* Supplementary Report, *supra* note 2, at 41–44.

7  *See* MEASURING RECIDIVISM, *supra* note 2.

8  *See generally* SALIENT FACTOR SCORE, *supra* note 2; FIRST OFFENDER, *supra* note 2.

9  *See* CRACK COCAINE RECIDIVISM REPORT, *supra* note 2; CHILD PORNOGRAPHY REPORT, *supra* note 2, at 293-310.

10  *See, e.g.,* Final Priorities for Amendment Cycle, 79 FED. REG. 49378, 49379 (Aug. 20, 2014) ("Pursuant to 28 U.S.C. § 994(g), the Commission intends to consider the issue of reducing costs of incarceration and overcapacity of prisons, to the extent it is relevant to any identified priority.").

11  *See, e.g.,* U.S. SENTENCING COMM'N, ANNUAL REPORT: FISCAL YEAR 2014, A-5 (2014).

12  Courtney Semisch, U.S. SENTENCING COMM'N, ALTERNATIVE SENTENCING IN THE FEDERAL CRIMINAL JUSTICE SYSTEM (2015), http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/alternatives/20150617_Alternatives.pdf.

13  FEDERAL BUREAU OF PRISONS, *Statistics*, https://web.archive.org/web/20160211120327/https://www.bop.gov/about/statistics/population_statistics.jsp (Feb. 11, 2016) (reporting 195,730 inmates, including 44,362 non-citizens).

14  BUREAU OF JUSTICE STATISTICS, PRISONERS IN 2014, http://www.bjs.gov/content/pub/pdf/p14.pdf (1,561,500 state prisoners as of 2014).

15  *See* USSG, App'x C, amend. 782 ("Reason for Amendment") (in voting to apply an amendment to the drug-trafficking guidelines that reduced offense levels for many offenders, the Commission noted that it "was informed by its studies that compared recidivism rates for offenders who were released early as a result of retroactive application of the Commission's 2007 crack cocaine amendment with a control group of offenders who served their full terms of imprisonment").

16  Judges are required to apply the federal sentencing guidelines, now "advisory" guidelines following United States v. Booker, 543 U.S. 220 (2005), before deciding what sentence to impose and these guidelines continue to have a significant policy effect on federal sentencing. *See, e.g.,* Peugh v. United States, 133 S. Ct. 2072, 2084 (2013) ("[C]onsiderable empirical evidence indicat[es] that the Sentencing Guidelines have the intended effect of influencing the sentences imposed by judges.").

17  *See* NAT'L INST. OF JUSTICE, *Recidivism*, https://web.archive.org/web/20160120175242/http://www.nij.gov/topics/corrections/recidivism/pages/welcome.aspx (Jan. 20, 2016).

18  *See* MICHAEL D. MALTZ, RECIDIVISM 7-20 (2001); *see also* Ryan King & Brian Elderbroom, *Improving Recidivism as a Performance Measure*, URBAN INSTITUTE (2014), https://www.bja.gov/Publications/UI-ImprovingRecidivism.pdf.

19  *See, e.g.,* Christopher T. Lowenkamp, Marie VanNostrand, and Alexander Holsinger, INVESTIGATING THE IMPACT OF PRETRIAL DETENTION ON SENTENCING OUTCOMES (2013), http://pretrialnola.org/wp-content/uploads/2015/09/Investigating-the-Impact-of-Pretrial-Detention-on-Sentencing-Outcomes-2013-.pdf; Elizabeth Drake, Steve Aos, and Marna Miller, *Evidence Based Public Policy Options to Reduce Crime and Criminal Justice Costs: Implications in Washington State*, *in* 4 VICTIMS AND OFFENDERS 170-96 (2009); NAT'L RESEARCH COUNCIL, PAROLE, DESISTANCE FROM CRIME, AND COMMUNITY INTEGRATION, 19-31 (2008).

20  *Recidivism*, *supra* note 18 ("[R]ecidivism is measured by rearrest, reconviction or return to prison."); *See also*, NAT'L INST. OF JUSTICE, *Measuring Recidivism*, https://web.archive.org/web/20160129195540/http://www.nij.gov/topics/corrections/recidivism/pages/measuring.aspx (Jan. 29, 2016) ("The timing of recidivism is key not only to its measurement but also to understanding the processes underlying the effects of sanctions and interventions with respect to the propensity of the individual to commit crime.")

21  *See* MALTZ, *supra* note 18, at 20-21, 28-29, 55-58; *Improving Recidivism as a Performance Measure*, *supra* note 19.

22  Arrests for alleged violations of probation, supervised release, or state parole (as well as actual revocations of any these types of supervision) were counted as rearrests. Revocations were not counted as reconvictions because the offenders were not convicted of a new offense (even if the basis for revocation was a "new law violation"). Offenders whose terms of supervision were revoked and who were sentenced to imprisonment were treated as reincarcerations.

23  *See* MALTZ, *supra* note 18; *Improving Recidivism as a Performance Measure, supra* note 18.

24  Matthew Durose, Alexia Cooper, and Howard Snyder, BUREAU OF JUSTICE STATISTICS, *Recidivism of Prisoners Released in 30 States in 2005: Patterns from 2005 to 2010* (2014) (hereinafter *Prisoners Released in 30 States in 2005*), http://www.bjs.gov/content/pub/pdf/rprts05p0510.pdf.

25  William Rhodes, et al., ABT ASSOCIATES, *Recidivism of Offenders on Federal Community Supervision* (2012), https://www.ncjrs.gov/pdffiles1/bjs/grants/241018.pdf.

26  *Recidivism of Prisoners Released in 30 States in 2005, supra* note 24 (discussing the methodology employed by BJS for collecting and processing criminal records for recidivism research). The Bureau of Justice Statistics is the United States' primary source for criminal justice statistics, including statistics on crime, criminal offenders, victims of crime, and the operation of justice systems at all levels of government. *See* http://www.bjs.gov/index.cfm?ty=abu. Appendix B of this report discusses the procedures employed by the Commission.

27  All of the federal offenders who re-entered the community after discharging their sentences of incarceration had served those sentences continuously from the time of the imposition of the sentences until the time of the offenders' re-entry in 2005. None of the offenders released from their sentences of incarceration in 2005 had previously been returned to prison upon revocation of probation or supervised release terms imposed in connection with their instant federal offenses of conviction.

28  *See Prisoners Released in 30 States in 2005, supra* note 24.

29  Immigration crimes committed by citizens are most commonly sentenced under USSG §2L1.1 (alien smuggling) rather than USSG §2L1.2 (illegal reentry).

30  *See generally* USSG §§4A1.1; 4A1.2.

31  543 U.S. 220 (2005).

32  These four different sentence types correspond to the four "Zones" (A-D) in the Sentencing Table in the *Guidelines Manual*. *See* USSG, Ch. 5, Pt. A (Sentencing Table); *see also* USSG §§5B1.1 & 5C1.1 (setting forth the sentencing options for Zones A-D). Zone A authorizes probation only; Zone B authorizes probation with a condition of confinement; Zone C authorizes a "split" sentence of imprisonment and community confinement (*e.g.,* home detention or a halfway house); and Zone D authorizes sentences of imprisonment only. *See* USSG §§5B1.1 & 5C1.1.

33  Of the offenders who received a Zone B sentence of probation with a condition of confinement, only 0.9 percent served the confinement in a jail or prison. The remainder served their confinement in home detention or in community confinement such as a halfway house.

34  The small percentage of offenders who received a fine only (65 members of the study group) are excluded from the analysis.

35  Imprisonment sentences are sentences to a term of confinement in the Federal Bureau of Prisons (BOP) with or without a sentence to community confinement or probation to follow (as a condition of supervised release pursuant to USSG §5C1.1(c)(2) or (d)(2)). Probation sentences may include either a period of community confinement. The term alternative confinement refers to a period of confinement in a location other than a BOP facility, usually home detention or a halfway house.

Typically, federal offenders sentenced to terms of imprisonment of less than one year serve their sentences in a local jail or detention center rather than a federal prison. *See* FED. BUREAU OF PRISONS, LEGAL RESOURCE GUIDE TO THE FEDERAL BUREAU OF PRISONS, 2014, 10 (2014),

https://www.bop.gov/resources/pdfs/legal_guide.pdf ("The BOP will often contract with a local jail or detention center to house an inmate sentenced to a term of one year or less."). Regardless of whether a federal offender served his or her sentence in a jail or prison, that sentence will be deemed a "sentence of imprisonment" for the analyses that follow.

36  U.S. SENTENCING COMM'N, FEDERAL OFFENDERS SENTENCED TO SUPERVISED RELEASE 4-9 (2010).

37  *Booker*, 543 U.S. 220.

38  *Id.* at 245.

39  U.S. SENTENCING COMM'N, REPORT ON THE CONTINUING IMPACT OF U.S. v. BOOKER ON FEDERAL SENTENCING 7 (2012).

40  *See Prisoners Released in 30 States in 2005, supra* note 24. The inmates released from 30 state prisons in 2005 included in the BJS study differ from the population released from federal prison that same year in several respects. A quarter (25.7 percent) of released state inmates had a violent commitment offense compared to only 6.8 percent of inmates released from federal prison. State offenders were more likely to be under 40 (68.5 percent) and male (89.3 percent) than the federal offenders (60.1 percent under age 40 and 85.9 percent male). The BJS study also included non-U.S. citizens, a category of offender excluded from the Commission's study.

41  The National Advisory Commission on Criminal Justice Standards and Goals recommends a three year follow-up period, but recognizes this as "an arbitrary figure." NATIONAL ADVISORY COMMISSION ON CRIMINAL JUSTICE STANDARDS AND GOALS, CORRECTIONS 529 (1973)

42  *See* USSG, Ch.4, Pt.A, intro. comment.

43  *See* SUPPLEMENTARY REPORT, *supra* note 2, at 41-44.

44  *See* RHODES, *supra* note 25 at 12; Alfred Blumstein, David P. Farrington, and Soumyo Moitra, CRIME AND JUSTICE: A REVIEW OF RESEARCH 216 (1985), *Delinquency Careers: Innocents, Desisters, and Persisters.* In two major cohort studies, the recidivism probability of youthful offenders rose with successive involvements with law enforcement; Paul Gendreau, Tracy Little, and Claire Goggin, Criminology, (2008), *A Meta-Analysis Of The Predictors Of Adult Offender Recidivism: What Works!* at 575. A meta-analysis of 131 studies found the strongest predictors of recidivism included criminogenic needs, criminal history, social achievement, age/gender/race, and family factors.

45  USSG, Ch.4, Pt.A, intro. comment.

46  This group falls within CHC IV.

47  Career Offenders are persons who commit a crime of violence or drug trafficking crime after being convicted of two prior felony drug trafficking or crime of violence offenses. *See* USSG §4B1.1.

48  Armed Career Criminals are persons subject to an enhanced sentence under the provisions of 18 U.S.C. § 924(e). USSG §4B1.4.

49  *See, e.g.,* USSG §2H4.1, comment (backg'd) (1995) ("For purposes of deterrence and just punishment, the minimum base offense level is 15.").

50  *See, e.g.,* USSG §2D1.1(b)(1).

51  USSG §3B1.1.

# APPENDIX A-1

## Rearrest Rates Across Selected Variables

# Rearrest Rates Across Selected Variables

*Criminal History*

| | Total | N | % |
|---|---|---|---|
| **Total** | 25,431 | 12,527 | 49.3% |
| **Criminal History Category** | | | |
| CHC I | 13,581 | 4,594 | 33.8% |
| CHC II | 3,084 | 1,674 | 54.3% |
| CHC III | 3,616 | 2,288 | 63.3% |
| CHC IV | 1,996 | 1,490 | 74.7% |
| CHC V | 1,121 | 872 | 77.8% |
| CHC VI | 1,923 | 1,541 | 80.1% |
| **Criminal History Points** | | | |
| 0 | 10,600 | 3,196 | 30.2% |
| 1 | 2,973 | 1,394 | 46.9% |
| 2 | 1,251 | 701 | 56.0% |
| 3 | 1,838 | 969 | 52.7% |
| 4 | 1,361 | 809 | 59.4% |
| 5 | 1,041 | 659 | 63.3% |
| 6 | 1,277 | 853 | 66.8% |
| 7 | 693 | 493 | 71.1% |
| 8 | 741 | 548 | 74.0% |
| 9 | 708 | 539 | 76.1% |
| 10 | 463 | 358 | 77.3% |
| More than 10 | 2,400 | 1,956 | 81.5% |
| **Career Offender/Armed Career Criminal Status** | | | |
| No Career Offender/Armed Career Criminal | 24,798 | 12,087 | 48.7% |
| Career Offender/Armed Career Criminal | 633 | 440 | 69.5% |

*Appendix A-1*

## Rearrest Rates Across Selected Variables

*Offense Level and Offense Type*

| | Total | N | % |
|---|---|---|---|
| **Final Offense Level** | | | |
| 1 to 8 | 3,020 | 1,364 | 45.2% |
| 9 to 10 | 1,598 | 679 | 42.5% |
| 11 to 12 | 1,972 | 1,023 | 51.9% |
| 13 to 16 | 3,981 | 1,949 | 49.0% |
| 17 to 21 | 5,283 | 2,783 | 52.7% |
| 22 to 25 | 3,676 | 1,945 | 52.9% |
| 26 to 30 | 3,214 | 1,538 | 47.9% |
| 31 to 43 | 2,580 | 1,180 | 45.7% |
| | | | |
| **Federal Offense Type** | | | |
| Drug Trafficking | 10,591 | 5,288 | 49.9% |
| Firearms | 3,244 | 2,216 | 68.3% |
| Fraud | 3,450 | 1,181 | 34.2% |
| Robbery | 1,100 | 740 | 67.3% |
| Larceny | 994 | 441 | 44.4% |
| Immigration | 891 | 496 | 55.7% |
| All Other | 5,159 | 2,165 | 42.0% |

## Rearrest Rates Across Selected Variables

*Offense Characteristics*

| | Total | N | % |
|---|---|---|---|
| **Weapon Enhancement** | | | |
| No Weapon Enhancement | 22,932 | 11,143 | 48.6% |
| Weapon Enhancement | 2,499 | 1,384 | 55.4% |
| | | | |
| **Aggravating Role** | | | |
| No Adjustment | 23,789 | 11,931 | 50.2% |
| +2 Levels | 872 | 325 | 37.3% |
| +3 Levels | 315 | 112 | 35.6% |
| +4 Levels | 439 | 148 | 33.7% |
| | | | |
| **Mitigating Role** | | | |
| No Adjustment | 22,726 | 11,287 | 49.7% |
| -2 Levels | 2,010 | 948 | 47.2% |
| -3 Levels | 232 | 87 | 37.5% |
| -4 Levels | 447 | 195 | 43.6% |
| | | | |
| **Acceptance of Responsibility** | | | |
| No Adjustment | 2,372 | 1,099 | 46.3% |
| -2 Levels | 7,297 | 3,403 | 46.6% |
| -3 Levels | 15,723 | 8,003 | 50.9% |

## Rearrest Rates Across Selected Variables

*Sentences Imposed*

| | Total | N | % |
|---|---|---|---|
| **Sentence Type** | | | |
| Probation Only | 4,754 | 1,670 | 35.1% |
| Prison Only | 20,575 | 10,810 | 52.5% |
| | | | |
| **Length of Sentence** | | | |
| Up to 6 Months | 1,048 | 393 | 37.5% |
| 6 to 11 Months | 762 | 387 | 50.8% |
| 12 to 23 Months | 3,655 | 1,857 | 50.8% |
| 24 to 59 Months | 8,023 | 4,334 | 54.0% |
| 60 to 119 Months | 4,552 | 2,525 | 55.5% |
| 120 Months or More | 2,521 | 1,306 | 51.8% |
| | | | |
| **Sentence Relative to the Guideline Range** | | | |
| Within Range | 15,680 | 7,881 | 50.3% |
| Above Range | 197 | 117 | 59.4% |
| 5K1.1 Departure | 5,112 | 2,430 | 47.5% |
| Other Government Sponsored Below Range | 520 | 261 | 50.2% |
| Non-Government Sponsored Below Range | 2,134 | 964 | 45.2% |
| | | | |
| **Length of Supervised Release** | | | |
| No Supervised Release | 121 | 60 | 49.6% |
| Less than 2 Years | 627 | 307 | 49.0% |
| 2 Years | 1,736 | 813 | 46.8% |
| 3 Years | 11,097 | 6,149 | 55.4% |
| 4 Years | 1,793 | 864 | 48.2% |
| 5 to 9 Years | 5,068 | 2,559 | 50.5% |
| 10 or More Years | 124 | 53 | 42.7% |

## Rearrest Rates Across Selected Variables

### Offender Characteristics

| | Total | N | % |
|---|---|---|---|
| **Age at Sentencing** | | | |
| Younger than 21 | 1,226 | 872 | 71.1% |
| 21 to 25 | 4,737 | 3,105 | 65.6% |
| 26 to 30 | 4,746 | 2,755 | 58.1% |
| 31 to 35 | 3,895 | 1,984 | 50.9% |
| 36 to 40 | 3,347 | 1,587 | 47.4% |
| 41 to 50 | 4,569 | 1,639 | 35.9% |
| 51 to 60 | 2,125 | 462 | 21.7% |
| Older than 60 | 741 | 104 | 14.0% |
| **Age at Release** | | | |
| Younger than 21 | 398 | 269 | 67.6% |
| 21 to 25 | 2,986 | 1,984 | 66.4% |
| 26 to 30 | 4,325 | 2,692 | 62.2% |
| 31 to 35 | 4,584 | 2,533 | 55.3% |
| 36 to 40 | 3,762 | 1,834 | 48.8% |
| 41 to 50 | 5,551 | 2,353 | 42.4% |
| 51 to 60 | 2,732 | 675 | 24.7% |
| Older than 60 | 1,048 | 168 | 16.0% |
| **Gender** | | | |
| Male | 20,758 | 10,825 | 52.2% |
| Female | 4,664 | 1,696 | 36.4% |
| **Race/Ethnicity** | | | |
| White | 11,099 | 4,628 | 41.7% |
| Black | 8,617 | 5,089 | 59.1% |
| Hispanic | 4,512 | 2,213 | 49.1% |
| Other | 1,179 | 582 | 49.4% |
| **Level of Education** | | | |
| Less than High School | 8,656 | 5,230 | 60.4% |
| High School Graduate | 9,324 | 4,724 | 50.7% |
| Some College | 5,409 | 2,126 | 39.3% |
| College Graduate | 1,884 | 359 | 19.1% |

# APPENDIX A-2

## Reconviction Rates Across Selected Variables

**Reconviction Rates Across Selected Variables**

*Criminal History*

| | Total | N | % |
|---|---|---|---|
| **Total** | 25,431 | 8,062 | 31.7% |
| **Criminal History Category** | | | |
| CHC I | 13,581 | 2,701 | 19.9% |
| CHC II | 3,084 | 1,019 | 33.0% |
| CHC III | 3,616 | 1,494 | 41.3% |
| CHC IV | 1,996 | 1,030 | 51.6% |
| CHC V | 1,121 | 634 | 56.6% |
| CHC VI | 1,923 | 1,140 | 59.3% |
| **Criminal History Points** | | | |
| 0 | 10,600 | 1,844 | 17.4% |
| 1 | 2,973 | 856 | 28.8% |
| 2 | 1,251 | 432 | 34.5% |
| 3 | 1,838 | 587 | 31.9% |
| 4 | 1,361 | 530 | 38.9% |
| 5 | 1,041 | 435 | 41.8% |
| 6 | 1,277 | 543 | 42.5% |
| 7 | 693 | 320 | 46.2% |
| 8 | 741 | 385 | 52.0% |
| 9 | 708 | 377 | 53.3% |
| 10 | 463 | 246 | 53.1% |
| More than 10 | 2,400 | 1,473 | 61.4% |
| **Career Offender/Armed Career Criminal Status** | | | |
| No Career Offender/Armed Career Criminal | 24,798 | 7,761 | 31.3% |
| Career Offender/Armed Career Criminal | 633 | 301 | 47.6% |

**Reconviction Rates Across Selected Variables**

*Offense Level and Offense Type*

| | Total | N | % |
|---|---|---|---|
| **Final Offense Level** | | | |
| 1 to 8 | 3,020 | 898 | 29.7% |
| 9 to 10 | 1,598 | 437 | 27.4% |
| 11 to 12 | 1,972 | 688 | 34.9% |
| 13 to 16 | 3,981 | 1,291 | 32.4% |
| 17 to 21 | 5,283 | 1,843 | 34.9% |
| 22 to 25 | 3,676 | 1,217 | 33.1% |
| 26 to 30 | 3,214 | 943 | 29.3% |
| 31 to 43 | 2,580 | 704 | 27.3% |
| | | | |
| **Federal Offense Type** | | | |
| Drug Trafficking | 10,591 | 3,259 | 30.8% |
| Firearms | 3,244 | 1,541 | 47.5% |
| Fraud | 3,450 | 731 | 21.2% |
| Robbery | 1,100 | 501 | 45.6% |
| Larceny | 994 | 296 | 29.8% |
| Immigration | 891 | 336 | 37.7% |
| All Other | 5,159 | 1,398 | 27.1% |

## Reconviction Rates Across Selected Variables

*Offense Characteristics*

| | Total | N | % |
|---|---|---|---|
| **Weapon Enhancement** | | | |
| No Weapon Enhancement | 22,932 | 7,177 | 31.3% |
| Weapon Enhancement | 2,499 | 885 | 35.4% |
| | | | |
| **Aggravating Role** | | | |
| No Adjustment | 23,789 | 7,704 | 32.4% |
| +2 Levels | 872 | 204 | 23.4% |
| +3 Levels | 315 | 68 | 21.6% |
| +4 Levels | 439 | 81 | 18.5% |
| | | | |
| **Mitigating Role** | | | |
| No Adjustment | 22,276 | 7,298 | 32.1% |
| -2 Levels | 2,010 | 587 | 29.2% |
| -3 Levels | 232 | 47 | 20.3% |
| -4 Levels | 447 | 125 | 28.0% |
| | | | |
| **Acceptance of Responsibility** | | | |
| No Adjustment | 2,372 | 661 | 27.9% |
| -2 Levels | 7,297 | 2,244 | 30.8% |
| -3 Levels | 15,723 | 5,143 | 32.7% |

## Reconviction Rates Across Selected Variables

*Sentences Imposed*

| | Total | N | % |
|---|---|---|---|
| **Sentence Type** | | | |
| Probation Only | 4,754 | 1,028 | 21.6% |
| Prison Only | 20,575 | 7,007 | 34.1% |
| | | | |
| **Length of Sentence** | | | |
| Up to 6 Months | 1,048 | 246 | 23.5% |
| 6 to 11 Months | 762 | 243 | 31.9% |
| 12 to 23 Months | 3,655 | 1,239 | 33.9% |
| 24 to 59 Months | 8,023 | 2,840 | 35.4% |
| 60 to 119 Months | 4,552 | 1,613 | 35.4% |
| 120 Months or More | 2,521 | 819 | 32.5% |
| | | | |
| **Sentence Relative to the Guideline Range** | | | |
| Within Range | 15,680 | 5,115 | 32.6% |
| Above Range | 197 | 88 | 44.7% |
| 5K1.1 Departure | 5,112 | 1,526 | 29.9% |
| Other Government Sponsored Below Range | 520 | 168 | 32.3% |
| Non-Government Sponsored Below Range | 2,134 | 602 | 28.2% |
| | | | |
| **Length of Supervised Release** | | | |
| No Supervised Release | 121 | 41 | 33.9% |
| Less than 2 Years | 627 | 188 | 30.0% |
| 2 Years | 1,736 | 533 | 30.7% |
| 3 Years | 11,097 | 4,130 | 37.2% |
| 4 Years | 1,793 | 524 | 29.2% |
| 5 to 9 Years | 5,068 | 1,558 | 30.7% |
| 10 or More Years | 124 | 30 | 24.2% |

## Reconviction Rates Across Selected Variables

*Offender Characteristics*

| | Total | N | % |
|---|---|---|---|
| **Age at Sentencing** | | | |
| Younger than 21 | 1,226 | 635 | 51.8% |
| 21 to 25 | 4,737 | 2,128 | 44.9% |
| 26 to 30 | 4,746 | 1,764 | 37.2% |
| 31 to 35 | 3,895 | 1,290 | 33.1% |
| 36 to 40 | 3,347 | 989 | 29.6% |
| 41 to 50 | 4,569 | 931 | 20.4% |
| 51 to 60 | 2,125 | 253 | 11.9% |
| Older than 60 | 741 | 59 | 8.0% |
| | | | |
| **Age at Release** | | | |
| Younger than 21 | 398 | 193 | 48.5% |
| 21 to 25 | 2,986 | 1,424 | 47.7% |
| 26 to 30 | 4,325 | 1,779 | 41.1% |
| 31 to 35 | 4,584 | 1,614 | 35.2% |
| 36 to 40 | 3,762 | 1,151 | 30.6% |
| 41 to 50 | 5,551 | 1,428 | 25.7% |
| 51 to 60 | 2,732 | 366 | 13.4% |
| Older than 60 | 1,048 | 94 | 9.0% |
| | | | |
| **Gender** | | | |
| Male | 20,758 | 7,022 | 33.8% |
| Female | 4,664 | 1,035 | 22.2% |
| | | | |
| **Race/Ethnicity** | | | |
| White | 11,099 | 2,999 | 27.0% |
| Black | 8,617 | 3,237 | 37.6% |
| Hispanic | 4,512 | 1,409 | 31.2% |
| Other | 1,179 | 408 | 34.6% |
| | | | |
| **Level of Education** | | | |
| Less than High School | 8,656 | 3,484 | 40.3% |
| High School Graduate | 9,324 | 3,041 | 32.6% |
| Some College | 5,409 | 1,279 | 23.7% |
| College Graduate | 1,884 | 196 | 10.4% |

# APPENDIX A-3

## Reincarceration Rates Across Selected Variables

## Reincarceration Rates Across Selected Variables

*Criminal History*

| | Total | N | % |
|---|---|---|---|
| **Total** | 25,431 | 6,266 | 24.6% |
| **Criminal History Category** | | | |
| CHC I | 13,581 | 1,897 | 14.0% |
| CHC II | 3,084 | 737 | 23.9% |
| CHC III | 3,616 | 1,189 | 32.9% |
| CHC IV | 1,996 | 868 | 43.5% |
| CHC V | 1,121 | 554 | 49.4% |
| CHC V | 1,923 | 986 | 51.3% |
| **Criminal History Points** | | | |
| 0 | 10,600 | 1,296 | 12.2% |
| 1 | 2,973 | 600 | 20.2% |
| 2 | 1,251 | 303 | 24.2% |
| 3 | 1,838 | 434 | 23.6% |
| 4 | 1,361 | 401 | 29.5% |
| 5 | 1,041 | 355 | 34.1% |
| 6 | 1,277 | 442 | 34.6% |
| 7 | 693 | 263 | 38.0% |
| 8 | 741 | 322 | 43.5% |
| 9 | 708 | 326 | 46.1% |
| 10 | 463 | 215 | 46.4% |
| More than 10 | 2,400 | 1,281 | 53.4% |
| **Career Offender/Armed Career Criminal Status** | | | |
| No Career Offender/Armed Career Criminal | 24,798 | 6,012 | 24.2% |
| Career Offender/Armed Career Criminal | 633 | 254 | 40.1% |

*Appendix A-3*

## Reincarceration Rates Across Selected Variables
### Offense Level and Offense Type

| | Total | N | % |
|---|---|---|---|
| **Final Offense Level** | | | |
| 1 to 8 | 3,020 | 631 | 20.9% |
| 9 to 10 | 1,598 | 320 | 20.0% |
| 11 to 12 | 1,972 | 536 | 27.2% |
| 13 to 16 | 3,981 | 1,034 | 26.0% |
| 17 to 21 | 5,283 | 1,488 | 28.2% |
| 22 to 25 | 3,676 | 934 | 25.4% |
| 26 to 30 | 3,214 | 744 | 23.2% |
| 31 to 43 | 2,580 | 546 | 21.2% |
| | | | |
| **Federal Offense Type** | | | |
| Drug Trafficking | 10,591 | 2,475 | 23.4% |
| Firearms | 3,244 | 1,258 | 38.8% |
| Fraud | 3,450 | 514 | 14.9% |
| Robbery | 1,100 | 443 | 40.3% |
| Larceny | 994 | 225 | 22.6% |
| Immigration | 891 | 272 | 30.5% |
| All Other | 5,159 | 1,079 | 20.9% |

## Reincarceration Rates Across Selected Variables

*Offense Characteristics*

| | Total | N | % |
|---|---|---|---|
| **Weapon Enhancement** | | | |
| No Weapon Enhancement | 22,932 | 5,550 | 24.2% |
| Weapon Enhancement | 2,499 | 716 | 28.7% |
| | | | |
| **Aggravating Role** | | | |
| No Adjustment | 23,789 | 5,994 | 25.2% |
| +2 Levels | 872 | 154 | 17.7% |
| +3 Levels | 315 | 46 | 14.6% |
| +4 Levels | 439 | 67 | 15.3% |
| | | | |
| **Mitigating Role** | | | |
| No Adjustment | 22,276 | 5,693 | 25.1% |
| -2 Levels | 2,010 | 442 | 22.0% |
| -3 Levels | 232 | 34 | 14.7% |
| -4 Levels | 447 | 92 | 20.6% |
| | | | |
| **Acceptance of Responsibility** | | | |
| No Adjustment | 2,372 | 524 | 22.1% |
| -2 Levels | 7,297 | 1,664 | 22.8% |
| -3 Levels | 15,723 | 4,066 | 25.9% |

*Appendix A-3*

## Reincarceration Rates Across Selected Variables

*Sentences Imposed*

| | Total | N | % |
|---|---|---|---|
| **Sentence Type** | | | |
| Probation | 4,754 | 624 | 13.1% |
| Prison | 20,575 | 5,620 | 27.3% |
| | | | |
| **Length of Sentence** | | | |
| Up to 6 Months | 1,048 | 169 | 16.1% |
| 6 to 11 Months | 762 | 180 | 23.6% |
| 12 to 23 Months | 3,655 | 1,015 | 27.8% |
| 24 to 59 Months | 8,023 | 2,299 | 28.6% |
| 60 to 119 Months | 4,552 | 1,283 | 28.2% |
| 120 Months or More | 2,521 | 676 | 26.8% |
| | | | |
| **Sentence Relative to the Guideline Range** | | | |
| Within Range | 15,680 | 4,021 | 25.6% |
| Above Range | 197 | 83 | 42.1% |
| 5K1.1 Departure | 5,112 | 1,132 | 22.1% |
| Other Government Sponsored Below Range | 520 | 137 | 26.4% |
| Non-Government Sponsored Below Range | 2,134 | 460 | 21.6% |
| | | | |
| **Length of Supervised Release** | | | |
| No Supervised Release | 121 | 35 | 28.9% |
| Less than 2 Years | 627 | 144 | 23.0% |
| 2 Years | 1,736 | 421 | 24.3% |
| 3 Years | 11,097 | 3,361 | 30.3% |
| 4 Years | 1,793 | 396 | 22.1% |
| 5 to 9 Years | 5,068 | 1,242 | 24.5% |
| 10 or More Years | 124 | 19 | 15.3% |

# Reincarceration Rates Across Selected Variables

*Offender Characteristics*

| | Total | N | % |
|---|---|---|---|
| **Age at Sentencing** | | | |
| Younger than 21 | 1,226 | 528 | 43.1% |
| 21 to 25 | 4,737 | 1,679 | 35.4% |
| 26 to 30 | 4,746 | 1,382 | 29.1% |
| 31 to 35 | 3,895 | 994 | 25.5% |
| 36 to 40 | 3,347 | 738 | 22.1% |
| 41 to 50 | 4,569 | 707 | 15.5% |
| 51 to 60 | 2,125 | 187 | 8.8% |
| Older than 60 | 741 | 42 | 5.7% |
| | | | |
| **Age at Release** | | | |
| Younger than 21 | 398 | 142 | 35.7% |
| 21 to 25 | 2,986 | 1,137 | 38.1% |
| 26 to 30 | 4,325 | 1,392 | 32.2% |
| 31 to 35 | 4,584 | 1,246 | 27.2% |
| 36 to 40 | 3,762 | 882 | 23.4% |
| 41 to 50 | 5,551 | 1,108 | 20.0% |
| 51 to 60 | 2,732 | 281 | 10.3% |
| Older than 60 | 1,048 | 69 | 6.6% |
| | | | |
| **Gender** | | | |
| Male | 20,758 | 5,560 | 26.8% |
| Female | 4,664 | 703 | 15.1% |
| | | | |
| **Race/Ethnicity** | | | |
| White | 11,099 | 2,266 | 20.4% |
| Black | 8,617 | 2,531 | 29.4% |
| Hispanic | 4,512 | 1,111 | 24.6% |
| Other | 1,179 | 351 | 29.8% |
| | | | |
| **Level of Education** | | | |
| Less than High School | 8,656 | 2,809 | 32.5% |
| High School Graduate | 9,324 | 2,344 | 25.1% |
| Some College | 5,409 | 929 | 17.2% |
| College Graduate | 1,884 | 134 | 7.1% |

# APPENDIX B

## Data Collection and Analysis Process

# Appendix B: Overview

Previous Commission recidivism studies required manual coding of criminal records from state and federal criminal history records (*i.e.*, RAP sheets). This project has used technological advances to greatly expand the number of federal offender records analyzed as compared to previous Commission studies by collecting RAP sheets electronically. This appendix describes this data collection and analysis process.

The Commission entered into a data sharing agreement with the FBI's Criminal Justice Information Services (CJIS) Division and the Administrative Office of the United States Courts (AO) to provide the Commission with secure electronic access to criminal history records through the CJIS's Interstate Identification Index (III) and the International Justice and Public Safety Network (NLETS). Results received using this system provide an individual's criminal history record maintained by all U.S. states, the District of Columbia, and federal agencies.[1] Once automated records were obtained, the Commission went through an extensive process to organize and standardize offense and court disposition descriptions across all reporting agencies with the assistance of NORC at the University of Chicago (NORC). The resulting database contained 30,182 offenders who had valid identifying information and were released during the study period, which included primarily calendar year 2005 (25,431 offenders) but was extended before and after this year to expand the sample for certain subgroups of offenders (4,751 offenders). This process, described below, began in 2014 and the database was completed in August 2015.

## *Collecting the Study Group from Commission and Other Records*

Identifying information, including FBI numbers required by the NLETS system, was collected on 36,007 offenders from Commission, Federal Bureau of Prisons (BOP), and AO sources. The primary study cohort includes all federal offenders who were either released from federal prison after serving a sentence of imprisonment or were placed on probation in 2005. For offenders released from prison, the BOP provided release dates, identifying information, some reincarceration information, and other relevant information which allowed the Commission to identify offenders who could not be reliably studied (*e.g.*, those who died while incarcerated). For offenders placed on probation, the AO

provided identifying information, some revocation information, and other relevant information (*e.g.*, death while under supervision).

Criminal history records were also drawn from two secondary offender groups for inclusion in possible future studies. The first group selected for additional collection was citizen offenders sentenced under USSG §4B1.1 (Career Offenders) and §4B1.4 (Armed Career Criminals) re-entering the community in calendar years 2004 and 2006 (in addition to those already included in the 2005 cohort). The second group included additional citizen offenders whose guideline calculations placed them in Zones B or C of the Sentencing Table.[2] In addition to those offenders in Zones B and C who reentered during the 2005 study period, these additional offenders expanded the reentry period to include those reentering the community from May 1, 2003 (beginning of the PROTECT Act period)[3] through calendar year 2006. The purpose of expanding the initial study group in this way was to increase the number of offenders eligible for probation or a shorter incarcerative sentence.

## *Processing the Criminal Records*

Following a practice pioneered by the U.S. Department of Justice's Bureau of Justice Statistics (BJS),[4] the Commission entered into a data sharing agreement with the FBI's CJIS Division and the Administrative Office of the United States Courts to provide the Commission with electronic access to criminal history records through the CJIS's Interstate Identification Index (III) using secure data exchange, which protected these confidential records from inadvertent disclosure. The CJIS's III allows authorized agencies to determine whether any federal or state repository has criminal history records on an individual. When an offender's records were found, each central criminal records repository, responding to III requests over the NLETS network, provided the records via the Administrative Office's Access to Law Enforcement System (ATLAS) secure interface to the Commission. As a result, offender criminal history records were collected from all state and federal agencies in which those records resided.

The ATLAS system returns the literal text in the RAP sheets in the format in which the original records appear: dates of criminal justice system actions (*e.g.*, arrests), offense categories which indicate the charges in the terminology used by that agency (*e.g.*, text strings or numeric categories); subsequent action tied to arrest charges (*e.g.*, charges filed by prosecutors, court findings of guilt, etc.); and sentencing and corrections information. All of these records are subject to availability from the originating source.

The ATLAS system also "parses" records from RAP sheets received from all the states, the District of Columbia, and federal agencies. Parsing records involves organizing key data elements into logical components: sorting into separate criminal justice system stages (arrest, court, and correctional events); organizing all records by date; and linking related elements (such as court action taken in response to an arrest) into a single cycle. Key data elements include offender identifiers, dates of key actions (such as arrests and convictions), the criminal charges, and outcomes such as convictions and sentencing information. The parsing process collates the multi-state records into a uniform structure, regardless of the state, and produces a database for all individuals with a valid FBI number who were found in one or more repositories across the country.

The initial extraction process began in September 2014 and was completed in April 2015. Commission staff examined the raw RAP sheet information and compared it to the parsed records, looking for missing or erroneous translation of information from its raw form to the parsed record. This step is important because criminal history record repositories are continually updating and improving their information systems in ways that change the location or format of key text strings, making software written for an earlier computer platform obsolete for purposes of accurately parsing the data in its intended format and detail. Commission staff worked with ATLAS staff to resolve possible issues in about one-half of the repositories, and as a result records for several state repositories had to be reprocessed after changes to the parsing procedures. In April 2015, this process was complete.

*Standardizing the Criminal Records*

Following the collection of the RAP sheet records on study group offenders, the Commission contracted with NORC to consolidate all records on each offender, organize the records chronologically, and remove duplicative or extraneous material.[5] Minor traffic offenses (*e.g.*, speeding) were removed, but serious traffic-related offenses (*e.g.*, driving while intoxicated) were not removed from the analysis. Following these preliminary process steps, NORC researched state and federal criminal codes and repository data definitions to assign each unique state offense and disposition description to a single uniform description. This step was needed because criminal records repositories are primarily designed to store their records in ways that accurately reflect the requirements of each state or federal repository, such as the criminal code for

that jurisdiction. As a result, any two repositories are likely to use many unique text strings to indicate the nature of the criminal charges and actions taken in response to those charges. Each jurisdiction's information was standardized by NORC for national-level analysis that reflected common definitions.

Using research on each repository, NORC created separate offense "crosswalks" for every state and the District of Columbia, as well as a separate crosswalk for federal repository records. These crosswalks translate any given jurisdiction's arrest and court records into standardized arrest and court codes. Through this standardization, all records, regardless of originating source, were brought into a common framework.

Within each arrest and court cycle, arrest and disposition of charges were categorized using standardized coding which generally follows the BJS model.[6] A charge severity index was created which incorporates both criminal law classification (*e.g.*, felony or misdemeanor) and offense severity. Offense severity was first separated into four broad categories (violent, property, drug, and public order), and then into 16 major arrest charge codes[7] and 98 detailed arrest charge codes used by BJS.[8] The charge severity index ranks murder of a public officer as the most serious charge, followed by 26 other detailed violent charge codes. These detailed violent charge codes are followed in order of severity by five drug trafficking, 16 property, 10 other drug, and 40 public order detailed charge codes. Additionally, court events are coded for charge disposition. After ordering, each charge is assigned a sequence number, and the top three for each event are retained.

Finally, by assembling all federal and state records, the database provides a complete criminal record for all individuals for which valid records could be found, across any jurisdiction maintaining data on that individual. After the receipt of data from NORC, the Commission again reviewed all records for completeness and questionable entries. From the 36,007 offender records initially processed through ATLAS, 1,812 records were eliminated for reasons including apparent death during the study period, missing criminal history records, and missing or suspect information as to United States citizenship. Additionally, 4,013 offenders were released from BOP on detainer, which ordinarily indicates transfer of custody to state court or transfer to a state correctional facility following completion of their federal sentence. These detained offenders were not released into the community during the study period, and their whereabouts are not recorded in the data; therefore, they were also withheld from the study. Over thirty thousand (30,182) usable records remained for analysis.

[1] Of the 262,284 arrest records processed for 2005 releases, these records were almost entirely U.S. state and federal records. However, also included are 345 (0.1%) territorial (non-federal) arrests provided by U.S. territories, primarily by Puerto Rico and the U.S. Virgin Islands.

[2] The guidelines sentencing table provides sentencing ranges based on an offender's offense level and Criminal History Category. *See* USSG, Ch.5 Pt.A. The offense level is calculated using offense specific aggravating and mitigating factors prescribed by the guidelines. *See* USSG §1B1.1(a)(1)-(5). The Criminal History Category is based on the recency and severity of an offender's prior sentences and supervision status. *See* USSG §4A1.1. The sentencing range is determined by "[t]he intersection of the Offense Level and Criminal History Category" on the sentencing table. USSG, Ch.5 Pt.A, comment. (n.1). The sentencing table is subdivided into four zones (A, B, C, and D) that determine confinement options for each sentencing range. Zone B authorizes probation with condition of community confinement (*e.g.*, home detention) and Zone C authorizes a "split" sentence of imprisonment and community confinement. USSG §§5B1.1(a)(2), 5C1.1(d)(2).

[3] In 2003, Congress enacted the Prosecutorial Remedies and Other Tools to end the Exploitation of Children Today Act ("the PROTECT Act"), Pub. L. No. 108-21 (2003), which restricted the use of departures by sentencing courts and changed the appellate standard of review for cases in which departures were imposed. The PROTECT Act restricted the availability of departures. The PROTECT Act period began May 1, 2003.

[4] *See* MATTHEW DUROSE, ALEXIA COOPER & HOWARD SNYDER, BUREAU OF JUSTICE STATISTICS, RECIDIVISM OF PRISONERS RELEASED IN 30 STATES IN 2005: PATTERNS FROM 2005 TO 2010 (2014) (hereinafter PRISONERS RELEASED IN 30 STATES IN 2005), http://www.bjs.gov/content/pub/pdf/rprts05p0510.pdf.

[5] Instances of arrest or sentencing that appeared to be duplicates of existing events were removed by NORC. Certain administrative records were removed after review of each state's procedures demonstrated that some entries were likely to be either reports of non-offending contact with law enforcement (*e.g.*, registration as a sex offender) or other information that pertained to the offender but was not a criminal justice event. Some states included historical data within cycles which caused issues with correct parsing of criminal history information; in these cases, the first court disposition for that cycle was retained and all others removed. Arrest entries that occurred outside of the eight-year follow-up period were removed from the datafiles and were not used to ascertain recidivism.

[6] *See* PRISONERS RELEASED IN 30 STATES IN 2005, *supra* note 4, at 22.

[7] The major arrest charge codes, as ranked by the Commission beginning with the most serious, were homicide, rape or sexual assault, robbery, assault, other violent offense, drug trafficking, burglary, larceny, motor vehicle theft, fraud, other property offense, drug possession, other drug offense, weapons offense (*e.g.*, unlawful sale, etc.), driving under the influence, and other public order offense.

[8] However, unlike the BJS major and detailed charge code rankings, the Commission chose to rank drug trafficking offenses immediately behind violent offenses in order of severity.